**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| **BGH Edelstahl Siegen GmbH** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Ct. No. 21-00080** |
| **United States** | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

On behalf of BGH Edelstahl Siegen GmbH ("BGH"), we hereby bring this civil action and allege the following:

**Parties**

1. BGH is foreign manufacturer and exporter of forged steel fluid end blocks located in Siegen, Germany.

2. Defendant is the United States of America, acting by and through the United States Department of Commerce ("Commerce").

**Jurisdiction**

3. This action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i) to contest Commerce's final determination under 19 U.S.C. §1671d in its countervailing duty investigation of forged steel fluid end blocks ("FEBs") from the Federal Republic of Germany. *See* Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 80011 (Dec. 11, 2020) ("Final Determination"); *see also* Issues and Decision Memorandum (Dec. 7, 2020).

4. Commerce's final affirmative determination resulted in the publication of a

countervailing duty order on January 29, 2021 that subjects fluid end blocks produced by BGH in Germany to countervailing duty deposits and to potential assessments of countervailing duties. *See* Forged Steel Fluid End Blocks from the People's Republic of China, the Federal Republic of Germany, India, and Italy: Countervailing Duty Orders, and Amended Final Affirmative Countervailing Duty Determination for the People's Republic of China, 86 Fed. Reg. 7535 (Jan. 29, 2021) ("Orders"); *see also* Forged Steel Fluid End Blocks from the People's Republic of China, the Federal Republic of Germany, India, and Italy: Correction to Countervailing Duty Orders, 86 Fed. Reg. 10244 (Feb. 19, 2021).

5. Accordingly, this Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## Standing

6. BGH is a foreign manufacturer and exporter of fluid end blocks and participated in the investigations resulting in the contested determinations. Accordingly, plaintiff is an interested party that participated in the underlying administrative proceedings within the meaning of 19 U.S.C. §§ 1516a(d) & (f)(3) and 1677(9)(A).

7. In addition, because Commerce made a final determination that was not lawful or otherwise overstated plaintiff's countervailing duty margins, plaintiff has been adversely affected or aggrieved by agency action within the meaning of Section 702 of Title 5 of the United States Code. Therefore, plaintiff has standing to bring this action under 28 U.S.C. § 2631(c).

## Timeliness

8. A countervailing duty order resulting from Commerce's unlawful determination was published in the *Federal Register* on January 29, 2021. A notice making certain corrections to

countervailing duty orders was published in the *Federal Register* on February 19, 2021. Plaintiff filed a summons instituting this action on February 26, 2021, within 30 days after publication of the initial countervailing duty order. Plaintiff served notice of the action upon all other participants in the investigations on the same date. Plaintiff is filing this complaint within thirty days after filing the aforementioned summons. Plaintiff has thus commenced this action within the time limits specified in 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c) and Rules 3 & 6 of the Rules of this Court.

**Facts**

9. On January 15, 2020, Commerce published a notice of initiation of countervailing duty investigations on forged steel fluid end blocks from the Federal Republic of Germany, India, Italy and the People's Republic of China in the *Federal Register*. 85 Fed. Reg. 2385 (Jan. 15, 2020).

10. In the investigation concerning Germany, BGH was chosen as one of two mandatory respondents and was sent a questionnaire dated February 4, 2020.

11. BGH provided full, accurate and timely responses to all of Commerce's requests for information, submitting several thousand pages of responses, documents and English translations.

12. On May 26, 2020, Commerce published notice of its preliminary determination in the *Federal Register*. 85 Fed. Reg. 31454 (May 26, 2020). In this preliminary determination, BGH was assigned a subsidy rate of 5.25% *ad valorem*.

13. On September 14, 2020, numerous Senior Commerce Officials, including Jeffrey I. Kessler, Assistant Secretary for Enforcement and Compliance, had a telephone conference with Representative Mike Kelly. A memorandum concerning this *ex-parte* telephone conference was

placed on the administrative record in the related antidumping duty investigation but not in this countervailing duty investigation. The memorandum includes a letter from Representative Kelly indicating additional discussions with Dr. Peter Navarro, Director of the Office of Trade and Manufacturing Policy (OTMP).

14. On October 21, 2020, Commerce released a post-preliminary determination. As a result of this post-preliminary determination, BGH's subsidy rate was increased by 0.52%, from of 5.25% to 5.77% *ad valorem*.

15. Despite the very late amendment to the preliminary determination, Commerce required case briefs to be filed just 11 days after release of the post-preliminary determination.

16. Interested parties, including BGH, timely submitted case briefs on November 2, 2020. On November 9, 2020, BGH also submitted a rebuttal brief.

17. On December 11, 2020, Commerce published notice of its final determination in the *Federal Register*. 85 Fed. Reg. 80011 (Dec. 11, 2020). In this final determination, BGH was assigned a subsidy rate of 5.86% *ad valorem*.

18. In its final determination, Commerce found the following legal provisions to be countervailable:

| **Legal Provisions** | ***Ad Valorem* Rate** |
|---|---|
| EU Emissions Trading System | 0.05% |
| Section 9a Taxes under the Electricity Tax Act | 0.81% |
| Section 9b Taxes under the Electricity Tax Act | 0.07% |
| Section 10 Taxes under the Electricity Tax Act | 0.19% |
| Section 51 Taxes under the Energy Tax Act | 0.57% |
| Section 55 Taxes under the Energy Tax Act | 0.01% |
| Special Equalization Scheme (EEG Surcharge) | 3.82% |
| Special Equalization Scheme (KWKG Surcharge) | 0.17% |

| | |
|---|---|
| Concession Fee Ordinance | 0.05% |
| European Emission Trading System – Compensation of Indirect $CO_2$ Costs | 0.12% |
| **Total** | **5.86%** |

19. All of these legal provisions (hereinafter collectively referred to as the "Climate Change Measures") were established by the Government of Germany or the European Union in order to meet their international obligations under the Paris Agreement and predecessor Kyoto Protocol. These measures are not designed to raise government revenue. Rather they are designed to reduce greenhouse gas emissions and encourage the development of renewable forms of energy. None of these measures provide a benefit or financial contribution to German producers of subject merchandise. Rather, these measures result in a direct and substantial increase in BGH's energy costs and impose financial costs and obligations upon German producers that are not borne by the U.S. domestic industry.

20. On January 29, 2021, Commerce published countervailing duty orders for the People's Republic of China, the Federal Republic of Germany, India and Italy and an amended final countervailing duty determination for China in the *Federal Register*. 86 Fed. Reg. 7535 (Jan. 29, 2021).

21. On February 19, 2021, Commerce published a correction to countervailing duty orders in the *Federal Register*. 86 Fed. Reg. 10244 (Feb. 19, 2021).

**<u>COUNT I</u>**

22. The allegations of paragraphs 1 through 21 are restated and incorporated herein by reference.

23. Commerce's determination to countervail the Climate Change Measures listed above and impose countervailing duties against BGH is not supported by substantial evidence on the

administrative record and otherwise not in accordance with law.

24. These Climate Change Measures were established by the Government of Germany and the European Union in order to meet their international obligations under the Paris Agreement and predecessor Kyoto Protocol. These measures are not designed to raise government revenue. Rather they are designed to reduce greenhouse gas emissions and encourage the development of renewable forms of energy. These measures in no way provide a benefit or financial contribution to German producers of subject merchandise. Quite to the contrary, these measures result in the direct and substantial increase in BGH's energy costs and impose financial costs and obligations upon German producers that are not borne by the U.S. domestic industry. Therefore, these measures do not meet any of the statutory requirements for a countervailable subsidy under U.S. law or U.S. treaty obligations pursuant to the WTO Agreement on Subsidies and Countervailing Measures.

25. None of the programs that Commerce determined to be countervailable conferred a benefit on BGH as required by section 771(5)(E) of the Act (19 U.S.C. § 1677(5)(C)). Rather, these programs represent additional taxes, surcharges and other costs that have been imposed upon German companies in order to reduce the emission of greenhouse gases and meet the targets agreed to in the Paris Agreement on the mitigation of greenhouse gas emissions. These Climate Change Measures in no way provide any benefit to companies but rather substantially increase a company's production costs. During the period of investigation, BGH had additional costs of well over 1.25 million Euros due to these Climate Change Measures.

26. In addition, none of the programs that Commerce determined to be countervailable provided a financial contribution to BGH as required by section 771(5)(D) of the Act (19 U.S.C. § 1677(5)(D)). All of the surcharge and fee programs work in a similar manner. They do not in

any way involve the transfer of government funds or the foregoing of government revenues. Rather, the surcharges and fees are charged by and paid to private distribution and transmission system operators to cover the costs of promoting renewable energy sources. BGH paid everything that was due under these provisions, which in 2018 amounted to a total of over 250,000 Euros. Similarly, the Electricity Tax Act and Energy Tax Act also provided no financial contribution to BGH. Neither of these acts is designed to raise government revenue. Rather they are designed to encourage German companies to reduce greenhouse gas emissions. BGH paid everything that was due under these acts and the German government did not forgo or fail to collect any revenues that BGH owed.

27. Commerce also erred in basing its subsidy calculations upon isolated reference to the base rates for the applicable taxes or surcharges without reviewing the entire context of the respective laws. Each of the laws enacting the environmental measures reviewed by Commerce are composed of interrelated provisions that provide for the detailed calculation of tax and surcharge rates based upon objective criteria considering, among other things, the absolute level of energy use. Thus, BGH is not being provided with the forgoing or non-collection of revenue that is otherwise due. Rather, each law determines the amount of revenue that is properly due based upon the factors in each law. Because BGH's production processes are energy intensive, it is paying an absolute amount of energy taxes and surcharges that are far greater than other users with less energy intensive processes. The fact that these laws may provide for a digressive rate structure as the level of use increases does not mean that revenues that would otherwise be due are being forgone or not collected. Rather, these revenues are simply not due under the applicable law. It is also important to understand that these laws are not designed to increase government revenue, but are rather designed to decrease greenhouse gas emissions. Commerce

also failed to properly account for all the costs related to complying with the various climate change measures. For example, in order to qualify under section 10 StromStG, companies must install and implement an energy management system, which requires significant investment costs.

28. Similarly, the EU emissions trading system also provided no financial contribution to BGH. The EU emissions trading system does not involve government funds. Rather, emission allowances and certificates are traded on a public exchange between private companies and individuals in the same way that stocks are traded on the New York Stock Exchange. The same applies to the European Union Emissions Trading Systems (ETS)-Compensation of Indirect $CO_2$ Costs. This program simply provides an adjustment for emission certificate costs that are already embedded in the costs of the energy producers.

29. The environmental measures are also not specific to an industry or group of industries as required by section 771(5A) of the Act (19 U.S.C. § 1677(5A)). Rather, these measures cover vast sectors of the Germany economy accounting for the major amount of greenhouse gas emissions. In fact, the predecessor to the Electricity Tax Act (the Act on Continuation of the Ecological Tax Reform) was examined by Commerce in the countervailing duty investigation of *Carbon and Certain Alloy Steel Wire Rod from Germany* and found to lack specificity. *See* Preliminary Affirmative Countervailing Duty Determination and Preliminary Negative Critical Circumstances Determination: Carbon and Certain Alloy Steel Wire Rod from Germany, 67 Fed. Reg. 5991, 5999 (Feb. 8, 2002), *see also*, Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Carbon and Certain Alloy Steel Wire Rod from Germany, 13 (Aug. 23, 2002).

30. Moreover, in considering specificity, Commerce must look at each statute in its

entirety and not just one isolated statutory provision. For example, the Electricity Tax Act contains rate adjustment provisions for various industries in a number of its sections, such as Section 9c dealing with public transport. Similarly, the EEG surcharge is calculated based upon an intricate application of various legal provisions.

**COUNT II**

31. The allegations of paragraphs 1 through 30 are restated and incorporated herein by reference.

32. Commerce's subsidy rate calculations are incorrect, not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

33. Commerce did not properly calculate BGH's sales denominator. For example, while Commerce found that subsidies received by Boschgotthardshütte O. Breyer GmbH ("BOB") and BGH Edelstahlwerke GmbH ("BGH-Werke") should be attributed, it did not include sales by these entities in the sales denominator.

34. Commerce also miscalculated the benefit under each of the programs concerning BGH. For example, as explained above, Commerce simply applied the base rate under each program without considering all applicable rate adjustments defined in the respective statutes. Commerce also failed to properly consider the absolute amounts paid by BGH under each of the applicable programs.

35. In addition, to the extent that Commerce's decision to apply facts available against the Government of Germany affects BGH's subsidy rate calculation, BGH challenges the application of facts available as not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

## **COUNT III**

36. The allegations of paragraphs 1 through 35 are restated and incorporated herein by reference.

37. Commerce's initiation of a countervailing duty investigation against Germany based upon the deficient information in the petition and its expansion of the investigation to include subsidy allegations on legal provisions that could have been raised in the petition is not supported by substantial evidence on the administrative record and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

38. The countervailing duty petition filed by petitioners did not meet the minimum statutory and regulatory requirements for the initiation of a countervailing duty investigation against Germany. Section 702(b)(1) of the Act (19 U.S.C. § 1671a(b)(1)) requires a petition to allege the elements necessary for the imposition of countervailing duties under the Act and to be accompanied by information reasonably available to the petitioner supporting those allegations. Similarly, 19 C.F.R. § 351.202 requires the petition to contain information concerning the "alleged countervailable subsidy and factual information (particularly documentary evidence) relevant to the alleged countervailable subsidy." 19 C.F.R. § 351.202(b)(7)(ii)(B).

39. The information contained in the petition was faulty, incomplete and failed to substantiate the allegations made in the petition. In addition, petitioners limited their allegations to certain specified statutory provisions with the exclusion of other provisions within the exact same statute. For example, the petition raised allegations concerning Section 9a of the Electricity Tax Act but did not raise any allegations concerning Sections 9b and 10 of that same act. Detailed information concerning all of the Climate Change Measures established by the German government are also readily available by internet. Rather than making a reasonable

search for this information or even reviewing copies of the legal texts that were already made exhibits to the petition, petitioners simply made very rudimentary and limited subsidy allegations.

40. Therefore, Commerce should not have initiated a countervailing duty investigation against Germany based upon such deficient information. Commerce should also not have expanded the investigation to include subsidy allegations on legal provisions that could have been raised in the petition. As it was, the investigation turned into an unlimited fishing expedition with multiple rounds of supplemental questionnaires seeking to obtain information on programs far outside of the scope of the petition. This results in an abuse of the countervailing duty laws. Governments and producers should not be subjected to such an ill-defined and unlimited search for information, going far beyond the scope of any allegations made in the petition.

**COUNT IV**

41. The allegations of paragraphs 1 through 40 are restated and incorporated herein by reference.

42. Commerce's decision requiring interested parties to submit case briefs just 11 days after issuance of the post-preliminary determination is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, representing a denial of BGH's rights of due process.

43. For a final determination in a countervailing duty investigation, interested parties would normally have 50 days after the date of publication of the preliminary determination to submit written case briefs. 19 C.F.R. § 351.309(c)(i).

44. In this investigation, Commerce issued a very late post-preliminary determination,

substantially amending the original preliminary determination, and then just one day later set a one-week briefing period for the final determination. This gave BGH no meaningful time to review the changes made in Commerce's preliminary determination and prepare its case brief.

45. The insufficiency of this extremely short time period was compounded by the fact that, at the same time, Commerce suddenly issued a questionnaire in lieu of performing on-site verification in the related antidumping duty investigation, setting a one-week response deadline, and then refusing to extend the deadline for this antidumping questionnaire by more than one day despite the unavailability of company staff and the severe COVID-19 restrictions in place in Germany and France.

**COUNT V**

46. The allegations of paragraphs 1 through 45 are restated and incorporated herein by reference.

47. Commerce's failure to place information on the administrative record of this proceeding concerning the September 14, 2020 telephone conference involving numerous Senior Commerce Officials, including Jeffrey I. Kessler, Assistant Secretary for Enforcement and Compliance, and Representative Mike Kelly as well as any other *ex parte* communications involving this investigation is not in accordance with law.

48. Pursuant to 19 U.S.C. § 1677f(a)(3), Commerce must maintain a record of any *ex parte* meeting.

49. The *ex parte* telephone conference occurred on September 14, 2020, approximately one month before Commerce released its post-preliminary determination. Given the large number of Senior Commerce Officials participating in this *ex parte* telephone conference, including officials responsible for decision-making in this investigation, the *ex parte* meeting is

relevant to this countervailing duty investigation. The letter from Representative Kelly also indicates that other *ex parte* discussions with Dr. Peter Navarro, Director of the Office of Trade and Manufacturing Policy (OTMP), also took place.

## Prayer for Relief

**WHEREFORE**, plaintiff respectfully requests that the court enter judgment in its favor and against the defendant by:

(1) declaring Commerce's final determination as not supported by substantial evidence on the administrative record and otherwise not in accordance with law or other applicable legal standard as stated above;

(2) remanding this matter to Commerce for disposition consistent with the final opinion and order of the Court; and

(3) granting plaintiff such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine
J Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman*
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.com

Date: March 29, 2021

Counsel for Plaintiff

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).