## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | Court No. 21-00080 |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ELLWOOD CITY FORGE CO., ELLWOOD ) | |
| NATIONAL STEEL CO., ELLWOOD QUALITY ) | |
| STEELS CO., AND A. FINKL & SONS, ) | |
| ) | |
| Defendant-Intervenors ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2
### MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:                                    SARAH E. KRAMER
AYAT MUJAIS                                    Trial Attorney
Attorney                                       U.S. Department of Justice
Office of the Chief Counsel                    Civil Division
 for Trade Enforcement & Compliance            Commercial Litigation Branch
U.S. Department of Commerce                    PO Box 480, Ben Franklin Station
                                               Washington, DC 20044
                                               Tel: (202) 353-0537
                                               Email: sarah.e.kramer@usdoj.gov

March 21, 2022                                 Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.    Administrative Determination Under Review .........................................2

    II.    Issues Presented for Review .....................................................................2

STATEMENT OF FACTS ........................................................................................3

SUMMARY OF THE ARGUMENT .........................................................................4

ARGUMENT .............................................................................................................8

    I.    Standard Of Review ..................................................................................8

    II.    Commerce's Determination That Parts Of The FRG And EU's Climate Change Measures Are Countervailable Subsidies Is Supported By Substantial Evidence And In Accordance With Law ............................................................................9

        A. Legal Background .......................................................................9

        B. The Electricity Tax Act And The Energy Tax Act Provide Countervailable Subsidies ............................................................12

            1. Factual Background ....................................................12

            2. These Sections Of The Electricity Tax Act And The Energy Tax Act Constitute Financial Contributions And Provide A Benefit ...................14

            3. Section 9a Of The Electricity Tax Act And Section 51 Of The Energy Tax Act Are *De Jure* Specific ...........................................................16

            4. Sections 9b And 10 Of The Electricity Tax Act And Section 55 Of The Energy Tax Act Are *De Facto* Specific ...............................................18

            5. The Subsidy Rate Was Appropriately Calculated .........................................21

        C. The EEG And KWKG Surcharge Reductions Under The Special Equalization Scheme Are Countervailable Subsidies ....................................22

            1. Factual Background ....................................................22

            2. The Special Equalization Scheme Constitutes A Financial Contribution And Confers A Benefit On BGH Through The EEG And KWKG Surcharge Reductions .........................................................24

3.   The Reduction In EEG And KWKG Surcharges Under The Special
     Equalization Scheme Is *De Jure* Specific ......................................................28

4.   Commerce's Subsidy Calculation Was Appropriate .....................................29

D.   The Free Emissions Allowances Under The EU ETS Constitute A
     Countervailable Subsidy ..........................................................................................30

     1.   Factual Background ........................................................................................30

     2.   The Additional Free Allowances In The ETS Program Constitute
          A Financial Contribution And Confer A Benefit............................................32

     3.   The ETS Program Is *De Jure* Specific...........................................................34

     4.   The Subsidy Was Calculated Accurately.........................................................34

E.   The EU ETS Compensation Of Indirect CO2 Costs Constitutes A
     Countervailable Subsidy ..........................................................................................35

     1.   Factual Background ........................................................................................35

     2.   The Compensation Of Indirect CO2 Costs Under The ETS Directive
          Provides A Financial Contribution And A Benefit.........................................36

     3.   The Compensation Of Indirect CO2 Costs Under The ETS Directive
          Is *De Jure* Specific........................................................................................36

F.   The Concession Fee Ordinance Constitutes A Countervailable Subsidy ............37

     1.   Factual Background ........................................................................................37

     2.   The Concession Fee Ordinance Constitutes A Financial Contribution
          And Confers A Benefit ...................................................................................39

     3.   The Concession Fee Ordinance Is *De Jure* Specific......................................40

III.   Commerce Properly Initiated This Investigation.......................................................41

A.   Legal Background .....................................................................................................41

B.   All Elements Necessary To Initiate A Countervailing Duty Investigation
     Were Present ............................................................................................................43

IV.   The Record Of This Investigation Is Complete .......................................................45

CONCLUSION.............................................................................................................................46

# TABLE OF AUTHORITIES

## Cases

*AK Steel Corp. v. United States*,
192 F.3d 1367 (Fed. Cir. 1999) ................................................................ 12

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004) ................................................................ 8

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017) ................................................................ 35

*Changzhou Trina Solar Energy Co. v. United States*,
195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) .............................. 42, 44

*Citrosuco Paulista, S.A. v. United States*,
704 F. Supp. 1075 (Ct. Int'l Trade 1988) ................................................ 44

*Consol. Edison Co. of N.Y. v. NLRB*,
305 U.S. 197 (1938) ................................................................................. 8

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ................................................................................. 8

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) ................................................................ 35

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ................................................................ 9

*FPC v. Transcon. Gas Pipe Line Corp.*,
423 U.S. 326 (1976) ................................................................................. 9

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ................................................................ 8

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ......................................... 8

*Icdas Celik Enerji Tersane v Ulasim Sanayi A.S. v. United States*,
498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .............................. 34, 37

*Jiaxing Bro. Fastener Co. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016) .............................................. 17, 20

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017) ................................................................. 8

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................. 8

*PSC VSMPO-Avisma Corp. v. United States,*
    688 F.3d 751 (Fed. Cir. 2012) ............................................................. 9, 45

*PT Pindo Deli Pulp and Paper Mills v. United States,*
    825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) .......................................... 41

*Royal Thai Gov't v. United States,*
    436 F.3d 1330 (Fed. Cir. 2006) ............................................................... 12

*Solarworld Americas., Inc. v. United States,*
    125 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ............................... 42, 43, 44

*Viet I–Mei Frozen Foods Co. v. United States,*
    839 F.3d 1099 (Fed. Cir. 2016) ................................................................. 8

*Wilmar Trading PTE Ltd. v. United States,*
    466 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) .......................................... 19

*Yama Ribbons & Bows Co. v. United States,*
    865 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ..................................... 17, 20

## Statutes

19 U.S.C. § 1671 ................................................................................................ 41
19 U.S.C. § 1671a ........................................................................................ 41, 42
19 U.S.C. § 1673a(b)(1) ............................................................................... 41, 44
19 U.S.C. § 1677 ........................................................................................ *passim*
19 U.S.C. § 1677d .................................................................................. 7, 42, 44
19 U.S.C. § 1677f(a)(3) ..................................................................................... 45
28 U.S.C. § 2637(d) ........................................................................................... 35

## Regulations

19 C.F.R. § 351.309(c)(2) .................................................................................. 35
19 C.F.R. § 351.311(b) ............................................................................... 7, 42, 44
19 C.F.R. § 351.502(a) ............................................................................... 5, 11, 19
19 C.F.R. § 351.503 .................................................................................... *passim*

19 C.F.R. § 351.509(a)(1) ........................................................................... 22

19 C.F.R. § 351.524(c)(1) ........................................................................... 22

## Federal Register

*Countervailing Duties,* 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .............. 33, 36

*Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand,* 66 Fed. Reg. 50, 410 (Dep't of Commerce Oct. 3, 2001) ..................................................................... 19, 21

*Preliminary Affirmative Countervailing Duty Determination: Carbon and Certain Alloy Steel Wire Rod from Germany,* 67 Fed. Reg. 5,991 (Feb. 8, 2002) . 18, 19, 20

*Forged Steel Fluid End Blocks from the Federal Republic of Germany,* 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020)...................................................... 1, 2

## Other Authorities

Statement of Administrative Action, Uruguay Round Trade Agreements Act, Texts of Agreements, Implementing Bill, Statement of Administrative Action, and Required Supporting Statements, H.R. Doc. No. 301-16 (1994), *reprinted in* 1994 U.S.C.C.A.N 2020 ................................................................................ *passim*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————————————————  )
                                   )
BGH EDELSTAHL SIEGEN GMBH,         )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )
UNITED STATES,                     )
                                   )
                Defendant,         )          Court No. 21-00080
                                   )
        and                        )
                                   )
ELLWOOD CITY FORGE CO., ELLWOOD    )
NATIONAL STEEL CO., ELLWOOD QUALITY )
STEELS CO., AND A. FINKL & SONS,   )
                                   )
                Defendant-Intervenors )
———————————————————————————————  )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff BGH Edelstahl Siegen Gmbh (BGH). BGH challenges certain aspects of the U.S. Department of Commerce's (Commerce) final determination in its countervailing duty investigation of forged steel fluid end blocks (FEBs) from Germany. Specifically, BGH challenges Commerce's determination that some climate change measures established by the Government of Germany (FRG) and the European Union (EU) include countervailable subsidies, that Commerce's lawfully initiated the countervailing duty investigation, and whether Commerce should have added to the record *ex parte* proceedings from a different administrative proceeding.

As demonstrated below, these claims lack merit.  Because Commerce's determination is supported by substantial evidence and is otherwise in accordance with the law, it should be sustained.  Accordingly, we respectfully request that the Court deny BGH's motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is Commerce's countervailing duty determination in its investigation covering forged steel FEBs from Germany.  *See Forged Steel Fluid End Blocks from the Federal Republic of Germany,* 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) (Final Results*)* (P.R. 292),[1] and the accompanying Issues and Decision Memorandum (IDM) (P.R. 293).  The period of investigation (POI) is January 1, 2018, to December 31, 2018.

### II.   Issues Presented for Review

1.  Whether substantial evidence supports Commerce's determination that parts of the climate change measures established by the Government of Germany and the European Union are countervailable subsidies.

2.  Whether Commerce's determination to initiate the countervailing duty investigation is supported by substantial evidence and in accordance with law.

3.  Whether Commerce complied with the statutory requirements to maintain a record of *ex parte* proceedings.

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the countervailing duty investigation.  The BGH Edelstahl Seigen Gmbh Motion for Judgment Upon Agency Record, Oct. 26, 2021, ECF No. 22, 23, is cited as "BGH Br.".

## **STATEMENT OF FACTS**

On December 19, 2019, the FEB Fair Trade Coalition, Ellwood Group, and Finkl Steel (petitioners) filed a petition with Commerce seeking the imposition of countervailing duties on imports of FEBs from Germany. *See Antidumping and Countervailing Duty Petitions* (Dec. 19, 2019) (P.R. 1) (C.R. 1). Petitioners alleged 16 programs were countervailable subsidies, including six programs pertaining to climate change measures implemented by the EU and FRG. On January 8, 2020, Commerce initiated a countervailing duty investigation of FEBs from Germany. *See Letter Pertaining to Initiation of Antidumping and Countervailing Duty Investigations*, (Jan. 10, 2020) (P.R. 26). On February 4, 2020, Commerce selected Schmiedewerke Groditz GmbH (SWG) and BGH as mandatory respondents. *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination,* 85 Fed. Reg. 31,454 (Dep't of Commerce May 26, 2020) (Preliminary Determination) (P.R. 231) and accompanying Preliminary Decision Memorandum (PDM) at 2 (P.R. 220). That same day, Commerce issued initial questionnaires to the FRG and the mandatory respondents, for which Commerce received timely responses. PDM at 2. On March 5, 2020, Commerce issued the initial questionnaire directly to the EU and received a timely response. *Id*. Between May 6, 2020, and May 11, 2020, Commerce received pre-preliminary comments from all parties. *Id.* at 3.

On May 26, 2020, Commerce published its *Preliminary Determination*. *See generally* PDM. Commerce found four climate change programs to be countervailable. Specifically, Commerce found that section 9a of the Electricity Tax Act, section 51 of the Energy Tax Act, the Free Allocation of Allowances under the Emissions Trading System (ETS), and the Special Equalization Scheme's EEG Surcharge were countervailable subsidy programs. *See id.* at 20-26.

However, Commerce determined it needed additional information to determine the countervailability of six other programs: the Concession Fee Ordinance, ETS – Compensation of Indirect CO2 Costs, section 9b of the Electricity Tax Act, section 10 of the Electricity Tax Act, section 55 of the Energy Tax Act, and Special Equalization Scheme: Reduced Surcharge Under the Combined Heat and Power Act (KWKG). *Id.* at 29. On April 28, 2020, Commerce issued supplemental questionnaires regarding these programs. *See* Supplemental Questionnaire, (P.R. 193). Commerce received timely responses to its supplemental questionnaire, and on October 21, 2020, it published its *Post-Preliminary Determination* finding these additional six programs countervailable. *See generally Post-Preliminary Determination* (Post-Prelim) (P.R. 271).

During this investigation, travel restrictions were imposed that prevented Commerce personnel from conducting on-site verification. On October 5, 2020, Commerce notified interested parties that it was unable to conduct on-site verification. IDM at 3. Parties submitted case briefs and rebuttal briefs between November 2, 2020, and November 9, 2020. *Id.* Commerce published its *Final Determination* on December 7, 2020, which continued to find these programs to be countervailable. *See generally id.* Commerce also determined that it had properly initiated the investigation and that the record of this investigation is complete. *See generally id.*

## <u>SUMMARY OF THE ARGUMENT</u>

Commerce's determination that parts of the climate change measures established by the FRG and the EU are countervailable subsidies is supported by substantial evidence and in accordance with law. Further, Commerce properly initiated this investigation and Commerce complied with its statutory obligation to place on the record all *ex parte* proceedings concerning this investigation.

First, BGH argues that sections 9a, 9b and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act do not provide a financial contribution or a benefit.  BGH Br. at 9-11.  However, these provisions provide financial contributions in the form of revenue forgone by the FRG and they confer benefits in the amount of the tax rebates and savings BGH receives pursuant to these sections.  PDM at 20-22; Post-Prelim at 7-9.  BGH further contends that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are not *de jure* specific because the Electricity Tax Act and Energy Tax Act are not limited to a foreign industry or group of industries and because Commerce found a previous iteration of the law to not be specific.  BGH Br. at 14-17.  However, Commerce properly determined that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because the tax rebates under both sections are limited as a matter of law to companies that perform specific industrial processes.  IDM at 41-42.  BGH also contends that sections 9b and 10 of the Electricity Act and section 55 of the Energy Tax Act are not *de facto* specific because Commerce only analyzed one factor listed in the statute and because the number of users is too large.  BGH Br. at 18-19.  But Commerce is only required to find one factor met to find a subsidy *de facto* specific under the statute and its regulations, and the number of users of these programs were a small percentage of the manufacturing sector.  19 C.F.R. § 351.502(a); Post-Prelim at 7-9; IDM at 43-45.

Second, contrary to BGH's contentions, Commerce explained how record evidence demonstrates that the FRG, through the Special Equalization Scheme, entrusted or directed private transmission system operators to provide a financial contribution to BGH in the form of revenue foregone.  PDM at 24-25; Post-Prelim at 11-12.  Moreover, despite BGH's claims otherwise, BGH Br. at 24, Commerce explained how these actions could be imputed to the FRG

through the relevant regulatory scheme.  IDM at 20-22.  BGH further argues that the EEG and

KWKG surcharges are not *de jure* specific because Commerce looked for the existence of

"neutral" rather than objective criteria and required "universal availability" for a subsidy to not

be *de jure* specific.  BGH Br. at 25-27.  But the EEG and KWKG surcharges under the Special

Equalization Scheme are *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because the

EEG and KWKG identify specific industrial sectors that are eligible for this program.  PDM at

25; Post-Prelim at 12.

Third, BGH argues that the FRG is not foregoing revenue under the ETS program

because it is not entitled to collect revenue under it.  Additionally, BGH contends that it is not

receiving a benefit from the ETS program but instead is incurring costs in procuring emission

allowances.  BGH Br. at 31-33.  Contrary to BGH's arguments, by giving free extra emissions

allowances to companies on the carbon leakage list, the FRG provides a financial contribution in

the form of revenue foregone.  PDM at 26-27.  Further, a benefit exists because BGH does not

need to purchase the additional allowances required to cover its carbon emissions for the year.

*Id.*  BGH further argues that the ETS program is not specific because users are too numerous;

however, Commerce found the program *de jure,* not *de facto*, specific, because the ETS

Directive limits program eligibility carbon leakage list installations.  PDM at 27; IDM at 50.

Fourth, BGH claims the compensation provided under the CO2 program is necessary to

offset the burden imposed by the Directive's free emissions allowances on the purchasers of

electricity.  BGH Br. at 39.  However, that is irrelevant to Commerce's analysis, and Commerce

correctly determined that the ETS Directive's CO2 program provides a financial contribution

because the FRG directly deposits funds into the bank accounts of eligible companies to

compensate for those companies' electricity costs.  Post-Prelim at 6; IDM at 50-51.

Additionally, contrary to BGH's arguments about the numerosity of eligible installations, the CO2 program is *de jure* specific because it limits eligibility for the program to the carbon leakage list. Post-Prelim at 6; IDM at 51.

Fifth, BGH argues the Concession Fee Ordinance does not involve entrustment because there is no obligation to pass the fee onto end users. BGH Br. at 40-41. But the FRG is entrusting or directing the network operators to forgo collecting revenue from certain customers who otherwise would have to pay the concession fees that the network operators pay to the municipalities. IDM at 38. BGH further contends that the Concession Fee Ordinance is not *de jure* specific because no record evidence demonstrates that it is limited to a discrete segment of the German economy. BGH Br. at 42. But this program is *de jure* specific because, by law, relief is limited to a subset of customers. IDM at 39.

Sixth, BGH argues that Commerce improperly initiated this investigation because the petition was deficient and that Commerce went on an "unlimited fishing expedition" for subsidy programs. BGH Br. at 43-44. Commerce determined that the petition provided sufficient factual information that was reasonably available to the petitioner to support its claims and complied with its statutory duty to investigate additional subsidies uncovered during the investigation. IDM at 9-10; 19 U.S.C. § 1677d; 19 C.F.R. § 351.311(b).

Finally, BGH argues that, because an additional *ex parte* meeting is noted in the record of the FEB antidumping investigation, the record here must be insufficient. BGH Br. at 45. That *ex parte* meeting is relevant to the antidumping duty investigation, not this countervailing duty investigation, and therefore was properly not part of this administrative record. IDM at 11.

# ARGUMENT

## I. Standard Of Review

This Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (citations omitted). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The possibility of drawing two inconsistent conclusions from record evidence does not render Commerce's findings unsupported by substantial evidence. *Viet I–Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (quotations marks and citations omitted). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

When reviewing Commerce's determinations, "absent constitutional constraints or extremely compelling circumstances," this Court "will defer to the judgment of an agency

regarding the development of the agency record." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (internal quotations omitted). "To do otherwise would 'run{} the risk of propel{ling} the court{s} into the domain which Congress has set aside exclusively for the administrative agency.'" *Id.* (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). Rather, "{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action." *Id.* at 761; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (reversing the Court of International Trade's order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance.").

II.  **Commerce's Determination That Parts Of The FRG And EU's Climate Change Measures Are Countervailable Subsidies Is Supported By Substantial Evidence And In Accordance With Law**

   A.  **Legal Background**

A subsidy is countervailable when an authority has provided a financial contribution to a person, a benefit is thereby conferred, and the subsidy is specific. 19 U.S.C. § 1677(5); *see also* Statement of Administrative Action, Uruguay Round Trade Agreements Act, Texts of Agreements, Implementing Bill, Statement of Administrative Action, and Required Supporting Statements, H.R. Doc. No. 301-16 (1994) (SAA), Vol. 1 at 925 (accompanying H.R. 5110, 103d Cong., 2d Sess. (1994) (enacted), *reprinted in* 1994 U.S.C.C.A.N 4040. In determining whether a subsidy is countervailable, Commerce looks to three specific elements: financial contribution, specificity, and whether a benefit was conferred. SAA at 925. Commerce may also find that there is a financial contribution "where the government entrusts or directs a private body to provide the subsidy." *Id.* The statute defines a financial contribution as:

(i)     the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii)    foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii)   providing goods or services, other than general infrastructure, or

(iv)    purchasing goods.

19 U.S.C. § 1677(5)(D).  These four categories of practices constituting a financial contribution are purposefully broad.  SAA at 927 ("The examples of particular types of practices falling under each of the categories are not intended to be exhaustive.").

Further, the statute defines a countervailable subsidy as a subsidy that is specific.  *See* 19 U.S.C. § 1677(5A).  Domestic subsidies can be specific as a matter of law (*de jure*) or in fact (*de facto*).  *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii).  A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i). "The *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary."  SAA at 930. However, the statute "does not attempt to provide a precise mathematical formula for determining when the number of enterprises or industries eligible for a subsidy is sufficiently small so as to properly be considered {*de jure*} specific."  *Id*.  Rather, "Commerce can only make this determination on a case-by-case basis."  *Id*.  The statute also explains the effect of eligibility requirements on determinations of *de jure* specificity:

> Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if

(I)     eligibility is automatic,
(II)    the criteria or conditions for eligibility are strictly followed,
        and
(III)   the criteria or conditions are clearly set forth in the relevant
        statute, regulation, or other official document so as to be
        capable of verification.

For purposes of this clause, the term "objective criteria or conditions"
means criteria or conditions that are neutral and that do not favor one
enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii).  The SAA further emphasizes that for a subsidy to be non-*de jure*

specific, the eligibility criteria must be objective and neutral.  *See* SAA at 930.

The statute also explains the standards for findings of *de facto* specificity as follows:

Where there are reasons to believe that a subsidy may be specific
as a matter of fact, the subsidy is specific if one or more of the
following factors exist:

(I)     The actual recipients of the subsidy, whether considered
        on an enterprise or industry basis, are limited in
        number.
(II)    An enterprise or industry is a predominant user of the
        subsidy.
(III)   An enterprise or industry receives a disproportionately
        large amount of the subsidy.
(IV)    The manner in which the authority providing the
        subsidy has exercised discretion in the decision to grant
        the subsidy indicates that an enterprise or industry is
        favored over others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV).  The SAA clarifies that when Commerce applies this test,

the weight of particular factors will vary from case to case.  SAA at 931.  Commerce's

regulations also provide that in *de facto* specificity analyses, Commerce "will examine the

factors contained in {19 U.S.C. § 1677(5A)(D)(iii)} sequentially in order of their appearance.  If

a single factor warrants a finding of specificity, {Commerce} will not undertake further

analysis."  19 C.F.R. § 351.502(a).  Furthermore, "in determining whether the number of

industries using a subsidy is small or large, Commerce could take account of the number of industries in the economy in question." SAA at 931. The courts have long recognized that Commerce's *de facto* specificity analysis is fact-intensive and case-specific. *See, e.g., Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006) (quoting *AK Steel Corp. v. United States,* 192 F.3d 1367, 1385 (Fed. Cir. 1999)) (stating that Commerce's determinations of *de facto* specificity "are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case.")). Therefore, both the statute and the SAA make clear that Congress vested Commerce with broad discretion in determining *de facto* specificity.

Finally, 19 U.S.C. § 1677(5)(E) provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy. Specifically, the statute states, in relevant part, that:

> A benefit shall normally be treated as conferred where there is a benefit to the recipient including – . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased for more than adequate remuneration.

19 U.S.C. § 1677(5)(E). Commerce examines whether a benefit has been conferred regardless of whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise, and does not need to consider the effect of the subsidy in determining whether it exists. 19 U.S.C. § 1677(5)(C).

### B. The Electricity Tax Act And The Energy Tax Act Provide Countervailable Subsidies

#### 1. Factual Background

The Electricity Tax Act establishes the electricity tax rate and conditions for electricity tax relief. PDM at 20. "Companies engaged in specific manufacturing processes, including the

processes to produce and work metals, are eligible for tax relief under Section 9a." *Id.*

Companies must apply for tax relief and applicants must keep a record showing the entity is part

of the prescribed industry specified by section 9a.  PDM at 20-21; FRG IQR Part 1 at Exhibit

ETA(9b)-1, 6 (P.R. 158) (C.R. 93).  Specifically, section 9a(1)(3) provides that the tax for

demonstrably taxed electricity will be remitted, reimbursed, or refunded to companies in the

manufacturing sector that

> produce and work metals, as well as . . . . produce forging, pressing,
> drawing, and stamping parts, roll forms and powder metallurgy
> products and for the treatment and coating of metals, and for heat
> treatment for melting, heating, keeping warm, expanding
> respectively or other forms of heat treatment . . .

FRG IQR Part 1 at Exhibit ETA(9b)-4 (P.R. 158) (C.R. 93).

Section 9b of the Electricity Tax Act provides tax relief of 5.13 Euro per megawatt hour

for electricity which was taxed and used in the manufacturing sector.  Post-Prelim at 7.  Tax relief

under section 9b is only granted if the amount of relief in a calendar year exceeds 250 euros.  *Id.*

Companies must apply for the tax relief and must keep a record that shows the type, quantity,

origin, and exact purpose of the electricity used.  *Id.*

Under section 10 of the Electricity Tax Act, companies in the manufacturing sector can

apply for tax relief up to 90 percent of the electricity tax for electricity used for business

purposes when the amount exceeds 1000 euros.  Post-Prelim at 8.  Tax relief obtained under

section 9a and 9b is deducted from this amount.  *Id.*  The tax relief collected pursuant to this

section is calculated based on the savings on pension contributions.  *Id.*  The tax relief is only

granted if the applying company proves that it operated an energy management system or was a

registered organization.  *Id.*  Further, tax relief is only granted if the applying company has

fulfilled requirements for energy intensity.  *Id.*

The Energy Tax Act establishes taxes on a wide variety of energy products, such as heating oil and natural gas, as well as the conditions for tax relief.  PDM at 21.  The relevant section of the Energy Tax Act, Chapter 5, covers the remissions, reimbursements, and refunding of energy taxes.  Specifically, section 51 of the Energy Tax Act provides tax relief for energy products which have been taxed and have been used as heating fuel to manufacture and process metals, including within the context of manufacturing metal products for forging, pressing, drawing, and stamping parts.  PDM at 21.  When companies apply for tax relief under this section, they must describe their economic activities, the types of energy products used, and how those energy products were used.  *Id.*  Under Section 55 of Energy Tax Act, companies in the manufacturing sector can apply for tax relief on their natural gas, liquefied petroleum gas, and heating oil use.  Post-Prelim at 9.  The actual tax relief is then calculated based on the savings on pension contributions.  *Id.*  The relief is only granted if the applying company submits that it operated an energy management system and has fulfilled requirements for energy intensity.  *Id.*

### 2. These Sections Of The Electricity Tax Act And The Energy Tax Act Constitute Financial Contributions And Provide A Benefit

Commerce determined that sections 9a, 9b, and 10 of the Electricity Tax Act provide financial contributions in the form of revenue forgone by the FRG pursuant to 19 U.S.C. § 1677(5)(D)(ii) and confer benefits under 19 U.S.C. § 1677(5)(E) to BGH in the amount of the tax rebates and savings it receives pursuant to these sections.  Further, Commerce determined that sections 51 and 55 of the Energy Tax Act provide financial contributions in the form of revenue forgone by the FRG pursuant to 19 U.S.C. § 1677(5)(D)(ii) and confer a benefit under 19 U.S.C. § 1677(5)(E) to BGH in the amount of the tax rebates it receives pursuant to these programs.  PDM at 21-22; Post-Prelim at 8-9.

BGH argues that sections 9a, 9b and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act do not provide a financial contribution because BGH received no transfer of funds from the FRG and BGH has fully paid all taxes due under the Electricity Tax Act and Energy Tax Act.  BGH Br. at 9-11.  BGH also contends that Commerce impermissibly ignores the "that is otherwise due" language of 19 U.S.C. § 1677(5)(D)(ii) in favor of the phrase "revenue foregone."  *Id.* at 9.  BGH further argues that sections 9a, 9b, and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act do not confer a benefit because overall BGH is paying additional taxes and has increased energy costs under the Acts.  *Id.* at 11.

These arguments are unpersuasive.  First, whether the FRG transferred funds directly to BGH is not the deciding factor in Commerce's financial contribution determination.  Commerce made its financial contribution determinations under 19 U.S.C. § 1677(5)(D)(ii), not under 19 U.S.C. § 1677(5)(D)(i).  PDM at 21; Post-Prelim at 7-9.  Each of these subsections may be used individually – Commerce is not required to find that there was a direct transfer of funds if Commerce is making its determination based on a finding of revenue foregone, as is the case here.  19 U.S.C. § 1677(5)(D) ("'financial contribution' means – (i) the direct transfer of funds…(ii) foregoing or not collecting revenue…(iii) providing goods or services…*or* (iv) purchasing goods) (emphasis added).  In making its determinations under of 19 U.S.C. § 1677(5)(D)(ii), Commerce took into consideration the entire language of the subsection.  Specifically, Commerce found that the FRG foregoes revenue that would otherwise be due absent the remission, reimbursement, or refunding of tax granted to BGH under sections 9a, 9b, and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act.  PDM at 21-22; Post-Prelim at 7-9.  If sections 9a, 9b, and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act did not exist, BGH would not be remitted, reimbursed, or refunded tax

payments from the FRG.  Thus, Commerce did not ignore the "would otherwise be due" language in 19 U.S.C. § 1677(5)(D)(ii).  Additionally, the record indicates that, under these provisions, BGH is being remitted or reimbursed tax payments because of the industry it operates in.  PDM at 20-21; Post-Prelim at 7-9.  Therefore, the claims raised by BGH regarding sections 9a, 9b, and 10 of the Electricity Tax Act and sections 51 and 55 of the Energy Tax Act lack merit, and record evidence demonstrates each of these sections constitutes a financial contribution and confers a benefit to BGH.

### 3. Section 9a Of The Electricity Tax Act And Section 51 Of The Energy Tax Act Are *De Jure* Specific

Commerce determined that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because the tax rebates under both sections are limited as a matter of law to companies that perform specific industrial processes, such as metal production and metal working.  PDM 21-22; FRG IQR Part 1 at Exhibit ETA(9b)-4, ETA(37)-3 (P.R. 158) (C.R. 93) (tax will be remitted, reimbursed, or refunded to companies in the manufacturing sector that "produce and work metals").  Therefore, the tax relief under these sections are not broadly available to all industries.  Likewise, Commerce found section 51 to be *de jure* specific because "section 51 tax relief is limited to certain industrial processes including the manufacture and process of metals."  PDM at 22.

BGH argues that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are not *de jure* specific because the Electricity Tax Act and Energy Tax Act are not limited to a foreign industry or group of industries.  BGH Br. at 14.  Specifically, BGH states that the Electricity Tax Act is applied to all electricity consumers, and that section 9a is open to all companies in the manufacturing sector and that the Energy Tax Act has the same coverage and comparable provisions to the Electricity Tax Act.  *Id.* at 14-15.  BGH notes that Commerce

found that the Electricity Tax Act and Energy Tax Act's predecessor was specific and contends that the current version of the Electricity Tax Act and Energy Tax Act is broader in application. BGH Br. at 16-17.  However, the record demonstrates that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are not widely available because the criteria governing the eligibility for obtaining tax relief under section 9a and section 51 include specific products and manufacturing processes, as discussed above.  IDM at 41 (citing *Softwood Lumber from Canada*).  Although BGH contends that section 9a and section 51 are available to a variety of industries, the record confirms that this is not the case, but instead that the relief under section 9a and 51 is available only to the specific, limited industries identified in the text of the Electricity Tax Act and the Energy Tax Act.  *Id*.  Therefore, the record indicates that section 9a of the Electricity Tax Act and section 51 of the Energy Tax Act are *de jure* specific.

Further, that Commerce found prior versions of the Electricity Tax Act and Energy Tax Act were not specific is irrelevant to the present case.  *Id.* at 42.  First, Commerce only examines the record before it, and each record stands on its own.  *Jiaxing Bro. Fastener Co. v. United States,* 822 F.3d 1289, 1289-99 (Fed. Cir. 2016); *see also Yama Ribbons & Bows Co. v. United States,* 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decision on the record before it in each individual investigation.").  Commerce examined the text of the laws on the record relevant to this POI, and determined, based on that text, that the programs were explicitly limited to companies that perform specific industrial processes.  PDM at 21-22; FRG IQR Part 1 at Exhibit ETA(9b)-4, ETA(37)-3.

Even if Commerce were to take the prior versions of the Acts into account, there were factual differences that led Commerce to find the prior iterations to be non-specific.  In their earlier forms, the Electricity Tax Act and Energy Tax Act were broadly available.  IDM at 42

17

(citing *Preliminary Affirmative Countervailing Duty Determination and Preliminary Negative Critical Circumstances Determination: Carbon and Certain Alloy Steel Wire Rod from Germany*, 67 Fed. Reg. 5,991 (Dep't of Commerce Feb. 8, 2002)).  Specifically, the tax reductions under the prior iterations were available to all industries in the manufacturing, agricultural, and forest industries and were not directed to a specific industry or enterprise.  *Steel Wire Rod*, 67 Fed. Reg. at 5,999, and accompanying IDM.  The Electricity Tax Act and Energy Tax Act that governed during this POI and that are on this investigation's record explicitly limit access to tax relief to specific products and processes as identified above.  IDM at 42 (citing FRG 4.6. IQR at Exhibit ETA(51)-01, Exhibit ETA(37)-04.).

**4. Sections 9b And 10 Of The Electricity Tax Act And Section 55 Of The Energy Tax Act Are *De Facto* Specific**

Commerce determined that sections 9b and 10 of the Electricity Tax Act and section 55 of the Energy Tax Act are *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) because the companies that are eligible for the tax rebates under these sections are limited in number. Post-Prelim at 7-9; IDM at 43-44.  Specifically, under section 9b of the Electricity Tax Act, only 33,192 companies of the 231,063 companies identified in the manufacturing sector, which amounts to only fourteen percent of the manufacturing, were eligible for tax rebates.  Post-Prelim at 7; IDM at 43.  Under section 10, the tax savings are limited to 9,409 companies, or only four percent, of the 231,063 companies identified in the manufacturing sector.  Post-Prelim at 8; IDM at 43.  Under section 55 of the Energy Tax Act, the actual recipients of the tax relief under this section are limited to 5,448 companies, or just two percent, of the 231,063 companies identified in the manufacturing sector.  Post-Prelim at 9; IDM at 44.

BGH argues that Commerce's *de facto* determinations rest on only one of the factors in 19 U.S.C. § 1677(5A)(D)(iii), and that the requirements of the other three factors are not met.

BGH Br. at 18-19.  However, Commerce need not rely on more than one factor when making its *de facto* specificity determination.  Commerce's regulations provide that in *de facto* specificity analyses, Commerce will examine the factors in 19 U.S.C. § 1677(5A)(D)(iii) sequentially, but if one factor is met, Commerce "will not undertake further analysis."  19 C.F.R. § 351.502(a).  Here, Commerce examined the factors in 19 U.S.C. § 1677(5A)(D)(iii) and found that the first factor, "the actual recipients of the subsidy . . . are limited in number" was met.  19 U.S.C. § 1677(5A)(D)(iii)(I).  Therefore, Commerce did not need to analyze the other three factors, much less ensure that the other factors were met.  *See Wilmar Trading PTE Ltd. v. United States,* 466 F. Supp. 3d 1334, 1358 (Ct. Int'l Trade 2020) (finding that the statute permits Commerce to rely on a single factor in finding that a subsidy is *de facto* specific); 19 U.S.C. § 1677(5A)(D)(iii) ("The subsidy is specific if *one or more* of the following factors exist.")(emphasis added).

BGH further contends that sections 9b and 10 of the Electricity Tax Act and section 55 of the Energy Tax Act are not "limited in number" because 33,192, 9,409, and 5,448 companies, respectively, obtained rebates under that section, and the number of companies obtaining tax relief under the Electricity Tax Act and Energy Tax Act exceeds the number of companies benefitting under their prior iterations.  BGH Br. at 19.  BGH further argues that Commerce found similar programs in other cases to be not *de facto* specific, pointing to *Steel Wire Rod* and *Hot-Rolled Carbon Steel Flat Products*.  *Id.*

Again, that Commerce found the prior versions of legislation in other cases to be not specific is irrelevant to the present case because each investigation's record stands on its own.  IDM at 42; *see Jiaxing Bro. Fastener Co.,* 822 F.3d at 1289-99; *Yama Ribbons,* 865 F. Supp. 2d at 1298.  Here, pursuant to the statute and the SAA, Commerce took into account the total number of companies in the manufacturing sector, 231,063, compared to the number of

companies that received tax rebates under these sections of the Acts.  SAA at 931 ("[I]n

determining whether the number of industries using a subsidy is small or large, Commerce could

take account of the number of industries in the economy in question."); IDM at 44-45.  Thus,

only a limited number of companies in the manufacturing sector, totaling two, four, and fourteen

percent, met the criteria and were approved for the tax rebates under these sections.  IDM at 45.

The investigations BGH references are distinguishable from the present investigation.

Again, Commerce looks at the economy as a whole in determining whether a limited number of

industries or enterprises are receiving a subsidy.  IDM at 14.  In *Steel Wire Rod*, Commerce

found that the prior version of the Electricity Tax Act was not *de facto* specific because around

100,000 companies had used the basic level of the program and 2,500 companies had received an

additional rebate, for a total of DM 4.4 million in rebates.  *Steel Wire Rod* at 5,999.  Germany did

not provide statistics of use by industry or region, and at the time, there were only 37 steel

companies in Germany.  *Id.*  Because there was such a large dollar amount and number of users

receiving the tax rebates, and so few steel companies, Commerce determined that the prior

iteration of the act was not *de facto* specific towards a specific industry.  *Id.*  Here, in contrast,

only a limited number of users were approved for these programs, indicating that the program

was *de facto* specific.  IDM at 44.

BGH then notes that Commerce found a program with 351 participants to not be *de facto*

specific in *Hot-Rolled Carbon Steel Flat Products*.  BGH Br. at 19 (citing *Final Affirmative

Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from

Thailand,* 66 Fed. Reg. 50,410 (Dep't of Commerce Oct. 3, 2001), accompanying Issues & Dec.

Mem. at Cmt. 15).  That case involved economy-wide debt restructuring, undertaken as part of

commitments to the IMF.  There, Commerce found the program not *de facto* specific not because

there were only 351 users, but because no one industry represented a disproportionate amount of the debt on the list; and companies were named to the list based on neutral and objective criteria that were established in consultation with the IMF as part of broader commitments to economic reform in Thailand. *Hot-Rolled Carbon Steel Flat Products* IDM at cmt. 15. In this investigation, the programs may have been available to a broad range of users, but only a limited number of users were actually approved for these programs. IDM at 45.

### 5. The Subsidy Rate Was Appropriately Calculated

BGH argues that Commerce miscalculated the subsidy rate for the countervailable subsidies under the Electricity Tax Act and Energy Tax Act because Commerce disregarded the fact that BGH's absolute energy taxes were higher than other taxpayers. BGH Br. at 20. BGH further argues that Commerce did not consider the expenses associated with complying with the Electricity Tax Act and Energy Tax Act. *Id.*

However, as it did before Commerce, BGH only makes conclusory allegations; it cites no regulation, statute, or other authority for why Commerce must take those factors into account. *See* IDM at 59 ("Additionally, we disagree with respect to BGH Siegen's contention that Commerce miscalculated the benefit under each program. BGH Siegen points to no specific instance where we made a ministerial error, nor does BGH Siegen point to a specific instance where the calculation methodology was incorrect."). Moreover, Commerce explained why and how it calculated the rate it did. For sections 9a, 9b, and 10 of the Electricity Tax Act, Commerce stated that "[a]s provided under 19 CFR 351.509(a)(1) and (b)(1), the benefit under this program is the difference in the tax amount SWG and BGH Siegen would have paid absent the program and the amount each respondent actually paid during the POI. We treated the tax savings as a recurring benefit, consistent with 19 CFR 351.524(c)(1). We then divided the POI

21

tax savings by the total sales for each mandatory respondent."  PDM at 21; Post-Prelim at 8.  For

sections 51 and 55, Commerce explained that "[a]s provided under 19 CFR 351.509(a)(1) and

(b)(1), we calculated the benefit as the tax rebate amount each respondent received during the

POI.  We treated the tax savings as a recurring benefit, consistent with 19 CFR 351.524(c)(1).

We then divided the POI benefit by the total sales of each mandatory respondent."  PDM at 22;

Post-Prelim at 8-9.

### C.   The EEG And KWKG Surcharge Reductions Under The Special Equalization Scheme Are Countervailable Subsidies

#### 1.   Factual Background

The EEG surcharge is a component of the Renewable Energy Resources Act under which

the FRG aims to increase the proportion of electricity generated from renewable energy sources

as a percentage of gross electricity consumption.  PDM at 22.  The EEG surcharge distributes the

cost of promoting renewable energy sources among various German electricity consumers.  *Id.*

Under the EEG, electricity-intensive undertakings (EIUs) in the manufacturing sector qualify for

a reduction from their electricity payments of the EEG surcharge.  *Id.*  BGH received a reduced

EEG surcharge under this program.  *Id.* at 25.

The EEG is effectuated by various entities involved in renewable energy, production,

transmission, and delivery in Germany, specifically network operators, transmission system

operators, and distribution system operators.  *Id.* at 22.  The network operators are legally

obligated to connect to and purchase electricity from installations that produce EEG electricity,

such as solar and wind power, and to distribute EEG electricity on a priority basis.  *Id.*  The

network operators pay EEG installations an established price (electricity tariff) that is set by the

FRG.  *Id.*  The distribution system operators are then required to transmit the EEG electricity to

transmission system operators, which operate the national high-voltage networks and distribute

electricity to end-users like BGH.  *Id.*  The distribution system operators also pay the government-mandated tariff to the EEG electricity installation operators, and as consideration for these obligations, the transmission system operators then pay the distribution system operators the equivalent of the tariffs plus the market premiums received by the EEG installation operators. *Id.*

The transmission system operators are required to sell EEG electricity at market-prevailing prices; however, sometimes the prices the transmission system operators receive on the market for EEG electricity is less than the price they paid to the distribution system operators (*i.e.*, the equivalent of the electricity tariffs plus the market premiums).  *Id.* at 22-23.  Therefore, the EEG allows the transmission system operators to then require their final customers to pay the difference between what the transmission system operators paid to the distribution system operators and what price the transmission system operators sold the EEG electricity in the market, which is the EEG surcharge.  *Id.*  In short, the EEG surcharge is passed on by the transmission system operators to the final consumers, and the amount of the surcharge is determined by the quantity of electricity procured.  *Id.*

The Special Equalization Scheme allows certain EIUs like BGH to qualify for a reduction of the EEG surcharge.  *Id.*  The Federal Office for Economic Affairs and Export Control determines which EIUs receive the EEG surcharge reduction, as well as the cap on the EEG surcharge for each EIU.  *Id.*  When EIUs receive a reduced EEG surcharge, other electricity consumers must pay a higher EEG surcharge.  *Id.*  The FRG does not calculate or receive the EEG surcharge, although they set the EEG electricity price and dictate the procedural process through which the EEG surcharge, and surcharge reductions, are effectuated.  *Id.*

The purpose of the KWKG surcharge, a component of the Combined Heat and Power Act, is to allocate the costs of expanding high-efficiency combined heat and power plants among all electricity consumers.  Post-Prelim at 10.  Similar to the EEG surcharge, certain EIUs like BGH qualify for a reduction of their payments of the KWKG surcharge.  *Id.*  Network operators are legally required to pay combined heat and power plant operators a fixed payment for each kilowatt per hour of combined heat and power electricity that is fed into the grid.  *Id.*  These costs are passed on to the transmission system operators.  *Id.*  To allocate the costs of combined heat and power plants across all final electricity consumers, the transmission system operators are obligated to calculate the KWKG surcharge for the year.  *Id.*  The transmission system operators are then responsible for processing and applying the KWKG surcharge to their final customers, which they are entitled by law to do.  *Id.*

The Special Equalization Scheme mandates that certain EIUs are exempted from the full KWKG surcharge.  *Id.* at 11.  EIUs who are granted a reduction in their EEG surcharge, as discussed above, also automatically receive a reduction in their KWKG surcharge.  *Id.* at 10-11.

**2.   The Special Equalization Scheme Constitutes A Financial Contribution And Confers A Benefit On BGH Through The EEG And KWKG Surcharge Reductions**

By statute, a subsidy exists when an authority provides, or entrusts or directs a private entity to make, a financial contribution.  19 U.S.C. § 1677(5)(B)(i), (iii).  Specifically, section 1677(5)(B)(iii) provides that a subsidy is bestowed when an authority entrusts or directs a private entity to make a financial contribution if providing the financial contribution would normally be vested in the government, and the practice does not differ in substance from the practices normally followed by governments.  Here, the FRG, under the EEG, sets the electricity tariffs and procedures for the transmission system operators to collect the EEG surcharge from its final

customers.  PDM at 24.  In addition, the FRG, under the KWKG, allows transmission system

operators to collect the KWKG surcharge from its final customers.  Post-Prelim at 11.  However,

the FRG mandates that certain EIUs may receive a reduction of the EEG and KWKG surcharges

under the Special Equalization Scheme.  PDM at 24; Post-Prelim at 11.  Thus, through this

mandate, the FRG directs the transmission system operators to forego the collection of the full

EEG or KWKG surcharge from EIUs that would otherwise be due, and consequently relieves

certain EIUs like BGH from the Special Equalization Scheme's higher EEG and KWKG

electricity costs.  PDM at 24; Post-Prelim at 11.  These mandates under the Special Equalization

Scheme reflect public policy objectives and are thus functions that would normally be performed

by the government, but here have been delegated to private entities, the transmission system

operators.  PDM at 24; Post-Prelim at 11.  Thus, Commerce determined that the FRG, through

the Special Equalization Scheme, entrusted or directed the transmission system operators to

provide a financial contribution to BGH in the form of revenue foregone pursuant to 19 U.S.C.

§ 1677(5)(B)(iii) and (D)(ii).  PDM at 24; Post-Prelim at 11.  Further, the Special Equalization

Scheme confers a benefit to BGH under 19 U.S.C. § 1677(5)(E) in the amount of the EEG and

KWKG surcharge reduction BGH received.  PDM at 24; Post-Prelim at 11.

      BGH argues that the Special Equalization Scheme does not provide a financial

contribution because Commerce does not explain how the transmission system operators are

foregoing any revenue, and that Commerce again did not contemplate the "that is otherwise due"

phrase of 19 U.S.C. § 1677(5)(D)(ii).  BGH Br. at 23.  In making its determinations under 19

U.S.C. § 1677(5)(D)(ii), Commerce did take into consideration the entire language of the

subsection, including the language "that is otherwise due."  IDM at 20.  Specifically, Commerce

found that the transmission system operators, as directed by the FRG under the Special

Equalization Scheme, are foregoing revenue, *i.e.,* the full EEG and KWKG surcharges, that would otherwise be due absent the reductions in EEG and KWKG surcharges afforded to EIUs under the Special Equalization Scheme.  IDM at 22, 31.  Additionally, Commerce did explain how the transmission system operators were foregoing revenue: the transmission system operators forgo the EEG and KWKG surcharge revenue from EIUs because of the reduction the EIUs receive.  IDM at 22, 31.  Typically, the transmission system operators would be able to pass costs associated with the EEG and KWKG to their customers through the EEG and KWKG surcharge.  PDM at 22-23; Post-Prelim at 10-11.  However, pursuant to the Special Equalization Scheme, the transmission system operators are not able to pass the full EEG and KWKG costs, or can only collect a reduced EEG and KWKG surcharge, from the EIUs granted reductions under the Special Equalization Scheme.  IDM at 22-23, 32.  Thus, the record indicates that the transmission system operators are forgoing revenue otherwise due.

BGH further argues that Commerce failed to show how the actions of the transmission system operators could be imputed to the FRG, and that there is no government-imposed obligation for the transmission system operators to either collect the EEG and KWKG surcharges or provide rebates of the EEG and KWKG surcharges to EIUs, and therefore forego revenue. BGH Br. at 24.  The SAA states that there are many ways in which an authority can act through a private party to provide a financial contribution, and Commerce must examine these circumstances on a case-by case basis.  SAA at 911, 926 (Commerce has found a countervailable subsidy to exist where the government took or imposed (through statutory, regulatory or administrative action) a formal, enforceable measure which directly led to a discernible benefit being provided to the industry under investigation); IDM at 20.  Further, the SAA provides that the "entrusts or directs" standard must be interpreted broadly.  SAA at 911, 926.  Here, while the

EEG and KWKG do not explicitly require the transmission system operators to pass the EEG and KWKG surcharge on to the final customer, record evidence demonstrates that in practice the transmission system operators have consistently done so.  IDM at 22, 32; PDM at 22-23; Post-Prelim at 10-11.  Additionally, under the Special Equalization Scheme, the transmission system operators may only collect a reduced EEG and KWKG surcharge from EIUs.  IDM at 22, 32.  The FRG established the EEG, the KWKG, as well as the Special Equalization Scheme, and their respective surcharge provisions.  Thus, Commerce determined that the FRG is entrusting or directing the transmission system operators, pursuant to the Special Equalization Scheme, to provide a reduced EEG and KWKG surcharge to EIUs.  *Id.* at 22, 32.

Further, the statute does not require that private entities be *compelled* to perform a government function for entrustment or direction to be found.  Although the transmission system operators are not obligated under the EEG or KWKG to pass on the EEG and KWKG surcharge to their customers, the transmission system operators consistently *do* pass the EEG and KWKG surcharge on and the customers must pay it.  IDM at 23, 32; PDM at 23; Post-Prelim at 10.  This is because the FRG has imposed a financial burden on the transmission system operators through the Special Equalization Scheme and the setting of electricity tariffs.  IDM at 23, 32; PDM at 23; Post-Prelim at 11.  Moreover, under the Special Equalization Scheme, the transmission system operators are mandated to collect a reduced EEG and KWKG surcharge from EIUs, which therefore is revenue that the transmission system operators are not able to recoup.  IDM at 23, 32; PDM at 24; Post-Prelim at 11.  Thus, although there is no government-imposed obligation for the transmission system operators to collect the EEG and KWKG surcharge, the transmission system operators do so *and* are directed per the Special Equalization Scheme mandate to only collect a reduction of the EEG and KWKG surcharge from EIUs.  Thus, the FRG, through an

explicit and affirmative legal mandate, the Special Equalization Scheme, is directing the

transmission system operators to forgo the collection of the EEG and KWKG surcharges that

would be otherwise due.  IDM at 23, 32; PDM at 24; Post-Prelim at 11.

### 3. The Reduction In EEG And KWKG Surcharges Under The Special Equalization Scheme Is *De Jure* Specific

Commerce found the reduction in EEG and KWKG surcharges under the Special

Equalization Scheme to be *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because the

applicable statutes identify specific industrial sectors, such as the manufacturing of metal

products and basic metal sector, that are eligible to apply for these programs.  PDM at 25; Post-

Prelim at 12.  Therefore, the reduction in EEG and KWKG surcharges under the Special

Equalization Scheme is expressly limited by law to certain EIUs.  IDM at 28-29, 32-33.

BGH argues that Commerce incorrectly stated that the criteria for applying the reduced

surcharge was "not neutral" and that the term "neutral" does not appear in the statute, but rather

the term "objective" does when describing criteria or conditions that make a program not *de jure*

specific.  BGH Br. at 26-27.   However, Commerce has an established practice concerning the

statute's directives regarding "objective criteria"; specifically, Commerce has found that the

criteria governing the eligibility of accessing a subsidy must be neutral and must not favor one

enterprise or industry over another for it to be not specific.  IDM at 29 (citing, *e.g.*, *SC Paper*

*from Canada*, IDM at cmt. 8; *Silicon Metal from Australia* IDM at cmt. 3).  When Commerce

applied this practice to the reduction of the EEG and KWKG surcharge under the Special

Equalization Scheme, Commerce determined that the criteria the FRG used were not neutral

because the criteria favored enterprises or industries that required a large amount of electricity

and were exposed to international competition.  *Id.* at 29, 33.  These eligibility conditions

therefore constitute explicit limitations on access to the subsidy under the law.

BGH further argues that Commerce imposed an unlawful standard of universal availability when reviewing the specificity of the reductions granted under the EEG and KWKG surcharge.  BGH Br. at 25-26.  BGH states that Commerce ignored the fact that the rate reduction under the EEG and KWKG surcharge is broadly available to all enterprises and industrial sectors.  However, the reduction in the EEG and KWKG surcharges under the Special Equalization Scheme is not as broadly available as BGH contends; it is instead limited to EIUs that engage in the activities listed in Annex 4 of the EEG, such as the manufacturing of metals.  PDM at 25; Post-Prelim at 12.  Therefore, the EEG and KWKG surcharges reductions under the Special Equalization Scheme are *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i).

### 4.  Commerce's Subsidy Calculation Was Appropriate

BGH argues that, because the surcharge rate would be high absent the subsidies and German electricity rates are generally high, the subsidy calculation must be incorrect.  BGH Br. at 29.  BGH further contends that Commerce should have taken into account BGH's recordkeeping and other expenses related to accessing the subsidies.  *Id.* at 30.  However, again, BGH's arguments are conclusory; BGH cites no regulation, statute, or other authority for why Commerce should take these factors into account when calculating the subsidy.  *See also* IDM at 59 ("Additionally, we disagree with respect to BGH Siegen's contention that Commerce miscalculated the benefit under each program.  BGH Siegen points to no specific instance where we made a ministerial error, nor does BGH Siegen point to a specific instance where the calculation methodology was incorrect.").  Moreover, Commerce explained its methodology for calculating the subsidies.  For the EEG surcharge,

> [t]he benefit under this program is the amount of the electricity tariffs that BGH Siegen and SWG did not have to pay, i.e., the amount of the EEG surcharge reduction under the SES, pursuant to 19 CFR 351.503(b)(2).  In order to calculate the countervailable

> benefit during the POI, we determined how much the total EEG
> surcharge BGH Siegen and SWG should have paid by applying the
> ct/kWh EEG surcharge to the total POI kWh consumption. We
> then subtracted from this total the amount of EEG surcharge each
> respondent actually paid to derive the benefit. We then divided the
> POI benefit by the total sales for each mandatory respondent.

PDM at 25.  Similarly, for the KWKG surcharge,

> [t]he benefit under this program is equal to the amount of the
> KWKG tariffs that BGH Siegen and SWG were exempted from
> paying as a result of this program during the POI, i.e., the amount
> of the KWKG surcharge reduction under the SES, pursuant to 19
> CFR 351.503(b)(2).  In order to calculate the countervailable
> benefit during the POI, we first determined the total KWKG
> surcharge BGH Siegen and SWG should have paid by applying the
> ct/kWh KWKG surcharge to the total POI kWh consumption.  We
> then subtracted from this total the amount of KWKG surcharge
> each respondent actually paid to derive the benefit.  We then
> divided the POI benefit by the total sales for each mandatory
> respondent.

Post-Prelim at 12.

### D.   The Free Emissions Allowances Under The EU ETS Constitute A Countervailable Subsidy

### 1.   Factual Background

The EU ETS program, established by EU Directive 2003/87/EC (ETS Directive), is a cap

and trade system of emissions allowances that is intended to limit the overall amount of

greenhouse gas emissions produced in the EU.  PDM at 25.  At the end of each year, polluting

installations must surrender emission allowances to cover the year's emissions output.  *Id.*

Installations obtain allowances through three methods: receipt of freely allocated emissions

allowances from their member state government, purchase of emission allowances through an

EU regulated auction, or purchase of allowances from private entities in a secondary market.  *Id.*

at 25-26.

Member states, like the FRG, are required to distribute for free a standard amount of emissions allowances to all installations. *Id.* at 26. All installations are freely allotted allowances to cover 44.2 percent of the emissions of the most efficient installations. *Id.* If an installation cannot cover its emissions for the year using only the freely allotted allowances, the installation must purchase additional allowances to cover its emissions. *Id.* at 27. However, a portion of the installations under the ETS program are deemed to be at a significant risk of carbon leakage, specifically at risk of being unable to cover the higher environmental costs of compliance under the ETS program. *Id.* at 26. To be considered at significant risk of carbon leakage, installations must meet one of three criteria:

> 1. The sum of direct and indirect additional costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added, by at least 5 percent; and at the same time the sector's trade intensity with non-EU countries is greater than 10 percent;

> 2. The sum of direct and indirect additional costs (*i.e.*, induced by the implementation of the EU ETS) would increase production cost, calculated as a proportion of the gross value added by at least 30 percent; or

> 3. The sector's trade intensity with non-EU countries is greater than 30 percent.

*Id.* These installations are provided additional free allowances equivalent to 100 percent of the allowances needed by the benchmark installations during the POI. *Id.* During the POI, BGH was on the carbon leakage list, and received additional freely allocated emissions allowances beyond the standard rate of allocation. *Id.* at 27. In the absence of these additional free allowances, BGH would have been required to cover its emissions by purchasing allowances from the FRG, from the auction, or from another private party. *Id.*

**2.  The Additional Free Allowances In The ETS Program Constitute A Financial Contribution And Confer A Benefit**

Commerce determined that, in providing these additional free allowances to companies on the carbon leakage list, the FRG provides something of value, *i.e.*, the free allowances, without requiring payment.  PDM at 27; IDM at 47-48.  Accordingly, the FRG provides a financial contribution to BGH in the form of revenue foregone pursuant to 19 U.S.C. § 1677(5)(D)(ii).  PDM at 27; IDM at 47-48.  Further, a benefit exists pursuant to 19 U.S.C. § 1677(5)(E) to the extent that the recipient (BGH) consequently does not need to purchase the additional allowances required to cover its carbon emissions for the year.  PDM at 27; IDM at 47-48.

BGH argues that Commerce's financial contribution determination is "based on a fundamental misunderstanding of the {ETS program}," and that by law the FRG cannot collect revenue on the free allowances.  BGH Br. at 31, 33.  Thus, BGH states that whether a company is on the carbon leakage list or not, the FRG has not given up its entitlement to collect revenue because they were not allowed to collect such revenues in the first place.  *Id.* at 33.  Further, BGH argues that it is not receiving a benefit from the ETS program but instead is incurring costs in procuring emission allowances.  *Id.* at 31.

However, BGH mischaracterizes the ETS program and Commerce's reasoning.  As discussed above, the ETS program established a system in which all installations, regardless of their carbon leakage list status, are allocated a certain amount of allowances based on industry standards.  IDM at 48.  This standard amount of allowances are provided to installations on a consistent, equal basis; these free allowances do not constitute a financial contribution because there is no revenue forgone that is otherwise due.  *Id.*  However, the ETS program then provides *additional* free emissions allowances to companies on the carbon leakage list.  *Id.* at 48-49.

Commerce found these *additional* free emissions allowances, beyond the standard 44.2 percent, are countervailable because the companies that receive them do not need to purchase additional allowances they would otherwise require to cover their yearly carbon emissions. *Id.* at 49. Thus, the ETS program specifically designates certain companies that do not have to pay the full costs incurred by other companies who produce emissions beyond the standard 44.2 percent allocated allowances. *Id.* By allowing installations on the carbon leakage list to avoid purchasing additional allowances, the FRG has given up its entitlement to collect revenue (i.e., has foregone revenue) that the carbon leakage companies would have provided if they had had to purchase additional allowances. *Id.* Thus, there is a financial contribution from the FRG to BGH in the form of revenue foregone, specifically the amount the FRG could have collected from BGH if BGH had been required to purchase additional allowances, instead of being granted free additional allowances. These facts further indicate that BGH is receiving a benefit in the form of free additional allowances that companies not on the carbon leakage list do not receive. IDM at 49-50.

BGH argues that the ETS program is necessary to achieve climate neutrality. BGH Br. at 32-33. However, that is irrelevant. When assessing whether a financial contribution or benefit exists, Commerce does not contemplate any advantages the government might receive by administering the program. *See* 19 C.F.R. § 351.503(c); *Countervailing Duties,* 63 Fed. Reg. 65,348, 65,361 (Dep't of Commerce Nov. 25, 1998) ("[T]he determination of whether a benefit is conferred is completely separate and distinct from an examination of the 'effect' of a subsidy"). Thus, ETS program's climate goals are irrelevant to Commerce's financial contribution and benefit determinations.

### 3.   The ETS Program Is *De Jure* Specific

Commerce determined that the ETS program is *de jure* specific pursuant to 19 U.S.C.

§ 1677(5A)(D)(i) because the ETS Directive limits eligibility for the program to installations on

the carbon leakage list.  PDM at 27; IDM at 50.  BGH argues that the installations on the carbon

leakage list account for 97 percent of emissions of the industrial sector, and that allocation of the

free emission allowances are widely distributed throughout a broad spectrum of industrial

sectors.  BGH Br. at 38.  However, BGH's arguments pertain to a *de facto* specificity finding,

which Commerce did not analyze here.  Commerce performed a *de jure* specificity analysis, and

found that the additional free allowances are limited, by the ETS Directive, to only installations

on the carbon leakage list, and thus expressly limits access to the program to those installations.

IDM at 50; 19 U.S.C. § 1677(5A)(D)(i).  When Commerce determines that a program is *de jure*

specific, Commerce is not additionally required to conduct a *de facto* specificity analysis, as

BGH implies.  *See Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,* 498 F.

Supp. 3d 1345, 1354 (Ct. Int'l Trade 2021) ("To be specific to an enterprise or industry, a

countervailable subsidy must exhibit *either de jure or de facto* specificity.") (emphasis added).

Whether the ETS program meets the requirement for *de facto* specificity is irrelevant to

Commerce's *de jure* specificity finding in this case.

### 4.   The Subsidy Was Calculated Accurately

BGH argues that Commerce used the wrong number of allowances in calculating its ETS

allowances subsidy.  BGH Br. at 38.  However, Commerce appropriately used all free

allowances received in its calculation.  *See* Prelim Calc. Memo at 3.  Moreover, this argument is

waived because BGH did not raise it in its administrative case brief or as a ministerial error after

the final determination.  *See* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all

arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."); 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) ("[A]bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."); *Corus Staal BV v. United States*, 502 F.3d 1370, 1378-79 (Fed. Cir. 2007) (requiring exhaustion of administrative remedies and noting Commerce's regulations make exhaustion "explicitly imposed by the agency as a prerequisite to judicial review").

### E.   The EU ETS Compensation Of Indirect CO2 Costs Constitutes A Countervailable Subsidy

#### 1.   Factual Background

As discussed above, the ETS Directive established a cap and trade system of emissions allowances.  These emission allowances place a financial burden on electricity suppliers; thus, the electricity suppliers, in practice, have passed the increased cost from the emission allowances onto the final consumer.  Post-Prelim at 6.  The Directive also provides that "those sectors deemed to be at significant risk of carbon leakage with installations using high amounts of electricity are eligible to have these increased electricity prices financially compensated for by the member state governments." *Id.*  Per the Directive, the FRG uses some funds raised from state auctions of emission allowances to finance this electricity price compensation. *Id.*  Eligible companies submit an application for the previous year's electricity expenses, and, upon approval,

the funds are deposited into the company's bank account. *Id.* BGH is on the carbon leakage list and received electricity price compensation for its installations during the POI. *Id.* at 7.

### 2. The Compensation Of Indirect CO2 Costs Under The ETS Directive Provides A Financial Contribution And A Benefit

Commerce determined that the Directive's CO2 program constitutes a financial contribution in the form of direct transfer of funds under 19 U.S.C. § 1677(5)(D)(i) because the FRG directly deposits funds into eligible companies' bank accounts. Post-Prelim at 6; IDM at 50-51. Further, a benefit exists pursuant to 19 U.S.C. § 1677(5)(E) in the amount of the funds transferred from the FRG to BGH to cover BGH's electricity expenses. Post-Prelim at 6; IDM at 50-51. BGH does not dispute that the FRG is directly transferring funds to eligible companies under this program. *See generally* BGH Br.

BGH claims that the compensation provided under the CO2 program is necessary to offset the burden imposed by the Directive's free emissions allowances on the purchasers of electricity. BGH Br. at 39. However, as discussed above, when assessing whether a financial contribution or benefit exists, Commerce does not contemplate any advantages the government might receive by administering the program, or, here, any disadvantages a government program may create to respondent parties. *See* 19 C.F.R. § 351.503(c); *Countervailing Duties,* 63 Fed. Reg. at 65,361. Thus, the policy or reason for the program is irrelevant to Commerce's financial contribution and benefit determination.

### 3. The Compensation Of Indirect CO2 Costs Under The ETS Directive Is *De Jure* Specific

Commerce determined that the ETS program's CO2 program is *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because it limits program eligibility to installations on the carbon leakage list that use a large amount of electricity. Post-Prelim at 6; IDM at 51. BGH puts forth

the same arguments as it did pertaining to the allocation of free allowances: that the operators on

the carbon leakage list account for 97 percent of emissions and cover thousands of enterprises.

BGH Br. at 39.  But BGH's arguments again pertain to a *de facto* specificity finding, which

Commerce did not make here.  Commerce performed a *de jure* specificity analysis, and found

that the ETS Directive limits the ability to receive compensation for electricity prices to only

installations on the carbon leakage list, and thus expressly limits access to the program to those

installations.  IDM at 51; 19 U.S.C. § 1677(5A)(D)(i).  When Commerce determines that a

program is *de jure* specific, Commerce is not additionally required to conduct a *de facto*

specificity analysis.  *See Icdas Celik Enerji,* 498 F. Supp. 3d at 1354 ("To be specific to an

enterprise or industry, a countervailable subsidy must exhibit *either de jure or de facto*

specificity.") (emphasis added).

### F.   The Concession Fee Ordinance Constitutes A Countervailable Subsidy

#### 1.   Factual Background

Under section 46(1) of the Energy Industry Act, municipalities must make their public

transport routes available for the laying and operation of power lines and gas pipelines for the

supply of energy to consumers in the municipality.  Post-Prelim at 12.  The municipality

generally has a concession agreement with the local network operator that governs the terms and

conditions under which access to the public transport routes is granted.  *Id.*  Under the

concession agreement, both parties agree to a concession fee that the network operators pay to

the municipality for using the public transport routes.  *Id.*  The network operators, in practice,

then pass on this concession fee to their final customers.  *Id.*

However, under section 2(4) of the Konzessionsabgabenverordnung (KAV or Concessions

Fee Ordinance), concession fees for electricity supplies to special contract customers, who are

usually commercial or industrial customers, may not need to be paid by the network operators to the municipalities if the average price per kilowatt-hour is lower than the average revenue per kilowatt hour from the supply of electricity to all special contract customers in the penultimate calendar year. *Id.* at 13. This difference in price is called the Marginal Price, and the network operators and municipalities may agree on a Marginal Price that exceeds or is less than the average revenue per kilowatt hour from the supply of electricity to special contract customers. *Id.* If a company is a special contract customer and provides data that demonstrates the average price per kilowatt hour for the supply of electricity is lower than the set Marginal Price, the network operator is not required to pay concession fees to the municipality for the electricity supplied to the special contract customer, and thus the concession fee will not be passed on to the special contract customer. *Id.*

In summary, the KAV requires that concession fees be paid by the network operators to the municipality per the concession agreement. *Id.* The network operators then, in practice, pass on this concession fee to their final customers. *Id.* If a customer establishes that they are a special contract customer whose price per kilowatt hour is lower than the Marginal Price, the network operators are exempt from paying a concession fee to the municipality for electricity supplied to those special contract customers, and therefore do not pass on the concession fee to the special contract customer. *Id.* Thus, the municipalities forego collecting concession fees from the network operators for the special contract customers who qualify. *Id.* at 14. During the POI, BGH was a special contract customer who qualified under the Concession Fee Ordinance. *Id.*

**2.   The Concession Fee Ordinance Constitutes A Financial Contribution And Confers A Benefit**

As discussed above, 19 U.S.C. § 1677(5)(B)(i) and (iii) provide that a subsidy exists

when an authority provides a financial contribution or entrusts or directs a private entity to make

a financial contribution, if providing the financial contribution would normally be vested in the

government.  In this case, record evidence demonstrates that the FRG, under the Concession Fee

Ordinance, requires network operators to exempt special contract customers from paying the

concession fee to network operators and similarly exempts the network operators from paying

the concession fee due to the municipality.  Post-Prelim at 14.  Thus, Commerce determined that

the FRG, through the Concession Fee Ordinance, entrusted or directed the network operators to

provide a financial contribution to the special contract customers like BGH in the form of

revenue foregone pursuant to 19 U.S.C. § 1677(5)(B)(iii) and (D)(ii).  *Id*.  Further, Commerce

determined that the Concession Fee Ordinance confers a benefit to BGH under 19 U.S.C.

§ 1677(5)(E) in the amount of the concession fees BGH was exempted from paying as a result of

this program.  *Id.*

BGH argues that the network operators have no legal obligation to pass on the cost of the

concession fee to their customers, and that the Concession Fee Ordinance states that

municipalities do not charge network operators concession fees on electricity supplied to special

contract customers and thus there is no revenue that is otherwise due.  BGH Br. at 40-41.

Although the network operators are not legally required to pass on the concession fee to their

customers, in practice they do so.  IDM at 38.  Basically, the FRG is entrusting or directing the

network operators to forgo collecting revenue from special contract customers who otherwise

would have to pay the concession fees that the network operators pay to the municipalities,

within the meaning of 19 U.S.C. § 1677(5)(B)(iii) and (D)(ii).  *Id.*  Under the Concession Fee

Ordinance, the special contract customers are exempt from the concession fee; thus, the FRG, through the Concession Fee Ordinance, is entrusting or directing the network operators to forgo collecting and paying revenue that would be otherwise due to the municipal governments. *Id.* There is no evidence on the record that contradicts this finding. *Id.*

BGH further argues that Commerce has not established that the actions of the network operators are imputed to the FRG, and that the payment of concession fees is a private contract matter between the network operators and the municipalities. BGH Br. at 41. However, as discussed above, the SAA states that there are a number of ways in which an authority can act through a private party to provide a financial contribution, such as imposing through statutory action an enforceable measure that benefits the industry under investigation. SAA at 911, 926. Here, the FRG established under the Concession Fee Ordinance that the municipalities, through the network operators, exempt special contract customers from paying the concession fee. IDM at 38. Thus, pursuant to the framework and guidance provided by the statute and the SAA, Commerce properly determined that the FRG is acting through the municipalities and network operators to provide a financial contribution to the special contract customers in the form of revenue foregone, including to BGH. *Id.*

### 3. The Concession Fee Ordinance Is *De Jure* Specific

In its Post-Preliminary determination, Commerce found that the Concession Fee Ordinance was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) because the recipients of the subsidy are limited in number, *i.e.,* only special contract customers are eligible for benefits under this program. Post-Prelim at 14. However, in the Final Results, Commerce determined that the Concession Fee Ordinance is *de jure* specific rather than *de facto* specific. IDM at 39. BGH argues that there is no record evidence demonstrating that the Concession Fee

Ordinance is limited to a discrete segment of the German economy.  BGH Br. at 42.  However, as discussed above, section 2(4) of the KAV specifically limits relief to special contract customers whose average price per kilowatt hour in the calendar year is lower than the average revenue per kilowatt hour from the supply of electricity to all special contract customers.  IDM at 39.  Thus, the FRG is expressly limiting access to the subsidy provided by the Concession Fee Ordinance by providing relief only to special contract customers whose average price per kilowatt hour is lower than the average revenue per kilowatt hour.  *Id.*  Companies that are defined as special contract customers, who also meet the requirements for average price versus average revenue per kilowatt hour, are a discrete segment of the German economy.  Thus, access to this program is expressly limited by law, and therefore Commerce properly determined that the program is *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i).  *Id.*

**III.**     **Commerce Properly Initiated This Investigation**

 **A. Legal Background**

  To initiate a countervailing duty investigation, Commerce must, within 20 days after the date on which a petition is filed and "after examining, on the basis of sources readily available to {Commerce}, the accuracy and adequacy of the evidence provided in the petition," "determine whether the petition alleges the elements necessary for the imposition of a duty under {19 U.S.C. § 1671} and contains information reasonably available to the petitioner supporting the allegations," as well as "determine if the petition has been filed by or on behalf of the industry." 19 U.S.C. § 1671a(c)(1)(A); *see also PT Pindo Deli Pulp and Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1328 (Ct. Int'l Trade 2012) (citing 19 U.S.C. § 1673a(b)(1) (requiring the petition to have information "reasonably available" to the petitioners)).  When determining whether to initiate an investigation into alleged subsidy programs, Commerce considers whether

such programs are comprised of the necessary elements of a countervailable subsidy, including

whether there is sufficient publicly available evidence that the government is providing a

financial contribution which confers a benefit to foreign producers pursuant to 19 U.S.C.

§ 1677(5)(D) and 19 U.S.C. § 1677(5)(E), and that the subsidy is specific pursuant to 19 U.S.C.

§ 1677(5A).  IDM at 9-10.  Additionally, the statute *requires* Commerce to initiate a

countervailing duty investigation when an interested party files a petition that "*alleges* the

elements necessary for the imposition of the duty imposed . . ., and which is accompanied by

information *reasonably available* to the petitioner supporting those allegations." 19 U.S.C.

§ 1671a(b)(1) (emphasis added); *see Solarworld Americas, Inc. v. United States,* 125 F. Supp. 3d

1318, 1326 (Ct. Int'l Trade 2015).

      After an investigation has been initiated, 19 U.S.C. § 1677d and 19 C.F.R. § 351.311(b)

mandate that Commerce examine practices or programs discovered during the course of the

investigation, and any subsequent review, if they appear to constitute a countervailable subsidy.

19 U.S.C. § 1677d(1) ("[T]he administering authority *shall* include the practice, subsidy, or

subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a

countervailable subsidy…") (emphasis added); 19 C.F.R. § 351.311(b) (providing that

Commerce "will examine" programs discovered during an investigation if sufficient time

remains before the final determination).  Thus, Commerce has an affirmative obligation to seek

information on, and include in a proceeding, all subsidy practices that might benefit the subject

merchandise.  *See Changzhou Trina Solar Energy Co. v. United States,* 195 F. Supp. 3d 1334,

1341-42 (Ct. Int'l Trade 2016) (holding that Commerce has "independent authority, pursuant to

19 U.S.C. § 1677d, to examine additional subsidization in the production of subject

merchandise," which permits Commerce to require respondents to report additional forms of

government assistance); *Solarworld,* 125 F. Supp. 3d at 1326-28 ("Commerce shall include the practice, program, or subsidy program in the proceeding as long as Commerce concludes that sufficient time remains before the scheduled date for the final determination.") (internal quotations omitted).

### B.  All Elements Necessary To Initiate A Countervailing Duty Investigation Were Present

During the initiation proceeding, Commerce analyzed the claims made by the petitioner and found that all elements necessary to initiate a countervailing duty investigation were present. IDM at 9.  Specifically, Commerce found that the petition included "the alleged countervailable subsidies and factual information related to those subsidies, as well as the law, regulation, or decree under which such subsidies were provided, the manner in which they were paid, and the value of the subsidies to the exporters or producers of the subject merchandise." *Id.*  Thus, the petition included sufficient evidentiary grounds to satisfy the elements required for the imposition of countervailing duties as to each alleged subsidy program, as laid out above. *Id.* Therefore, the initiation of the investigation was in accordance with law and supported by substantial evidence.

BGH argues that the petition contained only "rudimentary data from the internet" and failed to demonstrate that parts of the climate change measures established by the FRG and the EU met the necessary elements.  BGH Br. at 43.  BGH also notes that the petition was amended three times for deficiencies. *Id.*

However, as discussed above, the claims made in the petition met the requirements to initiate a countervailing duty investigation on each initiated-on program, and the petition provided sufficient factual information that was reasonably available to the petitioner to support its claims. IDM at 9.  Further, Commerce has the statutory discretion to allow amendment of a

petition at any time.  19 U.S.C. § 1673a(b)(1); *see Citrosuco Paulista, S.A. v. United States*, 704

F. Supp. 1075, 1083 (Ct. Int'l Trade 1988) (stating that a petition may be amended at such time

and upon such conditions as Commerce may permit).  Thus, the mere fact that the petitioners

were asked to amend their petition for deficiencies does not imply that the initiation was invalid.

      BGH further argues that petitioners limited their allegations to certain specified statutory

provisions and did not mention other provisions, which were later added to the investigation.

BGH Br. at 43.  Because additional provisions were added to the investigation, BGH contends

that the investigation turned into an "unlimited fishing expedition" that included several

supplemental questionnaires, and that Commerce should not have expanded the investigation to

include subsidy allegations not originally included in the petition.  *Id.* at 44.  However, BGH's

claim that petitioner's limitation of its allegations to certain provisions of a law renders the

petition deficient is incorrect.  Petitioners are not required to allege that every provision of a law

contains countervailable subsidies, and BGH cites no authority suggesting they are.  IDM at 10.

Moreover, Commerce independently analyzes each alleged program during the initiation

proceeding to determine if there are sufficient evidentiary grounds to satisfy the elements

required for imposing countervailing duties.  *Id.*  Thus, the omission of some provisions from the

petition does not render the entire petition deficient.  *Id.*

      Further, as discussed above, Commerce is obliged to investigate programs it discovers

during the course of an investigation.  19 U.S.C. § 1677d; 19 C.F.R. § 351.311(b); *see*

*Changzhou Trina Solar Energy Co.,* 195 F. Supp. 3d at 1341-42; *Solarworld,* 125 F. Supp. 3d at

1326-28.  In reviewing questionnaire responses from the interested parties, Commerce

discovered several additional programs that could potentially be countervailable that were not

included in the petition.  IDM at 10-11.  Therefore, pursuant to its statutory obligation,

Commerce investigated these additional programs to determine if they were indeed countervailable. *Id.* Thus, Commerce's inclusion of programs it discovered during the investigation, as well as Commerce's issuance of additional supplemental questionnaires to obtain information on these programs, was not an "unlimited fishing expedition," as BGH claims, but instead compliance with a statutory obligation. IDM at 10-11.

## IV.   <u>The Record Of This Investigation Is Complete</u>

Pursuant to 19 U.S.C. § 1677f(a)(3), Commerce must maintain a record of any *ex parte* meetings between interested parties, or parties providing factual information, and the person charged with making the determination in connection with the proceeding. Commerce complied with this statutory requirement, and maintained a record of all *ex parte* meetings relevant to the countervailing duty investigation on the administrative record. IDM at 11.

BGH argues that there was an additional *ex parte* meeting on the antidumping investigation record that was not included on the countervailing duty investigation record, assumes it must be relevant to this proceeding, and that therefore Commerce failed to maintain a record of *ex parte* meetings here. BGH Br. at 45. However, the administrative record of the antidumping duty investigation is irrelevant to the administrative record of this countervailing duty investigation. IDM at 11. The meeting that took place, as indicated by the antidumping investigation record, pertained to the antidumping duty investigation, not the countervailing duty investigation. IDM at 11. Commerce does not need to place *ex parte* meetings pertaining to a separate administrative proceeding on the record when the meeting did not pertain to the countervailing duty investigation itself, and BGH cites no authority so requiring. *Id.*; *see also PSC VSMPO-Avisma Corp.*, 688 F.3d at 760 (this Court "will defer to the judgment of an agency regarding the development of the agency record") (internal quotations omitted). Thus,

Commerce complied with its statutory obligation and acted in accordance with law in maintaining a record of all *ex parte* meetings which took place concerning the countervailing duty investigation of FEBs from Germany.

## CONCLUSION

For these reasons, we respectfully request that the Court deny BGH's motion for judgment upon the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:                          SARAH E. KRAMER
AYAT MUJAIS                          Trial Attorney
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Civil Division
 for Trade Enforcement & Compliance  Commercial Litigation Branch
U.S. Department of Commerce          PO Box 480, Ben Franklin Station
                                     Washington, DC 20044
                                     Tel: (202) 353-0537
                                     Email: sarah.e.kramer@usdoj.gov

March 21, 2022                       Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 13,962 words, including text, footnotes, and headings.

<u>/s/ Sarah E. Kramer</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| BGH EDELSTAHL SIEGEN GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Court No. 21-00080 |
| | ) | |
| and | ) | |
| | ) | |
| ELLWOOD CITY FORGE CO., ELLWOOD | ) | |
| NATIONAL STEEL CO., ELLWOOD QUALITY | ) | |
| STEELS CO., AND A. FINKL & SONS, | ) | |
| | ) | |
| Defendant-Intervenors | ) | |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment on the agency record, defendant's and defendant-intervenors' responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____                    _____

        New York, New York                              Judge

49