## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| BGH EDESTAHL SIEGEN GMBH, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | )   Court No. 21-00080 |
| and | ) |
| ELLWOOD CITY FORGE COMPANY, ET AL., | ) |
| Defendant-Intervenors. | ) |

## ORDER

Upon consideration of the Rule 56.2 motion of BGH Edelstahl Siegen GmbH

("Plaintiff"), all responses thereto, and all other relevant papers and proceedings herein, it is

hereby:

**ORDERED** that the Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record is

denied.

**SO ORDERED.**


Dated: _____          Signed: _____

New York, New York                          Clare R. Kelly, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| BGH EDELSTAHL SIEGEN GMBH, | ) | Court No. 21-00080 |
| | ) | |
| Plaintiff, | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| v. | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | Business Proprietary Information |
| ELLWOOD CITY FORGE COMPANY, ET AL., | ) | Removed from Brackets on Pages |
| | ) | 22, 27, 29-31, and 34. |
| Defendant-Intervenors. | ) | |
| | ) | |

## REBUTTAL BRIEF OF DEFENDANT INTERVENORS IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Chase J. Dunn
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W., Ste 400
Washington, D.C. 20006
(202) 567-2316
(202) 567-2301
*tbeline@cassidylevy.com*

*Counsel to Ellwood City Forge Company, Ellwood
National Steel Company, Ellwood Quality Steels
Company, and A. Finkl & Sons*

Dated:  March 21, 2022

**Table of Contents**

Page

STATEMENT OF ISSUES .......................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 3

SUMMARY OF ARGUMENT ...................................................................................... 5

ARGUMENT ............................................................................................................... 7

I.   Standard of Review ............................................................................................ 7

II.  Commerce's Determination that the Government of Germany Provided
     Countervailable Subsidies to its Domestic FEB Industry is Supported by Substantial
     Evidence and in Accordance with Law .............................................................. 8

     A.   BGH's Arguments Are Contrary to Applicable Law ................................ 8

     B.   Commerce Lawfully Found Certain Provisions of the Electricity and Energy
          Tax Acts to be Countervailable .............................................................. 11

          1.   The Electricity and Energy Tax Reductions Are Financial Contributions .......... 12

          2.   The Electricity and Energy Tax Reductions Confer a Benefit ............................ 14

          3.   The Electricity and Energy Tax Reductions Are Specific ................................... 16

          4.   Commerce Correctly Calculated the Electricity and Energy Tax Reduction
               Subsidy Rates ................................................................................................. 19

     C.   Commerce Lawfully Found EEG and KWKG Surcharge Caps to be
          Countervailable Subsidies ..................................................................... 20

          1.   The EEG and KWKG Surcharge Caps Are a Financial Contribution ................. 21

          2.   The EEG and KWKG Surcharge Caps Provide a Benefit ................................... 23

          3.   The EEG and KWKG Surcharge Caps are Specific ............................................ 23

          4.   Commerce Correctly Calculated the EEG and KWKG Surcharge Cap
               Subsidy Rates ................................................................................................. 24

     D.   Commerce Lawfully Found Additional Free Allowances Provided Under the
          EU ETS to be a Countervailable Subsidy ................................................ 25

          1.   The Free EU ETS Allowances for Companies on the Carbon Leakage List
               Constitute a Financial Contribution ............................................................... 27

2. The Additional Free EU ETS Allowances Provide a Benefit ............................... 28

3. The Additional Free EU ETS Allowances Are Specific ........................................ 28

4. Commerce Correctly Calculated the Additional Free EU ETS Allowance Subsidy Rate ................................................................................................................ 29

E. Commerce Lawfully Found the EU ETS Compensation of Indirect $CO_2$ Cost Program to be a Countervailable Subsidy ........................................................................ 31

1. The EU ETS Compensation of Indirect $CO_2$ Cost Program Provides a Benefit ........................................................................................................................ 31

2. The EU ETS Compensation of Indirect $CO_2$ Cost Program is Specific ............. 32

F. Commerce Lawfully Found the Concession Fee Ordinance Relief Program to be a Countervailable Subsidy ........................................................................................ 32

1. The Concession Fee Ordinance Relief Program is a Financial Contribution ....... 33

2. The Concession Fee Ordinance Relief Program Provides a Benefit .................... 34

3. The Concession Fee Ordinance Relief Program is Specific ................................. 35

III. Commerce's Initiation of This CVD Investigation Was Supported by Substantial Evidence .................................................................................................................................. 35

IV. Commerce Placed All Relevant *Ex Parte* Memoranda on the Record ................................. 38

CONCLUSION .......................................................................................................................... 40

## Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1516a .................................................................................................40

19 U.S.C. § 1516a(b)(1)(B) ....................................................................................7

19 U.S.C. § 1671a(b)(1) ..........................................................................3, 6, 37, 38

19 U.S.C. § 1677(5) ....................................................................................... passim

19 U.S.C. § 1677(5)(B)(iii) ................................................................21, 22, 23, 34

19 U.S.C. § 1677(5)(D)(i) ...............................................................................32, 35

19 U.S.C. § 1677(5)(D)(ii) ............................................................................ passim

19 U.S.C. § 1677(5A) .................................................................................... passim

19 U.S.C. § 1677(5A)(D)(i) .............................................................................17, 29

19 U.S.C. § 1677(5A)(D)(ii) ...........................................................................24, 29

19 U.S.C. § 1677(5A)(D)(iii) ..........................................................................18, 19

19 U.S.C. § 1677(5A)(D)(iii)(I) ...........................................................................18

19 U.S.C. § 1677(5B)(D) ..................................................................9, 10, 15, 23

19 U.S.C. § 1677(6) .............................................................................................20

19 U.S.C. § 1677(6)(A) .......................................................................................20

19 U.S.C. § 1677d .................................................................................................38

19 U.S.C. § 1677d(1) .........................................................................................6, 37

19 U.S.C. § 1677f(a)(3) ..............................................................................3, 6, 39

19 U.S.C. § 3512(d) ...............................................................................................17

**Regulations**

19 C.F.R. § 351.202(e) ..........................................................................................37

19 C.F.R. § 351.311 .........................................................................................6, 37

19 C.F.R. § 351.509(a)(1) ...........................................................................15, 19

<u>Court Decisions</u>

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) .................................18

*Bernklau v. Principi*, 291 F.3d 795 (Fed. Cir. 2002) ....................................39

*Butler v. Principi*, 244 F.3d 1337 (Fed. Cir. 2001) ....................................39

*Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) ...........................................................................................................16, 17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...........................................................................................7, 8, 14

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938).....................................7

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ....................................7

*Corus Staal BV v. DOC*, 395 F3d 1343 (Fed. Cir. 2005) ...........................14, 20

*France v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) ............................14

*Goss Graphics Sys. v. United States*, 33 F. Supp. 2d 1082 (Ct. Int'l Trade 1998), ......................................................................................................7

*Goss Graphics Sys. v. United States*, 216 F.3d 1357 (Fed. Cir. 2000)............................7

*Gov't of Sri Lanka v. United States*, 308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ..............................................................................................13

*Hynix Semiconductor, Inc. v. United States*, 391 F. Supp. 2d 1337 (Ct. Int'l Trade 2005) ...........................................................................................22

*Saarstahl AG v. United States*, 78 F.3d 1539 (Fed. Cir. 1996)............................6, 10, 23

*Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ........................................................................................39

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)........................................8

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..............................7

Administrative Determinations

*Certain Softwood Lumber Products from Canada: Final Affirmative
Countervailing Duty Determination, and Final Negative Determination
of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017) .................................................18

*Final Affirmative Countervailing Duty Determination and Final
Negative Critical Circumstances Determination Carbon and Certain
Alloy Steel Wire Rod from Germany*, 67 Fed. Reg. 55,808 (Aug. 30,
2002) ........................................................................................................................................16, 19

*Forged Steel Fluid End Blocks from the Federal Republic of Germany,
India, Italy and the People's Republic of China: Initiation of
Countervailing Duty Investigations*, 85 Fed. Reg. 2,385 (Jan. 15, 2020).......................................4

*Forged Steel Fluid End Blocks from the Federal Republic of Germany:
Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg.
80,011 (Dec. 11, 2020) ................................................................................................... *passim*

*Forged Steel Fluid End Blocks from the Federal Republic of Germany:
Preliminary Affirmative Countervailing Duty Determination, and
Alignment of Final Determination with Final Antidumping Duty
Determination*, 85 Fed. Reg. 31,454 (May 26, 2020)......................................................................4

*Preliminary Affirmative Countervailing Duty Determination and
Preliminary Negative Critical Circumstances Determination: Carbon
and Certain Alloy Steel Wire Rod from* Germany, 67 Fed. Reg. 5,991
(Feb. 8, 2002)...........................................................................................................................16, 19

Other

Appellate Body Report, United States – Tax Treatment for "Foreign
Sales Corporations," Recourse to Article 21.5 of the DSU by the
European Communities, para. 98, WTO Doc. WT/DS108/AB/RW (Jan.
14, 2002) ........................................................................................................................................20

*Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348 (Nov. 25, 1998)........................... *passim*

S. Rep. No. 96-249, 96 Cong., 1st Sess. 86 (1979) ......................................................................20

Statement of Administrative Action accompanying the Uruguay Round
Agreements Act (URAA), H.R.Doc. No. 316, 103d Cong., 2d Sess.
(1994)..............................................................................................................................16, 17, 21

NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| BGH EDELSTAHL SIEGEN GMBH, | ) | Court No. 21-00080 |
| Plaintiff, | ) | |
| | ) | **NON-CONFIDENTIAL** |
| v. | ) | **VERSION** |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| ELLWOOD CITY FORGE COMPANY, ET AL., | ) | Business Proprietary Information |
| Defendant-Intervenors. | ) | Removed from Brackets on Pages |
| | ) | 22, 27, 29-31, and 34. |

**DEFENDANT INTERVENOR'S MEMORANDUM OF LAW AND FACTS IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons, defendant-intervenors in the above captioned proceeding, respectfully submit this response brief in opposition to the motion for judgement on the agency record file on October 26, 2021, by BGH Edelstahl Siegen GmbH ("BGH"). None of BGH's challenges to the final determination of the U.S. Department of Commerce ("Commerce") in its countervailing duty ("CVD") investigation concerning forged steel fluid end blocks ("FEBs") from Germany, *see Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) ("*Final Determination*"),[1] and accompanying Issues and Decision Memorandum (P.R. 293) ("Final

---

[1] The administrative record does not include the Federal Register notice, as published, but includes an unpublished notice at P.R. 292, which is identical in substance.

IDM"), are meritorious.  Distilled to their essence, BGH claims that it incurs higher costs to produce FEBs in Germany so any government subsidy it received to alleviate those high costs can *never* be found to be an actionable subsidy.  BGH's arguments are incorrect as a matter of law because the CVD statute and Commerce's regulations do not excuse subsidy programs that alleviate high costs that may be high because of government policies.  These arguments also lack substantial record evidence since there is no evidence that BGH's costs increased *because* BGH agreed to participate in the subsidy programs found countervailable by Commerce.  Because Commerce correctly analyzed the programs at issue in light of what BGH would have been required to pay but for the government alleviating it of that imposition, the Court should sustain the *Final Determination* in all respects as Commerce's decision is supported by substantial record evidence and is otherwise in accordance with law.

## STATEMENT OF ISSUES

1.   A countervailable subsidy exists when an authority, directly or indirectly, provides a financial contribution, that confers a benefit, and that is specific in law or in fact.  *See* 19 U.S.C. § 1677(5) and (5A).  When substantial evidence established that the Federal Republic of Germany ("FRG") and European Union ("EU") created subsidy programs that relieved BGH of taxes and other payments that BGH would have incurred to acquire electricity and energy to produce FEBs that met this tripartite legal requirement, did Commerce lawfully find the electricity and energy programs to be countervailable subsidies under U.S. law?

2.   Commerce must initiate a countervailing duty investigation whenever it receives a petition filed on behalf of a domestic industry, which alleges the statutory elements required for a countervailable subsidy and supports those allegations with "reasonably available" information.  19 U.S.C. § 1671a(b)(1).  Did Commerce lawfully initiate the

investigation when petitioners provided detailed descriptions of fifteen alleged subsidy

programs, explained how each met the statutory definition of a countervailable subsidy,

and provided dozens of exhibits collecting reasonably available information supporting

those allegations?

3.   Commerce is required to maintain a record of all *ex parte* meetings during which

information relating to a given proceeding is presented or discussed.  19 U.S.C. §

1677f(a)(3).  In September 2020, Commerce officials held an *ex parte* meeting with

Congressman Mike Kelly to discuss the parallel antidumping duty investigation and

placed a memorandum detailing that meeting on the administrative record of that

proceeding.  Did Commerce err by not including it on the administrative record of the

countervailing duty investigation when there is no evidence that any information relating

to this investigation was presented or discussed?


## STATEMENT OF FACTS

On December 19, 2019, Petitioners filed a CVD petition against imports of FEBs from

Germany to address substantial subsidies provided by the German Government to its domestic

FEB industry.  *See* "Fluid End Blocks from China, Germany, India, and Italy: Antidumping and

Countervailing Duty Petitions: Volume IV" (Dec. 19, 2019) (C.R. 1-9) ("CVD Petition").  The

vast majority of these subsidies were in the form of discounted electricity and energy.  In

response to a supplemental questionnaire from Commerce, Petitioners amended the petition and

responded to detailed questions about the subsidy programs contained in the CVD Petition.  *See*

"Fluid End Blocks From China, Germany, India and Italy: Amendment of Petitions and

Response to Commerce's Supplemental Questions: Volume III" (Dec. 30 ,2019) (C.R. 10-15)

("Amended CVD Petition").  Commerce initiated a CVD investigation on January 15, 2020.  *See*

*Forged Steel Fluid End Blocks from the Federal Republic of Germany, India, Italy and the People's Republic of China: Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 2,385 (Jan. 15, 2020).

Commerce selected BGH Edelstahl Siegen GmbH ("BGH") and Schmiedewerke Gröditz GmbH ("SWG") as the mandatory respondents.  *See* Commerce Memorandum, "Respondent Selection" (Feb. 4, 2020) (C.R. 32).  Between February 4, 2020, and May 18, 2020, Commerce issued initial and supplemental questionnaires to the mandatory respondents as well as the German Government  and EU.   *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 31,454 (May 26, 2020) (P.R. 231) ("*Preliminary Determination*"), and accompanying Decision Memorandum (P.R. 220) ("PDM").

Commerce published its *Preliminary Determination* on May 26, 2020.  *See id.* Commerce preliminarily found that the FRG provided countervailable subsidies to the mandatory respondents during the period of investigation ("POI") and calculated a subsidy rate of 5.25 percent *ad valorem* for BGH.  *See id.* (also calculating subsidy rates of 6.06 percent for SWG, 10.04 percent for Voestalpine Bohler group, and 5.61 percent as the "all others" rate).  In the *Preliminary Determination*, Commerce explained that it did not make a preliminary finding on nine subsidy programs reported in BGH's questionnaire responses because it required additional information on these programs before making such a determination.  *See* PDM at 29. After receiving additional questionnaire responses from the FRG, Commerce published its post-preliminary determination in which it found additional subsidy programs countervailable and increased BGH's *ad valorem* subsidy rate from 5.25 percent to 5.77 percent.  *See* Commerce

Memorandum, "Post-Preliminary Analysis of Countervailing Duty Investigation: Forged Steel Fluid End Blocks from the Federal Republic of Germany" (Oct. 21, 2020) (P.R. 271) ("Post-Preliminary DM"); *see also* Commerce Memorandum, "BGH Edelstahl Siegen GmbH Calculations for the Post-Preliminary Determination" (Oct. 21, 2020) (C.R. 212) ("Post-Preliminary Calculations").

Following Commerce's post-preliminary determination, the parties submitted case and rebuttal briefs.  *See* Final IDM at 3.  Commerce published notice of its final determination in the *Federal Register* on December 11, 2020.  *Final Determination* at 80,012.  In the *Final Determination*, Commerce cited to substantial record evidence demonstrating that during the POI BGH had received various countervailable subsidies totaling 5.86 percent *ad valorem.  Id.*; *see also* Final IDM.

This appeal ensued.  The specific facts relevant to this appeal are presented within the argument section to avoid repetition.

## SUMMARY OF ARGUMENT

Commerce's *Final Determination* is supported by substantial evidence and in accordance with law, and BGH's arguments do not demonstrate otherwise.  While BGH asked Commerce, and now this Court, to create an exemption for alleged "climate change measures" in U.S. countervailing duty law, the statute allows for no such waiver.  Under U.S. law, a countervailable subsidy exists where, as here, an authority, directly or indirectly, provides a financial contribution, that confers a benefit on the recipient, and which is specific in law or in fact.  *See* 19 U.S.C. § 1677(5) and (5A).  The intent of the subsidy provider is irrelevant.  Indeed, Commerce long ago considered, and rejected, nearly identical arguments to those BGH makes today, making clear in its 1998 *CVD Final Rule* that a government's imposition of new environmental requirements and the subsidization of compliance with those requirements

represent two distinct actions, the latter of which constitutes an actionable countervailable subsidy. *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,361 (Nov. 25, 1998) ("*CVD Final Rule*").  Whether or not the subsidy confers a competitive advantage on foreign producers vis-à-vis U.S. industry is also immaterial to Commerce's subsidy determination under the statute.  *Saarstahl AG v. United States*, 78 F.3d 1539, 1543 (Fed. Cir. 1996) ("*Saarstahl*").

BGH's claim that Commerce unlawfully initiated the investigation is without merit. Pursuant to 19 U.S.C. § 1671a(b)(1) Commerce is required to initiate an investigation whenever a petitioner alleges the elements necessary for imposition of a duty and accompanies those allegations with supporting information "reasonably available to the petitioner."  The petition included the relevant laws and policies that provided the countervailable subsidies, tied those facts to the legal framework, and established a reasoned basis to conclude that BGH received subsidy benefits.  Moreover, the statute and regulations make clear that Commerce may consider new subsidies uncovered during the course of an investigation, *see* 19 U.S.C. § 1677d(1); *see also* 19 C.F.R. § 351.311, rendering BGH's claims of an improperly "expanded" investigation baseless.

BGH's assertion that Commerce failed to report relevant *ex parte* communications on the record of this proceeding is also incorrect and belied by the record.  The statute requires Commerce to maintain a record of all *ex parte* meetings during which information relating to a given proceeding is presented or discussed.  19 U.S.C. § 1677f(a)(3).  While BGH references an *ex parte* teleconference related to the parallel antidumping duty investigations, it cites no evidence whatsoever demonstrating that this investigation was also a topic of conversation. Mere speculation is insufficient to overcome the presumption of regularity among government officials, and the Court should therefore deny BGH's request for remand.

## ARGUMENT

### I.  <u>Standard of Review</u>

This court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's decision is supported by substantial evidence, the court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is therefore "something less than the weight of evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  An agency thus "has discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys. v. United States*, 33 F. Supp. 2d 1082, 1100 (Ct. Int'l Trade 1998), *aff'd* 216 F.3d 1357 (Fed. Cir. 2000).  Where there is reasonable evidence on the record to support an agency's findings, a reviewing court should not substitute its judgment for that of the agency.  *Id*.

To determine whether Commerce's interpretation of a statue is "in accordance with law," the courts apply the two-step framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("*Chevron*").  Under *Chevron*, a reviewing court must first examine "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent

of Congress." *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.  Under *Chevron*, an agency's "interpretation {of a statute} governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A*., 555 U.S. 305, 316 (2009).  As the Supreme Court succinctly explains, "'{t}he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id*.

## II.   Commerce's Determination that the Government of Germany Provided Countervailable Subsidies to its Domestic FEB Industry is Supported by Substantial Evidence and in Accordance with Law

BGH contends that Commerce erred in finding various EU and FRG programs countervailable because "these measures do not meet any of the statutory requirements for a countervailable subsidy under U.S. law."  BGH Br. at 6.  But in so arguing, BGH attempts to divine standards found nowhere in the applicable statute, which makes clear that a countervailable subsidy exists whenever there is a direct or indirect financial contribution that is provided to specific groups of enterprises or industries, and which confers a benefit on the recipient.  *See generally* 19 U.S.C. § 1677(5) and (5A).

### A.   BGH's Arguments Are Contrary to Applicable Law

BGH argues that the subsidy programs countervailed by Commerce "were established by the German Government or the European Union in order to meet their international obligations under the Paris Agreement and the predecessor Kyoto Protocol" and that "{t}hese measures are not designed to raise government revenue."  BGH Br. at 4; *see also id*. at 6, 10-11, 30, 38.  BGH similarly contends that the programs in question cannot be subsidies because the environmental

"measures result in the direct and substantial increase in BGH's energy costs and impose financial costs and obligations upon German producers that are not borne by the U.S. domestic industry."  BGH Br. at 5.  BGH also claims that because the U.S. has not imposed similar costs, there is no competitive advantage conferred.  BGH Br. at 7. Commerce rejected BGH's claim below, finding that "the reasoning for enacting the laws as they relate combating climate change and meeting the standards of the Kyoto Protocol has no bearing on Commerce's CVD analysis, which instead is governed by the statute and regulations."[2]  Final IDM at 9.

Indeed, BGH's entire argument was settled over 30 years ago after the passage of the Uruguay Round Agreements Act during the Clinton Administration.  Commerce's *CVD Final Rule*, published after ratification of the WTO Agreements specifically contemplated, described in detail, and rationally rejected nearly identical arguments to those BGH makes today.

Specifically, in the 1998 *CVD Final Rule* Commerce noted that a government could:

> put{} in place new environmental restrictions that require a firm to purchase new equipment to adapt its facilities. Assume also that the government provides the firm with subsidies to purchase that new equipment, but the subsidies do not fully offset the total increase in the firm's costs-that is, the net effect of the new environmental requirements and the subsidies leaves the firm with costs that are higher than they previously were.  In this situation, section 771(5B)(D) of the Act, which deals with one form of non-countervailable subsidy, makes clear that a subsidy exists. Section 771(5B)(D) of the Act treats the imposition of new environmental requirements and the subsidization of compliance with those requirements as two separate actions. A subsidy that reduces a firm's cost of compliance remains a subsidy (subject, of course, to the statute's remaining tests for countervailability), even though the overall effect of the two government actions, taken together, may leave the firm with higher costs.

*CVD Final Rule*, 63 Fed. Reg. at 65,361.   Commerce further explained:

> if there is a financial contribution and a firm pays less for an input than it otherwise would pay in the absence of that financial contribution (or {is relieved

---

[2] The applicable statute and regulations also preceded the entry into force of the Kyoto Protocol, which the United States has not ratified.

> of penalty/payment obligations it would otherwise have to pay for non-
> compliance}), that is the end of the inquiry insofar as the benefit element is
> concerned. The Department need not consider how a firm's behavior is altered
> when it receives a financial contribution that lowers its input costs or increases its
> revenues…While, as stated above, there must be a benefit in order for a subsidy to
> exist, section 771(5)(C) of the Act expressly provides that the Department "is not
> required to consider the effect of the subsidy in determining whether a subsidy
> exists."

*Id.; see also Saarstahl* 78 F.3d at 1543 ("the statute does not limit Commerce to countervailing

only subsidies that confer a competitive advantage on merchandise exported to the United

States").  In other words, once an authority establishes a standard to comply with, the favorable

waiver or reduction of that standard for a specific number of enterprises or industries is a

quantifiable financial contribution that is specific and confers a benefit regardless of the purpose

of the program and regardless of whether the subsidy is provided at initiation or during

compliance.  It is similarly immaterial whether a U.S. producer is subject to the same standard.

Contrary to BGH's contentions, Commerce's determination was thus not an

unprecedented sleight of hand orchestrated by the Trump Administration.  *See* BGH Br. at 10-12.

Rather, Commerce's findings were entirely consistent with well-established U.S. law, which has

long made clear that the United States will not allow foreign governments to harm U.S. industry

by subsidizing domestic manufacturers under the guise of environmental objectives regardless of

how sincerely held the belief is to address environmental degradation.  Commerce's rationale

makes sense because otherwise a foreign government could subsidize its industry to cost

competitiveness and be immune from the WTO obligations by calling the measure

"environmental."  Critically, no such carve out was ever adopted in international law and the

United States expressly rejected such a carve out in domestic law.

As discussed further below, during the course of the investigation Commerce analyzed

provisions of the EU's Emissions Trading System ("EU ETS") and the FRG's Electricity and

Energy Tax Acts, EEG and KWKG Surcharge Caps, Concession Fee Ordinance Relief, and EU

ETS Compensation of Indirect $CO_2$ Costs and found that they constituted countervailable

subsidies because they were direct or indirect government financial contributions, which were

provided to specific groups of enterprises or industries, and conferred a benefit to BGH.  *See*

*generally* 19 U.S.C. § 1677(5) and (5A).  After lawfully determining these programs constituted

countervailable subsidies, Commerce appropriately calculated applicable subsidy rates based on

the size of the benefit BGH received under each program.  As Commerce's determinations were

supported by substantial evidence and fully in accordance with the law they should be affirmed.

### B.   Commerce Lawfully Found Certain Provisions of the Electricity and Energy Tax Acts to be Countervailable

Commerce correctly found that BGH benefited from countervailable subsidies contained

in the FRG's Electricity Tax Act (Stromsteuergesetz or StromStg), which establishes electricity

tax rates and the conditions for electricity tax relief, and the FRG's Energy Tax Act

(Energiesteuergesetz or EnergieStG), which establishes taxes on the use of other energy products

such as oil, coal and natural gas and the conditions for tax relief.  *See* Final IDM at 39-45; *see*

*generally* Letter from FRG, "Section II Response" (Apr. 6, 2020) (C.R. 88-104) ("FRG 4/6 QR")

at Exhibits ETA(9b)-4 and  ETA(37)-4.   These subsidies include:

- **Section 9a of the Electricity Tax Act**, titled "Remission, reimbursement or refunding of tax for particular processes or procedures," reduces electricity tax liability for companies in the manufacturing sector that conduct certain specified activities including the production and processing of metal products.  *See* FRG 4/6 QR at Exhibit ETA(9b)-4.

- **Section 9b of the Electricity Tax Act**, titled "Tax relief for companies," reduces electricity tax liability by €5.13 per megawatt hour for companies in certain sectors whose total electricity relief under the provision exceeds €250. *See id*.

- **Section 10 of the Electricity Tax Act**, titled "Remission, reimbursement or refunding in special cases," provides up to a 90 percent reduction in electricity

taxes for companies in the manufacturing sector where the total amount of electricity tax in a calendar year exceeds €1000.  *See id.*

- **Section 51 of the Energy Tax Act**, titled "Tax relief for particular processes and procedures," reduces energy tax liability for companies in the manufacturing sector undertaking certain specified activities, including the production and processing of metal products.  *See id.* at Exhibit ETA(37)-4.

- **Section 55 of the Energy Tax Act**, titled "Special cases of tax relief for companies," provides for up to a 90 percent reduction in energy tax liability for companies in the manufacturing sector based on their consumption of natural gas, liquidized petroleum gas (LPG), and heating oil.  *See id.*

BGH argues that none of these programs meet the statutory definition of a countervailable subsidy (*i.e.* a financial contribution provided either directly or indirectly by a governmental authority that is specific and confers a benefit).  As discussed below, BGH's arguments are without merit.

### 1.    The Electricity and Energy Tax Reductions Are Financial Contributions

BGH claims that the subsidies provided by the FRG through tax reductions and exemptions do not constitute a financial contribution because BGH "received no transfer of funds from the German Government" and because the FRG is not otherwise "foregoing or not collecting revenue that is otherwise due."  BGH Br. at 9.  Specifically, BGH states that:

> BGH fully paid all taxes due under the Electricity Tax Act and the Energy Tax Act, and there is no revenue foregone by the German Government that is otherwise due under these acts.  The fact that the Acts may provide for a digressive rate structure as the level of use increases does not mean that revenues that would otherwise be due are being forgone or not collected.  Rather, these revenues are simply not due under the Act.

BGH Br. at 10.  BGH's contention is inconsistent with the plain language of the statute and longstanding Commerce practice.

The statute is unambiguous that favorable provisions in a tax law constitute a financial contribution, even where they do not involve a direct transfer of funds from a governmental

authority.  In particular, 19 U.S.C. § 1677(5)(D)(ii) clarifies that the term "financial

contribution" means, *inter alia*, "foregoing or not collecting revenue that is otherwise due, such

as granting tax credits or deductions from taxable income."  Plainly, Congress believed that tax

laws providing for tax reductions (*e.g.,* "tax credits or deductions from taxable income") were

examples of "foregoing or not collecting revenue that is otherwise due."  As BGH admits, the tax

relief provided to BGH under the Electricity and Energy Tax Acts are such a reduction, as has

been previously affirmed by this Court.  *See, e.g., Gov't of Sri Lanka v. United States*, 308 F.

Supp. 3d 1373, 1378 (Ct. Int'l Trade 2018) (upholding Commerce's determination that a tax

concession reducing the income tax rate applicable to certain exporters was a government

financial contribution rather than a "sovereign exercise of tax policy").

  BGH's hyper-focus on the words "otherwise due" is without merit.  Indeed, by BGH's

logic *no tax reduction or exemption could ever represent a financial contribution* because

legislation ensures no taxes are "due" from particular entities.  Such an interpretation is plainly

contrary to the clear terms of the statute which lists "tax credits or deductions from taxable

income" as examples of government financial contributions.  The phrase "otherwise due" thus

means otherwise due *absent the subsidy*, not absent the foreign government tax legislation writ

large.

  It is also irrelevant, contrary to BGH's assertions, that BGH did not legally owe

additional taxes under the FRG's distortive tax laws or that it paid more in absolute terms than

lower energy consumers.  Instead, it is the very fact that the tax laws are distortive—*i.e.* designed

to benefit high-energy users in particular industries—that constitutes the subsidy under U.S. law.

Put simply, under the favorable provisions of the Electricity and Energy Tax Acts, BGH paid

less in both absolute and relative terms than it otherwise would have had the law treated all

enterprises and industries equally.  This is unambiguously a financial contribution under 19

U.S.C. § 1677(5)(D)(ii).   BGH's uncontextualized quotation from a decades-old WTO Appellate

Body report does not replace the clear will of Congress in this regard.  *See Corus Staal BV v.

DOC*, 395 F3d 1343, 1348-49 (Fed. Cir. 2005) ("*Corus Staal*"); *see also* note 3, *infra*.  Indeed,

WTO decisions have no impact on U.S. law unless they are expressly adopted by Congress and

signed into law by the President.  *See France v. United States*, 981 F.3d 1318, 1325 (Fed. Cir.

2020) ("WTO decisions are not binding on the United States, much less this court.") (internal

quotation marks and citations omitted).

### 2.      The Electricity and Energy Tax Reductions Confer a Benefit

BGH argues that the Electricity and Energy Tax Acts must each be viewed as "an integral

whole," under which BGH does not receive a benefit but instead faces an "obligation to pay

additional taxes on electricity/energy, taxes that are not paid by U.S. producers."  BGH Br. at 13.

Such an interpretation is directly contrary to Commerce's long-standing and reasonable

interpretation of U.S. law.  *See generally Chevron*, 467 U.S. at 844 (noting that "considerable

weight should be accorded to an executive department's construction of a statutory scheme it is

entrusted to administer").

As discussed above, once a governmental authority establishes a standard to comply with,

the favorable waiver or reduction of that standard constitutes a benefit.  This is true regardless of

the underlying purpose of the action.  Indeed, as Commerce made clear in the *CVD Final Rule*,

"Section 771(5B)(D) of the Act treats the imposition of new environmental requirements and the

subsidization of compliance with those requirements as two separate actions," thus "{a} subsidy

that reduces a firm's cost of compliance remains a subsidy…even though the overall effect of the

two government actions, taken together, may leave the firm with higher costs."  63 Fed. Reg. at

65,361.  Commerce's regulations echo this reasoning, explaining that in "the case of a program

14

that provides for a full or partial exemption or remission of a direct tax…or a reduction in the base used to calculate a direct tax, a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program."  19 C.F.R. § 351.509(a)(1).

The challenged programs unquestionably provide tax benefits.  Indeed, the relevant FRG legislation explicitly describes the programs as either providing "tax relief," *see* FRG 4/6 QR at Exhibits ETA(9b)-4 and ETA(37)-4 (describing Section 9b of the Electricity Tax Act and Sections 51 and 55 of the Energy Tax Act) or for the "remission, reimbursement or refunding" of taxes, *id.* (describing Sections 9a and 10 of the Electricity Tax Act).  Consistent with the statute and its regulations, Commerce thus appropriately found that each of these tax relief programs provides a benefit "in the amount of the tax savings," PDM at 20-22, or "equal to the difference in the tax amount {BGH} would have paid absent the program and the amount each respondent actually paid during the POI."  Post-Preliminary DM at 7.

Contrary to BGH's assertions, the statute does not require that a subsidy program create a benefit "vis-à-vis American producers" to be countervailable.  *See* BGH Br. at 11.  Rather, the illustrative examples set forth in the statute make clear that a benefit exists when the recipient "enjoys a reduction in input costs or revenue enhancement that it would not otherwise have enjoyed absent the {foreign} government action."  *CVD Final Rule*, 63 Fed. Reg. at 65,360. Here, BGH benefited from lower electricity and energy taxes (and thus a reduction in the costs of these inputs) relative to what it would have paid absent the subsidies.  These programs that provide "tax relief" or a "remission" of taxes constitute a benefit under U.S. law.

Additionally, BGH's reference to Commerce's determination in *Carbon and Certain Alloy Steel Wire Rod from Germany*, BGH Br. at 12, is entirely misplaced.  In that case,

Commerce did not find that the tax scheme at issue was not countervailable because it did not

provide a benefit (which it did), but rather because it was not specific.  *See Preliminary*

*Affirmative Countervailing Duty Determination and Preliminary Negative Critical*

*Circumstances Determination: Carbon and Certain Alloy Steel Wire Rod from Germany*

("*Carbon Wire Rod from Germany Prelim*"), 67 Fed. Reg. 5,991, 5,999 (Feb. 8, 2002)

(unchanged in final determination, 67 Fed. Reg. 55,808 (Aug. 30, 2002)).   In contrast, as

discussed below, Commerce here found that the distinct provisions of the Electricity and Energy

Tax Acts are specific, and thus constitute a countervailable subsidy under U.S. law.

### 3.    The Electricity and Energy Tax Reductions Are Specific

BGH contends the Electricity and Energy Tax Acts "have not provided BGH with any

subsidy that is specific as defined by the statute." BGH Br. at 13.  In particular, BGH argues that

Commerce only found the programs to be specific because it applied an erroneous "standard of

universal availability" that has no basis in the statute or the accompanying Statement of

Administrative Action ("SAA").  BGH is mistaken.

As an initial matter, BGH selectively quotes—and entirely mischaracterizes—the SAA

and this Court's determination in *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834

(Ct. Int'l Trade 1983) ("*Carlisle*").  Indeed, the SAA is unambiguous that the purpose of the

specificity test is "to function as an initial screening mechanism to winnow out *only those*

*foreign subsidies which truly are broadly available and widely used throughout an economy*."

SAA accompanying the Uruguay Round Agreements Act (URAA), H.R.Doc. No. 316, 103d

Cong., 2d Sess. (1994) at 929 (emphasis added); *see also CVD Final Rule*, 63 Fed. Reg. at

65,358 (citing 19 U.S.C. § 3512(d)) (noting that this language from the authoritative SAA

"makes the purpose of the specificity test abundantly clear").  Quoting Judge Maletz's decision

in *Carlisle*, the SAA further explains that examples of such "broadly available and widely used"

subsidies include "such things as public highways and bridges" or "a tax credit for investment expenditures on capital investment" that are *available to all industries and sectors.*"  SAA at 929-30 (quoting *Carlisle,* 564 F. Supp. at 838 (emphasis added)).  The subsidies in question are not analogous.

The tax reduction programs in question are not "broadly available and widely used throughout an economy" nor are they "available to all industries and sectors."  Rather, as Commerce explained in detail, these programs are limited either by law or in application to select enterprises or industries, or groups thereof, and thus clearly meet the requirement of specificity under the statute.  In particular, Commerce correctly found that Section 9a of the Electricity Tax Act and Sections 51 of the Energy Tax Act are *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i) because the clear terms of the applicable statutes "expressly limit access" to the subsidies.  Final IDM at 41-42.  Contrary to BGH's assertions, these programs are not available to all companies in the manufacturing sector.  *See* BGH Br. at 14.  Rather, the text of the subsidies makes clear that they are only available to companies in the manufacturing sector *who undertake specifically defined production activities.*  For example, refunds under Section 9a of the Electricity Tax Act are explicitly limited to companies involved in electrolysis, production of glass and ceramic products, production and working of metal products, and chemical reduction. *See* FRG 4/6 QR at Exhibit ETA(9b)-4.  Sections 51 and 57 of the Energy Tax Act contain similarly limiting restrictions.  *See* FRG 4/6 QR at Exhibits ETA(37)-1 and ETA(37).  As Commerce explained, these eligibility restrictions clearly favor particular industries, such as steelmaking, and thus, consistent with the statute and its evaluation of similar subsidy programs, Commerce determined that these subsidies are *de jure* specific under U.S. law.  *See* Final IDM at 41-42 (citing *Certain Softwood Lumber Products from Canada: Final Affirmative*

*Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017), and accompanying IDM at Comment 68).

Commerce also correctly found that Sections 9b and 10 of the Electricity Tax Act and Section 51 of the Energy Tax Act are *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii).  *See* Final IDM at 43-45.  Under this statutory provision, a subsidy is *de facto* specific where "one or more" of the enumerated factors exist.  Here, Commerce found that the provisions are *de facto* under 19 U.S.C. § 1677(5A)(D)(iii)(I) because the "actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number."  Final IDM at 44 (quoting 19 U.S.C. § 1677(5A)(D)(iii)(I)).  As Commerce explained, there is no absolute threshold for "limited in number."  *Id*..  Instead, consistent with Federal Circuit precedent, Commerce must evaluate this and other specificity factors "on a case-by-case basis taking into account all facts and circumstances of a particular case."  *Id*. (quoting *AK Steel Corp. v. United States,* 192 F.3d 1367, 1385 (Fed. Cir. 1999)).  Commerce thus carefully evaluated the record evidence and determined that while the programs are ostensibly available to a "a broad range of users," in reality the programs functioned in such a way that "only a limited number of users were approved for these programs."  Final IDM at 45.  In particular, Commerce noted that while the programs were technically available to 231,063 companies in the manufacturing section, only a small subset of this group actually received subsidies under the programs.  This included 33,192 companies (14% of users) for Section 9b, 9,409 companies (4% of users) for Section 10, and 5,448 companies (2% of users) for Section 55.  *Id*. at 43-44.  Commerce thus correctly concluded that the programs are *de facto* specific under U.S. law.

Finally, BGH's repeated references to *Steel Wire Rod from Germany*, BGH Br. at 19-20, are without merit.  As Commerce explained, the FRG's predecessor "Act on Continuation of the

Ecological Tax Reform" was a different program that contained different provisions, and which ultimately is no longer under investigation by Commerce.  Final IDM at 42.  Commerce found that this past FRG tax program was not specific because it was broadly available to and used by "{c}ompanies in the manufacturing, agriculture, and forestry sectors…if they pay more than DM 1,000 in excise taxes on electricity and mineral oils."  *Carbon Wire Rod from Germany Prelim*, 67 Fed. Reg. at 5,999.  By contrast, here Commerce correctly found that the Electricity and Energy Tax Act subsidies specific because eligibility and/or use of these subsidies was limited.

### 4.  Commerce Correctly Calculated the Electricity and Energy Tax Reduction Subsidy Rates

BGH claims that, even if Commerce correctly determined the various provisions of the Electricity and Energy Tax Acts to be countervailable, it nonetheless erred in its calculations because it disregarded that BGH was paying more on an absolute basis than other energy customers.  BGH Br. at 20-21.  Such arguments are without merit.  BGH paid more in absolute terms for electricity because it consumed more electricity than other customers.  Under U.S. law the benefit is the size of the subsidy (*i.e.*, the amount of tax reduction relative to what BGH would have paid in the absence of the subsidy).  *See generally* 19 U.S.C. § 1677(5A)(D)(iii); 19 C.F.R. § 351.509(a)(1).   The overall amount of taxes paid by the recipient has no bearing on this calculation, and BGH provides no support in U.S. law or Commerce practice for its argument to the contrary.  Indeed, BGH's only reference is to a twenty-year-old WTO Appellate Body report which is both irrelevant to U.S. law, *see Corus Staal*, 395 F.3d at 1348-49, and, even if it were relevant, does not support its claims.[3]

---

[3] BGH quotes the WTO Appellate Body report as stressing a need for a "a comparison of the fiscal treatment of comparable income, in the hands of taxpayers in similar situations."  BGH Br. at 10, 20.  However, the quoted language refers to the need to consider whether it is appropriate

*(footnote continued on next page)*

19

BGH additionally asserts that Commerce erred because it did not consider the costs associated with the receipt of the subsidy, including an updated energy management system. BGH Br. at 20-21.   But BGH failed to support its claims with evidence, as is required by the net subsidy provision set forth in 19 U.S.C. § 1677(6).   That provision allows Commerce to subtract from the gross subsidy the amount of "any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy."   19 U.S.C. § 1677(6)(A). However, applicable legislative history makes clear that "it is expected that {Commerce} will only offset amounts which are definitely established by reliable, verified evidence."   S. Rep. No. 96-249, 96 Cong., 1st Sess. 86 (1979).   BGH entirely failed to demonstrate on the record what its actual costs of compliance, if any, were.

### C.   Commerce Lawfully Found EEG and KWKG Surcharge Caps to be Countervailable Subsidies

Commerce correctly found that BGH benefitted from countervailable subsidies contained in the Renewable Energy Resources Act (*Erneuerbare-Energien-Gesetz* or "EEG") and the Combined Heat and Power Act (*Kraft-Wärme-Kopplungsgeset* or "KWKG").   Final IDM at 16-33.   These laws require German Transmission System Operators ("TSOs") to purchase energy from renewable and combined heat and power ("CHP") sources and allow the TSOs to pass on the additional costs of this energy to their customers through EEG and KWKG surcharges, respectively.   However, the laws cap the amount of EEG and KWKG surcharges that TSOs can

---

*(footnote continued from previous page)*

for distinct provisions of the U.S. tax system to treat different types of foreign income differently for the same taxpayers (the WTO Appellate Body found it was not).   It has absolutely nothing to do with subsidy programs, tax reduction or remission schemes, or a comparison of the absolute amount of taxes paid by different taxpayers under the same tax provisions.   *See* Appellate Body Report, United States – Tax Treatment for "Foreign Sales Corporations," Recourse to Article 21.5 of the DSU by the European Communities, para. 98, WTO Doc. WT/DS108/AB/RW (Jan. 14, 2002).

pass on to certain energy-intensive undertakings ("EIUs"), like BGH, whose applications for surcharge reduction are approved by the FRG.  *See* Final IDM at 21-22; 31-32.

BGH claims that these surcharge-capping programs, referred to collectively as the "Special Equalization Scheme" or "SES" do not meet the statutory definition of a countervailable subsidy.  As discussed below, BGH's arguments are without merit.

### 1.    The EEG and KWKG Surcharge Caps Are a Financial Contribution

BGH claims that the Special Equalization Scheme is not a government financial contribution to BGH because the FRG did not require TSOs to collect the EEG and KWKG surcharges or, alternatively, because the TSOs are not foregoing the collection of revenue otherwise due.  *See* BGH Br. at 22-25.  Neither of these arguments have merit.

The statute provides that a subsidy exists not only where a government authority makes a financial contribution directly, but also where a government authority "entrusts or directs a private entity to make a financial contribution" including by "foregoing or not collecting revenue that is otherwise due."  19 USC §§ 1677(5)(B)(iii) and (5)(D)(ii); *see also* Final IDM at 20.  The SAA clarifies that such entrustment or direction may exist in a broad variety of circumstances "where the government t{akes} or impose{s} (through statutory, regulatory, or administrative action) a formal, enforceable measure which directly led to a discernible benefit being provided to the {enterprise or} industry under investigation."  SAA at 911, 926.  This is the case with the TSO's collection of EEG and KWKG surcharges.

The collection of EEG and KWKG surcharges—and the reduction or elimination of those surcharges for certain EIUs—are the result of government entrustment and direction rather than private market forces.  As Commerce explained, German law *requires* TSOs to purchase energy from renewable and CHP sources at rates *established* by the FRG.  *See generally* Final IDM at 21-22.  German law entitles TSOs to pass the additional costs of purchasing such energy to their

customers as a per-kilowatt-hour surcharge, and directs TSOs to provide relief from this surcharge to EIUs that the FRG approves through an application process. *See id.* Under U.S. law, such actions constitute a government financial contribution even though the FRG orchestrates the tariff-reductions through the TSOs rather than as a direct government rebate. *See* 19 U.S.C. § 1677(5)(B)(iii); *see also Hynix Semiconductor, Inc. v. United States*, 391 F. Supp. 2d 1337, 1348-49 (Ct. Int'l Trade 2005) (holding section 1677(5)(B)(iii) "empowers Commerce to countervail benefit-conferring financial contributions made by private parties pursuant to government entrustment or direction….").

Contrary to BGH's assertions, it is irrelevant that German law imposes no mandate on TSOs to collect EEG or KWKG surcharges. *See* BGH Br. at 24. As Commerce explained, the system created by the FRG incentivizes the TSOs to pass on such costs and record evidence demonstrates that TSOs do, in fact, consistently pass on these surcharges—which customers are legally required to pay—on a per-kilowatt-hour basis. *See* Final IDM at 21-23. However, the FRG caps the amount of EEO surcharge that TSOs can collect from certain FRG-approved EIUs and prohibits TSOs from collecting any KWKG surcharges from such exempted EIUs operating in particular industrial sectors, [                                ]. *See* FRG 4/6 QR at Exhibit EEG(SCS)-3; Letter from Petitioners, "Petitioner's Rebuttal Brief" (Nov. 9, 2020) (C.R. 217) ("Petitioners' Rebuttal Br.") at 22. In other words, the FRG "entrusts or directs" the TSOs to provide a benefit to certain FRG-selected entities, creating a financial contribution under 19 U.S.C. § 1677(5)(B)(iii).

BGH is also wrong that TSOs are not forgoing revenue that is otherwise due. Notably, if BGH's application for surcharge reductions were not approved by the FRG, BGH would—like other customers—owe a total surcharge based on its total kilowatt hours of electricity

consumption.  Although TSOs collect these fees from other customers, they do not collect them

from BGH because the FRG legally prohibits them from doing so.  This is revenue that would

otherwise have been due to the TSOs from BGH absent the FRG-mandated subsidy.

### 2. The EEG and KWKG Surcharge Caps Provide a Benefit

BGH argues that it received no benefit under the respective Acts, which instead imposed

an "obligation to pay additional surcharges on electricity, surcharges that are not paid by U.S.

producers."  BGH Br. at 25.  BGH misunderstands the applicable law.  As explained with respect

to the Electricity and Energy Tax Acts, *see* section II.B.2 *supra*, U.S. law treats the establishment

of a standard and the favorable waiver or reduction of that standard as two distinct acts.  The

later government action is a subsidy under 19 U.S.C. § 1677(5B)(D), "even though the overall

effect of the two government actions, taken together, may leave the firm with higher costs."  *See*

*CVD Final Rule*, 63 Fed. Reg. at 65,361.

Here, the FRG set a standard by authorizing German TSOs to pass on the cost of

purchasing the required amount of renewable- and CHP-sourced energy on to their customers

based on their energy usage.  It then provides a benefit to BGH and other high-energy usage

customers by legally limiting the TSOs ability to collect from them.

The costs borne by U.S. producers are also irrelevant to this determination.  *See*

*Saarstahl*, 78 F.3d at 1543 (confirming "the statute does not limit Commerce to countervailing

only subsidies that confer a competitive advantage on merchandise exported to the United

States").

### 3. The EEG and KWKG Surcharge Caps are Specific

BGH confusingly asserts that the referenced surcharge reductions cannot be specific

because "the rate reduction is broadly available to all enterprises, having an annual electricity

consumption exceeding 1,000,000 kilowatt-hours (kWh)."  BGH Br. at 26.  But, as Commerce

explained, the FRG's explicit statutory limitation of the benefit to only such high-energy manufacturers is precisely what makes the subsidies *de jure* specific (*i.e.*, expressly limited by law to electricity-intensive undertakings in the manufacturing sector).  *See* Final IDM at 28-29. Contrary to BGH's assertions, *see* BGH Br. at 26, these rate reduction provisions do not have "broad availability throughout the economy."  Instead, they are only available to enterprises that meet very specific FRG-defined requirements.

BGH's quibbles over the word "neutral" vs. "objective" are similarly misguided.  Indeed, any distinction between the terms in Webster's dictionary are wholly irrelevant where the statute itself unambiguously states that "{f}or the purposes of this clause, the term 'objective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another."  19 U.S.C § 1677(5A)(D)(ii).  Here, German law explicitly favors certain enterprises (*i.e.*, those in the manufacturing sector that consume more than 1 million kWh of electricity per year).  These explicit criteria are neither neutral nor objective—as specifically defined in the statute—and the subsidies are *de jure* specific.  As Commerce correctly determined the EEG and KWKG surcharge reduction schemes to be *de jure* specific, it had no reason to consider whether the subsidies were also *de facto* specific.  *See* Final IDM at 29.

> **4.  Commerce Correctly Calculated the EEG and KWKG Surcharge Cap Subsidy Rates**

BGH claims that Commerce's subsidy calculation must be erroneous because the subsidy it calculated was greater than BGH's total electricity costs.  BGH Br. at 29.  But the size of the subsidy demonstrates only the extent of the distortion resulting from the FRG mandates, not any error in Commerce's approach.  As Commerce explained, it calculated the benefit BGH received under the program by multiplying the surcharge (which the TSOs pass on to customers on a cost per kWh of electricity consumption) by BGH's total kWh consumption during the POI.  *See*

Final IDM at 30, 33. Commerce then subtracted from this total the amount of surcharges that BGH actually paid during the POI to calculate BGH's total POI benefit under the program. *Id*. There is nothing "absurd" or erroneous about this calculation. Rather, it is BGH's argument that is absurd as it would render any subsidy program to be subject to an error in calculation if that subsidy is so generous as to offset a producer's costs significantly.

BGH additionally claims that Commerce erred because it based its subsidy calculation on an erroneous "insistence that all electricity customers must pay the same surcharge rate per kilowatt-hour (kWh) regardless of actual consumption." BGH Br. at 29. BGH ignores that the EEG surcharge is charged at a uniform national EEG surcharge rate in Euro cents/kilowatt hour and is passed down to the final customers "according to the quantity of electricity procured." Final IDM at 22. If BGH had not been selected as a beneficiary and approved by the FRG, it would have paid the surcharge at the same per kilowatt hour rate as other customers. Commerce thus correctly calculated the benefit BGH received under the program.

As discussed with respect to the Electricity and Energy Tax Act, *see* section II.B.4 *supra*, the costs of compliance are part of the benefit calculation under U.S. law only if the record supports an offset. Here, no offset was established or demonstrated by BGH on the record of this proceeding.

        **D.   Commerce Lawfully Found Additional Free Allowances Provided Under the EU ETS to be a Countervailable Subsidy**

Commerce correctly found that BGH benefited from countervailable subsidies contained in the EU's Emissions Trading System ("ETS"). The ETS establishes a "cap and trade" system for emissions of greenhouse gases by setting an overall limit on emissions, which is enforced by requiring industrial entities to surrender "emission permits" (*i.e.*, "allowances") corresponding to their emissions in the previous year. *See* Amended CVD Petition at 8; *see also* Letter from the

EU, "EU Supplemental Questionnaire Response," (Apr. 28, 2020) (C.R. 133-141) ("EU 4/28 QR") at 3, 4, and 7.  The number of allowances issued each year corresponds to the annual emissions cap.  Once the number of allowances is set, the EU and FRG distribute a portion of these allowances to industrial entities free of charge, while the remainder are auctioned with auction proceeds going to the FRG.  *See* Letter from the EU, "EU Comments and Questionnaire Response" (Mar. 26, 2020) (C.R. 30-49) ("EU 3/26 QR") at Annex I at 1; EU 4/28 QR at 3; Letter from FRG, "First Supplemental Questionnaire Response" (May 11, 2020) (C.R. 154) ("FRG 5/11 QR") at 14.  If an entity's emissions exceed the number of free allowances it is provided each year, it must purchase additional allowances to cover the difference.  *See* Final IDM at 49.

Recognizing the negative impact of agreeing to environmental commitments on domestic industry, the EU allocated industrial sectors with free emissions allowances sufficient to cover 44.2 percent of the emissions of the most fuel-efficient entities in that sector.[4]  Final IDM at 48.  Entities engaging in the specific industrial activities appearing on the EU's "carbon leakage list" were gifted additional free allowances to cover 100 percent of the emissions of the most fuel-efficient installations in that sector (*i.e.*, 65.8 percent more emissions permits than they would receive if they did not appear on the carbon leakage list).  *Id*.  Thus, while BGH wants to cloak itself in the EU's commitment to addressing climate change, the EU and FRG would rather keep their domestic steel industry happy than meaningfully redress climate change.  Thus, the EU and FRG subsidize steel companies like BGH, which consume large amounts of electricity and are exposed to significant international competition, because they fear if they were forced to cover

---

[4]  Commerce found that these standard free allowances did not constitute a countervailable subsidy, even when provided to companies on the carbon leakage list.  *See* Final IDM at 48.

the full cost of their emissions (*i.e.*, by purchasing auctioned permits for emissions exceeding the 44.2 percent threshold otherwise applicable) they would be forced to cease operations or leave the EU.

        **1.    The Free EU ETS Allowances for Companies on the Carbon Leakage List Constitute a Financial Contribution**

BGH claims that the additional emissions permits provided to companies on the carbon leakage list do not constitute a financial contribution because BGH "received no transfer of funds from the European Union or the German Government" and instead "was required to spend over [      ] Euros for ETS allowances that would not otherwise be due if the ETS did not exist." BGH Br. at 31.  BGH again misunderstands the law.

As discussed *supra*, U.S. law does not require that a financial contribution involve a direct transfer of government funds.  Instead, pursuant to 19 U.S.C. § 1677(5)(D)(ii) a financial contribution exists where a government authority directly or indirectly "forego{es} or {does} not collect revenue that is otherwise due, such as granting tax credits or deductions from taxable income."  Here, if BGH had not been on the carbon leakage list—and thus had not received the additional free emission allowances—it would have had to purchase significantly *more* than [      ] Euros in emissions credits in 2018 to account for its level of pollution.  Commerce thus correctly concluded that the free emissions allowances are akin to tax rebates, and that the ETS functions "similar to a tax program in which the taxing authority allows all filers to claim a rebate of—for example—5 percent, but then allows a certain class of filers on a special list to claim a rebate of 10 percent."  Final IDM at 49.  In other words, "{b}y allowing BGH and other listed installations to not have to purchase additional emissions allowances from the government, the government has given up its entitlement to collect revenue" that it would otherwise collect from these entities.  *Id*.

BGH's focus on the fact that "neither the European Union nor any Member State may collect revenues on the 43% of free allowances and none of the 57% auctioned allowances can be allocated for free" is a red herring. BGH Br. at 33. Indeed, contrary to BGH's assertions, the proportion of free vs. auctioned allowances is irrelevant. Rather, what is relevant is the fact that if BGH had *not* been one of the special entities on the carbon leakage list in 2018, it would have been allocated fewer free annual allowances and therefore had higher costs than it otherwise had. To account for its level of emissions over the course of the year, BGH would have been required to purchase additional auctioned emissions permits. The EU and FRG provided BGH preferential treatment in this regard, which constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(ii).

### 2. The Additional Free EU ETS Allowances Provide a Benefit

BGH claims that it received no benefit from these subsidies, but rather incurred additional costs in procuring emissions allowances that are not borne by U.S. producers. *See* BGH Br. at 33-34. As discussed *supra*, U.S. law treats the establishment of an environmental standard and the favorable waiver or reduction of that standard as two distinct acts. *CVD Final Rule*, 63 Fed. Reg. at 65,361. Thus, "{a} subsidy that reduces a firm's cost of compliance remains a subsidy…even though the overall effect of the two government actions, taken together, may leave the firm with higher costs." *Id*. Here, had BGH not received the preferential allotment of additional emissions permits it would have had to purchase additional auctioned allocations and, thus, BGH received a benefit under U.S. law.

### 3. The Additional Free EU ETS Allowances Are Specific

BGH claims the ETS subsidy is not specific because it is based on "objective" criteria and is "broadly available" to German enterprises. *See* BGH Br. at 34-35. Neither of these characterizations is accurate. As discussed previously, the statute defines "objective" criteria as

28

those "that are neutral and that do not favor one enterprise or industry over another."  19 U.S.C §

1677(5A)(D)(ii).  By explicitly favoring companies engaged in certain high-polluting and

internationally competitive industrial activities over others, the program clearly picks favorites

and ensures that the additional free allocations are not "broadly available" to all industrial users.[5]

*See* Final IDM at 49.  As Commerce explained the subsidy is *de jure* specific under 19 U.S.C. §

1677(5A)(D)(i) because "eligibility for this subsidy is limited by law to companies on the carbon

leakage list."  *Id*. at 50.  It is irrelevant to the *de jure* specificity analysis that the operators on this

list are the biggest polluters and come from different industries, what is relevant is that only

select operators are eligible for the subsidy.  BGH's arguments with respect to *de facto*

specificity are simply irrelevant.  *Id*.

### 4. Commerce Correctly Calculated the Additional Free EU ETS Allowance Subsidy Rate

BGH claims that Commerce's subsidy rate calculation is in error.  BGH Br. at 38.  This is

simply untrue.  As demonstrated in its subsidy calculation worksheet for the ETS program,

Commerce first [


].  *See*

Commerce Memorandum, "BGH Edelstahl Siegen GmbH Calculations for the Final

Determination" (Dec. 7, 2020) (C.R. 220-221) ("BGH Final Calc. Memo") at Attachment,

"ETS" worksheet; *see also* EU 4/28 QR at Exhibit ETS SQ DE 3 ([                    ]).  These

---

[5] Indeed, it is worth reiterating that Commerce determined that the free emissions allowances granted to all industrial users (*i.e.*, accounting for 44.2 percent of the emissions of the most fuel-efficient entities in the relevant sector) did not constitute a countervailable subsidy.  Rather, Commerce determined that was only the *additional* allowances provided to operators on the carbon leakage list that met the relevant statutory criteria.  *See* Final IDM at 49-50.

figures, which total [        ], are notably [

                          ], see Letter from BGH, "Response to Section III of the

Countervailing Duty Questionnaire (Program-Specific Questions Sections A-C)" (Apr. 2, 2020)

(C.R. 72-83) ("BGH 4/2 QR") at Appendix CVD-77, and which [

    ] in 2018, *see* FRG 4/6 QR at Exhibit ETS-1 at ETS-13.[6]  Commerce then calculated the

[

                                                      ].  *See* BGH

Final Calc. Memo at Attachment, "ETS" worksheet.  This totaled [        ].  The difference

between the two figures ([        ]) is the number of extra free allowances that BGH received in

2018, which Commerce [

        ].  *See* BGH 4/2 QR at Appendix CVD-77.

        BGH takes issue with this calculation, claiming that it only used [        ] of the free

allowances that it was granted in 2018.  BGH Br. at 38.  This is false.  BGH's own reporting

demonstrates that [                                        ].[7]  Rather it

[

                                          ].  For example, in 2018 BGH

required [        ] allowances to cover its emissions over the course of the year.  Because it was

on the carbon leakage list it was granted [        ] free allowances, thus it had to use [

    ] credits [                    ] to cover the difference.  However, had it not been on the

carbon leakage list it would have received only [        ] free allowances, meaning it would have

---

[6] [                                                      ].

[7] For example, data provided by BGH demonstrates that it [
        ].  *See* BGH 4/2 QR at Appendix CVD-77.

had to use [                    ] credits [                ] (*i.e.*, [              ]) to cover its

emissions for the year.  The fact that BGH [

                                                                                                    ]

does not diminish the value of the free allowances it received.  In other words, contrary to

BGH's assertions, [

                                                    ].

### E.   Commerce Lawfully Found the EU ETS Compensation of Indirect CO$_2$ Cost Program to be a Countervailable Subsidy

Commerce correctly found that BGH received a countervailable subsidy through the EU

ETS Compensation of Indirect CO$_2$ Costs Program.  *See* Final IDM at 50-51.  Under the ETS

system, electricity companies are not eligible for free allowances.  Instead, they must purchase

allowances sufficient to cover 100 percent of their annual emissions from the government-run

auction, which results in higher electricity prices for customers.  *See* PDM at 26, n. 133; Post-

Preliminary DM at 6.  However, EU ETS guidelines provide that Member State governments

may compensate installations appearing on the carbon leakage list for a portion of these higher

electricity costs.  *See* Post-Preliminary DM at 6.  In Germany, eligible companies apply to the

FRG by detailing their electricity expenses over the past year and, if approved, the FRG deposits

reimbursement funds directly into the company's bank account.  *See id*.  BGH does not dispute

that the EU ETS Compensation of Indirect CO2 Cost Program constitutes a financial

contribution under 19 U.S.C. § 1677(5)(D)(i), but, incorrectly, claims it received no benefit and

that the program was not specific.

### 1.   The EU ETS Compensation of Indirect CO$_2$ Cost Program Provides a Benefit

BGH claims that the money transferred to it by the FRG "does not provide a

countervailable benefit but only offsets part of the burden imposed by the ETS," *i.e.*, the higher

electricity costs borne by customers.  BGH Br. at 39.  BGH again misunderstands U.S. law, which "treats the imposition of new environmental requirements and the subsidization of compliance with those requirements as two separate actions," the latter of which provides a benefit even if the requirements leave the firm with higher overall costs.  *CVD Final Rule*, 63 Fed. Reg. at 65,361.  The funds transferred by the FRG to BGH under this electricity price compensation program thus constitute a benefit to BGH.

### 2.   The EU ETS Compensation of Indirect CO$_2$ Cost Program is Specific

BGH claims Commerce erred in finding the ETS Compensation of Indirect CO$_2$ Costs *de jure* specific for the same reasons it erred in finding the overall ETS program *de jure* specific, namely that the program is broadly available across the economy.  This is not the case.  Commerce correctly found the ETS Compensation of Indirect CO2 Costs Program, like the ETS program writ large (*see* section II.D.3 *supra*), to be *de jure* specific because the law expressly "limits eligibility to only those companies on the carbon leakage list."  IDM at 51.

### F.   Commerce Lawfully Found the Concession Fee Ordinance Relief Program to be a Countervailable Subsidy

Commerce correctly found that BGH received a countervailable subsidy under the FRG's Concession Fee Ordinance ("*Konzessionsabgabenverordnung*" or "KAV") program.  *See* Final IDM at 37-39.  Under German law, municipalities must make their public transport routes available for the laying and operation of power and gas pipelines by local network operators (NOs).  *See* Post-Preliminary DM at 12.  Use of these public routes is governed by a concession agreement between the NO and the relevant municipality which, *inter alia*, sets the concession fee that the NO must pay the municipality for such use.  *See id.*  The NOs can—and do—pass these concession fees on to their customers.  *See id.*; *see also* Final IDM at 38.  However, German law also specifies that such concession fees "may not be agreed to or {be} paid" for

electricity supplied to special contract customers who meet certain criteria (*i.e.*, whose average electricity price per kilowatt-hour in the prior year is lower than the marginal price agreed upon by the NO and municipality). *See* Post-Preliminary DM at 13.  By prohibiting NOs from paying (and the municipalities from collecting) concession fees from such customers, the FRG ensures that this select group of special contract customers are relieved of paying concession fees that would otherwise be passed down by the NOs. *See* Final IDM at 38.  This constitutes a countervailable subsidy under U.S. law.

1. **The Concession Fee Ordinance Relief Program is a Financial Contribution**

BGH claims that the Concession Fee Ordinance cannot constitute a financial contribution because it did not receive a transfer of funds from the FRG and because no revenue was otherwise due to the private network operators.  BGH Br. at 41-42.  BGH is wrong.  As discussed previously with respect to the FRG's EEG scheme (*see* section II.C.1 *supra*), U.S. law does not require that a financial contribution involve a direct transfer of government funds to the recipient.  Instead, the statute makes clear that a financial contribution exists when a government authority forgoes revenue that would otherwise be due absent the subsidy scheme, 19 U.S.C. § 1677(5)(D)(ii), or entrusts or directs a private entity to do the same, 19 U.S.C. § 1677(5)(B)(iii).

Here, German law requires that NOs pay concession fees to local municipalities in the amount specified in the relevant concession agreement.  Although there is no legal obligation to do so, the NOs, in practice, pass the concession fees on to the users of the network and, in so doing, are "subject to the principle of equal treatment."  Letter from FRG, "Supplemental Questionnaire Response" (Sep. 22, 2020) (P.R. 270) ("FRG 9/22 QR") at 1; *see also* Post-Preliminary DM at 12.  Were it not for the FRG subsidy, BGH would thus face the same concession fee payments charged to other customers.  However, as a result of the FRG law the

relevant municipalities are prohibited from collecting concession fees from the NO for electricity supplied to BGH and other qualifying special contract customers and, as no fee is due, no concession fee is passed on from the NO.  *See* Final IDM at 38.  Commerce thus correctly found that by exempting the NO from paying a portion of the fee due to the municipality for certain customers, and therefore prohibiting the NO from charging those customers those fees, the FRG entrusted or directed the NOs to provide a financial contribution in the form of revenue forgone pursuant to 19 U.S.C. § 1677(5)(D)(ii) and 19 U.S.C. § 1677(5)(B)(iii).  *See* Post-Preliminary DM at 13-14; see also IDM at 38-39.

Contrary to BGH's assertions, this is not purely "a matter of private contract between the {NOs} and the counties/municipalities."  BGH Br. at 46.  Indeed, by the FRG's own admission, if this were a private contract the NOs would be prohibited from favoring certain network users over others.  *See* FRG 9/22 QR at 1.  Rather, the FRG's Concession Fee Ordinance is an *interference* in private contracts, intended to further the FRG's industrial policy goals by directing NOs (and municipalities) to favor certain entities, like BGH.

**2.    The Concession Fee Ordinance Relief Program Provides a Benefit**

BGH claims that the Concession Fee Ordinance does not provide a benefit because it pays net concession fees of almost [          ] Euros, which increases its electricity costs.  *See* BGH Br. at 42.  BGH ignores that it would have owed [          ] Euros *more* in concession fees were it not for the reductions resulting from the Concession Fee Ordinance.  *See* Letter from BGH, "Response to Second Supplemental Questionnaire (Questions 4c, 4d, 9b, 15-23 & 26-28)" (May 8, 2020) (C.R. 152) ("BGH 5/8 QR") at Appendix S-41; *see also* BGH Final Calc. Memo at Attachment, "KAV" worksheet.  As Commerce correctly determined, BGH thus received a benefit "equal to the amount of the concession fees that BGH Siegen…{was} exempted from

paying as a result of this program during the POI, *i.e.*, the amount of the concession fee reduction under the {Concession Fee Ordinance}."  Post-Preliminary DM at 14.

### 3. The Concession Fee Ordinance Relief Program is Specific

BGH claims that the FRG's Concession Fee Ordinance Relief scheme cannot be specific because there is no evidence demonstrating that the program is narrowly focused on discrete segments of the German economy or that it favors particular industries.  BGH Br. at 42-43. BGH again misunderstands the law.  Pursuant to 19 U.S.C. § 1677(5)(D)(i), a program can also be *de jure* specific when the government authority expressly limits access to a group of enterprises.  As Commerce has made clear, there is no requirement that the members of this group share similar characteristics or, for that matter, belong to the same industry.  Instead, "{t}he purpose of the specificity test is simply to ensure that subsidies that are distributed very widely throughout an economy are not countervailed."  *CVD Final Rule*, 63 Fed. Reg. at 65,357.

Here the FRG subsidy is expressly limited to the group of companies "whose average price per kilowatt-hour in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."  Final IDM at 39.  Contrary to BGH's assertions, the fact that these enterprises may be in different industries is irrelevant.  What is relevant is that, by clear legislative mandate, Concession Fee Ordinance Relief is not distributed widely to all German companies, but only to individual enterprises that meet the specified criteria.  As Commerce correctly determined, this makes the program *de jure* specific under U.S. law.  Final IDM at 39.

### III. Commerce's Initiation of This CVD Investigation Was Supported by Substantial Evidence

Petitioners filed a CVD petition against imports of FEBs from Germany to address substantial subsidies provided by the FRG to its domestic FEB industry.  *See* CVD Petition.

In the CVD Petition, Petitioners outlined 15 subsidies provided by the FRG and detailed how each program met the definition of a subsidy under U.S. law (*i.e.*, constituted a financial contribution that was specific and provided a benefit). *See id.* In support, Petitioners provided 32 exhibits containing factual information and descriptions of these programs. *See id.* In response to a supplemental questionnaire from Commerce, Petitioners amended the petition, responded to detailed questions about the alleged programs, and provided an additional six exhibits supporting the subsidy allegations contained in the Petition. *See* Amended CVD Petition. Of the programs alleged, Commerce found 11 to be countervailable upon completion of a full investigation. *See* Final IDM at 5-8.

Notwithstanding Petitioners' detailed description of each subsidy program, an explanation of how each program met the statutory criteria of a countervailable subsidy, dozens of exhibits of supporting documentation, and the legal framework that a petition must include information "reasonably available," 19 U.S.C. § 1671a(b)(1), BGH asserts the "petition filed by petitioners did not meet the minimum statutory and regulatory requirements for the initiation of a countervailing duty investigation," BGH Br. at 43. BGH does not address any of the evidence provided in the CVD Petition or Amended CVD Petition, but merely claims that because Petitioners amended the petition or chose to allege a subsidy under one provision of a German law rather than a different provision renders the petition deficient. *See id.* This Court should not entertain these baseless claims.

*First*, the mere fact that the petition was amended does not demonstrate that Commerce's initiation of the instant CVD investigation is unsupported by substantial evidence. In enacting the CVD statute, Congress explained that a "petition may be amended at such time, and upon such conditions, as {Commerce} may permit." 19 U.S.C. § 1671a(b)(1). Similarly,

Commerce's regulations explain that it "may allow timely amendment of the petition," including amendments that "consists of new allegation."  19 C.F.R. § 351.202(e).  Commerce, thus, has discretion to determine the time and conditions under which a petition may be amended.  And in any event, new subsidies can be raised at any time during the course of an investigation either by an interested party or by Commerce under its own initiative.  *See* 19 U.S.C. § 1677d(1); *see also* 19 C.F.R. § 351.311.  BGH fails to cite to any agency or judicial precedent demonstrating that Commerce acted unlawfully.

*Second*, the fact that Petitioners alleged a countervailable subsidy under one section of the Electricity Tax Act but not others does not render Commerce's initiation of the investigation unsupported by substantial evidence.  As Commerce, explained, "each alleged program is independently analyzed" and "the mere omission of {certain} programs from the petition does not itself render the entire petition, or the allegation pertaining to a certain program, deficient."  Final IDM at 10.  Not every subsidy program provided by a government will meet the statutory definition of a countervailable subsidy under U.S. law upon a full investigation.  Petitioners alleged subsidies under the Electricity Tax Act, provided facts reasonably available that demonstrated that German FEB producers were eligible for these programs and likely used them, and made allegations accordingly.  That the investigation uncovered benefits conferred under one section of the Electricity Tax Act rather than another section does not render *initiation* of the investigation unlawful.  Nor could it as the statute contemplates that Commerce will countervail subsidy programs found during its investigation. *See* 19 U.S.C. § 1677d.

*Third*, BGH misstates the record by claiming that the CVD "petition contained only the most rudimentary data from the internet and failed to demonstrate that any of the climate change measures established by the Government of Germany and the European Union met the elements

necessary for the imposition of countervailing duties."  BGH Br. at 43.  Notably, BGH's claim is

conclusory and fails to discuss the evidence contained in either the CVD Petition or the

Amended CVD Petition and explain how the evidence is lacking.  *See id.*  In fact, the Petition

provided an analysis of each element of a countervailable subsidy (*i.e.*, a financial contribution

that is specific and provides a benefit) for each alleged subsidy and provided reasonably

available factual information and evidence in support.  *See* CVD Petition at 5-34.  Importantly,

the legal standard is "reasonably available," *see* 19 U.S.C. § 1671a(b)(1), and Petitioners

exceeded that standard.  Indeed, the standard is such because countries like Germany have a

woeful record of disclosing subsidy programs.  *See CVD Petition* at 2-4.  BGH may wish to cast

aspersions on Petitioners' efforts to seek redress from unfair trade practices, but baseless

accusations do not substitute for reasoned argument, which BGH has not provided.

## IV.  Commerce Placed All Relevant *Ex Parte* Memoranda on the Record

BGH erroneously claims that Commerce failed to comply with 19 U.S.C. § 1677f(a)(3)

because it failed to maintain a record of an *ex parte* meeting during which Rep. Mike Kelly and

Commerce officials discussed the distinct antidumping duty investigations.  BGH Br. at 45-46.

BGH's assertion is without merit because it failed to cite any evidence reasonably indicating that

the *CVD proceeding* was discussed at the meeting in question and thus failed to demonstrate that

the administrative record of the CVD proceeding is in any way incomplete.  *See generally Soc*

*Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018)

("Parties cannot rely upon speculation that *ex parte* communications occurred, but must establish

that a reasonable basis exists to believe that the administrative record is incomplete."); *see also*

*Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (holding that a "presumption of

regularity" supports official acts that can only be overcome by "clear evidence to the contrary");

*Bernklau v. Principi*, 291 F.3d 795, 801 (Fed. Cir. 2002) (the burden is on attacker to rebut presumption of regularity).

The fact that Commerce conducted an *ex parte* teleconference related to the parallel antidumping duty investigations does not provide a reasonable basis for believing the CVD record is incomplete. As Commerce explained, the "administrative record of the companion AD case is irrelevant to this particular issue, as each investigation stands on its own record. There is no requirement that every *ex parte* communication be placed on the records of companion AD and CVD proceedings, as *ex parte* communications may (and frequently do) pertain to only one segment of a proceeding." Final IDM at 11. This is consistent with 19 U.S.C. § 1677f(a)(3) which only requires Commerce to provide a record of *ex parte* meetings where "information relating to that proceeding was presented or discussed." Contrary to BGH's assertions, there is no indication that information related to the CVD investigation was presented or discussed during the referenced call with Rep. Kelly.

BGH's contention that Rep. Kelly's letter "indicates that other *ex parte* discussions with Dr. Peter Navarro, Director of the Office of Trade and Manufacturing Policy (OTMP), also took place," *see* BGH Br. at 45, is also a gross mischaracterization. Again, this document is not on the record of this proceeding,[8] and BGH's claims fail to make out the high legal standard to establishing that the record is incomplete. Accordingly, BGH's request for remand should be denied.

---

[8] To be sure, while the CVD administrative record does not include the letter and therefore it is unavailable for the Court to review as this is an appeal on the record, *see generally* 19 U.S.C. § 1516a, defendant-intervenors would not object to the Court accessing the letter because its text establishes just how baseless BGH's claims are. The letter addresses the need for verification and discusses a visit to Ellwood Group's plant on a wholly unrelated matter.

## CONCLUSION

As the forgoing discussion demonstrates, in its *Final Determination* Commerce reached reasoned conclusions that are both supported by substantial record evidence and fully in accordance with U.S. law.  That BGH would have preferred a different outcome, or for Congress to amend the countervailing duty statute, does not undermine Commerce's *Final Determination*. Defendant-Intervenors accordingly request that this Court affirm Commerce's *Final Determination* in full.

Respectfully submitted,

/s/ Thomas M. Beline
Thomas M. Beline
Jack A. Levy
Myles S. Getlan
Chase J. Dunn
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
(202) 567-2301
tbeline@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

**NON-CONFIDENTIAL VERSION**

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 12,433 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.


By:     /s/ Thomas M. Beline
         Thomas M. Beline