UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Claire R. Kelly, Judge

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | )   Ct. No. 21-00080 |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| ELLWOOD CITY FORGE COMPANY, *et. al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

**REPLY BRIEF OF**
**BGH EDELSTAHL SIEGEN GMBH**

Marc E. Montalbine
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Dated: April 20, 2022

**TABLE OF CONTENTS**

I.     ARGUMENT ................................................................................................ 1

  A.     Countervailable Subsidy Requirements .................................................. 1

      1.     No Specificity ................................................................................. 2

          a.     *De Jure* Specificity ................................................................. 3

          b.     *De Facto* Specificity .............................................................. 7

      2.     No Financial Contribution ............................................................ 11

          a.     Electricity Tax Act and Energy Tax Act.................................... 12

          b.     EEG and KWKG Surcharges ................................................. 13

          c.     EU Emissions Trading System ("ETS")................................... 14

          d.     Remaining Measures............................................................... 15

      3.     No Benefit..................................................................................... 16

  B.     Improper Initiation and Expansion of Countervailing Duty Investigation .......... 21

  C.     *Ex parte* Communications................................................................. 22

II.    CONCLUSION AND PRAYER FOR RELIEF ........................................... 22

i

# TABLE OF AUTHORITIES

**Cases**

Anderson v. U.S. Sec'y of Agric.,
462 F. Supp. 2d 1333 (CIT 2006) ........................................................................... 10

Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,
429 F. Supp. 3d 1325 (CIT 2020) ............................................................................. 3

Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,
523 F. Supp. 3d 1393 (CIT 2021) ........................................................................... 1-5

Chevron U.S.A. Inc. v. NRDC,
467 U.S. 837 (1984) ................................................................................................. 4

Corus Staal BV v. United States,
502 F.3d 1370 (Fed. Cir. 2007) .............................................................................. 20

Delverde, SrL v. United States,
202 F.3d 1360 (Fed. Cir. 2000) .............................................................................. 17

Nippon Steel Corp. v. United States,
118 F. Supp. 2d 1366 (CIT 2000) ........................................................................... 22

Soc Trang Seafood Joint Stock Co. v. United States,
321 F. Supp. 3d 1329 (CIT 2018) ........................................................................... 22

SKF USA Inc. v. United States,
263 F.3d 1369 (Fed. Cir. 2001) .............................................................................. 10

Timex V.I., Inc. v. United States,
157 F.3d 879 (Fed. Cir. 1998) ................................................................................. 4

Wilmar Trading PTE Ltd. v. United States,
466 F. Supp. 3d 1334 (CIT 2020) ........................................................................... 11

**Statutes**

19 U.S.C. §1671b(b)(4) ............................................................................................ 2

19 U.S.C. § 1677(5) ................................................................................................. 1

19 U.S.C. § 1677(5)(D) ........................................................................................... 13

19 U.S.C. § 1677(5)(E) ......................................................................................... 18, 19

19 U.S.C. § 1677(5A) ............................................................................................ 3, 4, 5, 6

19 U.S.C. § 1677(5A)(D) ............................................................................................ 2, 9

19 U.S.C. § 1677(5A)(D)(i) ..................................................................................... 3, 5, 7

19 U.S.C. § 1677(5A)(D)(iii) ........................................................................................ 8

19 U.S.C. § 1677(6)(A) .............................................................................................. 19

**Administrative Determinations**

Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat
Products from Thailand, 66 Fed. Reg. 50410 (Oct. 3, 2001) .................................... 10, 11

Preliminary Affirmative Countervailing Duty Determination and Preliminary Negative
Critical Circumstances Determination: Carbon and Certain Alloy Steel Wire Rod from
Germany, 67 Fed. Reg. 5991 (Feb. 8, 2002) ..................................................... 9, 10, 16

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ..................... 5, 6, 8

Countervailing Duties Final Rule,
63 Fed. Reg. 65348 (1998) ................................................................................. 12, 13

United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint),
Report of the Panel (WT/DS353/R) (2011) ................................................................. 6, 7

United States – Tax Treatment for "Foreign Sales Corporations," Recourse to Article 21.5
of the DSU by the European Communities, WTO Doc. WT/DS108/AB/RW (Jan. 14, 2002) ... 18

Pursuant to this Court's amended scheduling order of February 8, 2022 (ECF No. 27) and

Rule 56.2(d) of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH ("BGH"), hereby

submits this brief in reply to Defendant's response to plaintiff's motion for judgment on the

agency record (March 21, 2022) (ECF No. 28) ("Gvt. Br.") and the response brief of Defendant-

Intervenors, Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National

Steel Company and A. Finkl & Sons (collectively, "Petitioners" or "Consolidated") (March 21,

2022) (ECF No. 30 & 31) ("Def.-Int. Br.").

## I.    ARGUMENT

### A.    Countervailable Subsidy Requirements

As this Court recently explained in *Asemesa II*, the countervailing duty provisions of the

Tariff Act of 1930 were promulgated by Congress "to empower Commerce to offset economic

distortions caused by countervailable subsidies."  Asociación de Exportadores e Industriales de

Aceitunas de Mesa v. United States, 523 F. Supp. 3d 1393, 1397 (CIT 2021) (hereinafter

"Asemesa II") (citations omitted).  Under the Tariff Act, a countervailable subsidy can only be

found to exists when each of the following three elements is present:

    (1)    a government or public authority has provided a financial contribution;

    (2)    a benefit is thereby conferred upon the recipient of the financial
           contribution; and

    (3)    the subsidy is specific to a foreign enterprise or foreign industry, or a
           group of such enterprises or industries.

Asemesa II, 523 F. Supp. 3d at 1397-98 (citing 19 U.S.C. § 1677(5)).

Neither the Government nor the Defendant-Intervenors dispute this legal standard.  *See*

Gvt. Br. 9; Def.-Int. 8.

As explained in BGH's initial brief, contrary to the clear statutory requirements of section

1677(5), Commerce has treated as countervailable subsidies 10 portions of the climate change

measures established by the German government and the European Union in order to meet their international obligations under the Paris Agreement and predecessor Kyoto Protocol.  Pl. Br. 3-4[1] (*see* table listing each climate change measure and the *ad valorem* subsidy rate imposed by Commerce).[2]  However, these climate change measures do not fulfill any of the statutory requirements for a countervailable subsidy.  These measures are not designed to raise government revenue.  Rather they are designed to reduce greenhouse gas emissions and encourage the development of renewable forms of energy.  None of these measures provide a benefit or financial contribution to German producers of subject merchandise.  Rather, these measures resulted in a direct and substantial increase in BGH's energy costs and imposed financial costs and obligations upon German producers that are not borne by the U.S. domestic industry.

Accordingly, Commerce erred in treating these climate change measures as countervailable subsidies and in imposing countervailing duties upon subject merchandise produced by BGH.

### 1.    No Specificity

As this Court recently explained in *Asemesa II*, a countervailable subsidy can be either *de jure* or *de facto* specific.  <u>Asemesa II</u>, 523 F. Supp. 3d at 1398 (citing 19 U.S.C. § 1677(5A)(D)).  In this current investigation, Commerce found <u>only</u> *de jure* specificity with respect to seven of the ten climate change measures, including the main measures relating to Section 9a of the

---

[1] Citations to BGH's October 26, 2021 Rule 56.2 memorandum in support of motion for judgment upon the agency record (ECF No. 22 & 23) are indicated as "Pl. Br."

[2] As shown by this table, almost 90% of the total final countervailing duty rate of 5.86% relates to just three provisions (*i.e.*, Section 9a of the Electricity Tax Act; Section 51 of the Energy Tax Act and Special Equalization Scheme (EEG Surcharge)).  The remaining provisions account for a total final countervailing duty rate of just 0.66% and are therefore *de minimis* under 19 U.S.C. §1671b(b)(4).

Electricity Tax Act, Section 51 of the Energy Tax Act and the Special Equalization Scheme

(EEG Surcharge).  Commerce made no finding of *de facto* specificity with respect to these

measures and its finding of *de jure* specificity is clearly contrary to the legislative history of the

statute and the Court's recent holding in *Asemesa II*.

a.  *De Jure* Specificity

   This Court's recent decision in *Asemesa II* provided an exhaustive review of the statutory

provisions concerning *de jure* specificity in 19 U.S.C. § 1677(5A)(D)(i).  As explained by the

Court, "a domestic subsidy is de jure specific '[w]here the authority providing the subsidy, or the

legislation pursuant to which the authority operates, expressly limits access to the subsidy to an

enterprise or industry.'" <u>Asemesa II</u>, 523 F. Supp. 3d at 1398 (quoting 19 U.S.C.

§ 1677(5A)(D)(i)).  In that case, Commerce determined that payments provided to olive growers

in Spain through the EU's Common Agricultural Policy ("CAP") and Basic Payment Scheme

("BPS") were *de jure* specific domestic subsidies under section 1677(5A).  <u>Asemesa II</u>, 523 F.

Supp. 3d at 1398-99.

   In *Asemesa I*, the Court initially determined that Commerce's finding that the BPS

program constituted a *de jure* specific subsidy did not include a reviewable interpretation of the

statute and remanded the matter to Commerce for further explanation.  <u>Asociación de</u>

<u>Exportadores e Industriales de Aceitunas de Mesa v. United States</u>, 429 F. Supp. 3d 1325, 1339-

40 (CIT 2020) ("<u>Asemesa I</u>").  On remand, Commerce concluded that, "although the limitation

of the BPS to the agricultural sector is itself not sufficient basis to deem it a de jure specific

subsidy program, its non-uniform application across the agricultural sector <u>does</u> constitute an

express limitation of the subsidy to an enterprise or industry."  <u>Asemesa II</u>, 523 F. Supp. 3d at

1402 (citing <u>Remand Results</u>, 14-15).

3

The Court applied step one of *Chevron* to Commerce's statutory interpretation by looking to the text of section 1677(5A) and using the traditional tools of statutory construction.  <u>Asemesa</u> <u>II</u>, 523 F. Supp. 3d at 1403 (citing <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998); <u>Chevron U.S.A. Inc. v. NRDC</u>, 467 U.S. 837, 843 n.9 (1984)).  The Court analyzed the dictionary definitions of the terms "express" and "limit" as used in section 1677(5A) and determined:

> Thus, the plain meaning of the statute is that a subsidy is de jure specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry. There is no ambiguity in this reading.

<u>Asemesa II</u>, 523 F. Supp. 3d at 1403.

The Court therefore rejected "Commerce's interpretation of Section 1677(5A) as permitting a finding of de jure specificity when 'by law, there is no uniform treatment across the agricultural sector in the provision of benefits.'"  <u>Id</u>. (quoting <u>Remand Results</u> at 14).  The Court explained:

> The law's failure to provide uniform treatment in the distribution of subsidies is not equivalent to its <u>explicit restriction</u> of those benefits to a specific enterprise or industry.  It is not sufficient, as Commerce and the Government suggest, for the legislation underlying the subsidy under consideration to merely "reference[] and incorporate[]" prior legislation which itself may favor a specific sector.  Such reading reduces the de jure specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation.  As Plaintiffs note, it therefore fails to give meaning to the statute's requirement that a de jure specific subsidy must exhibit explicit restriction to an <u>enterprise or industry</u>. . . .  Under the plain meaning of Section 1677(5A), subsidies are only de jure specific where the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry.

<u>Asemesa II</u>, 523 F. Supp. 3d at 1403-04 (citations omitted).

**What is important with the *Asemesa II* decision as it relates to the facts of this current investigation is that both Commerce and the Court determined that limiting the**

**BPS payments to the agricultural sector was itself not a sufficient basis to deem the payments a *de jure* specific subsidy program.**  In fact, this Court went even further and found that the non-uniform application of the BPS payments across the agricultural sector does not meet the statutory requirements for a *de jure* specific subsidy.

In this current investigation, Commerce imposed an unlawful standard of universal availability and automatically treated any measures that were not "broadly available to <u>all industries</u>" as being *de jure* specific.  *See* <u>Final IDM</u>, 41; P.R. 293 (emphasis added).  By "all industries," Commerce evidently meant all industries in the foreign country regardless of size, activity, consumption of electricity and fossil fuels or level of greenhouse gas emissions.  According to Commerce's determination, any non-uniform application of a climate change measure among all industries of the German economy triggers an automatic finding of *de jure* specificity.  *See, e.g.*, <u>id</u>. at 36 (finding *de jure* specificity where measure applied to electricity consumption exceeding one million kWh per year).

Such an interpretation of section 1677(5A)(D)(i) is directly contrary to the clear meaning of the statute and this Court's recent decision in *Asemesa II*.  Accordingly, Commerce's findings of *de jure* specificity with respect to each of the countervailed climate change measure are contrary to law and cannot be sustained.

As this Court found in *Asemesa II*, it is clear that the *de jure* specificity provisions of section 1677(5A)(D)(i) do not require the universal availability of a measure to "all industries" or even uniform application within a specific sector.  The specificity provisions of section 1677(5A) were added to the countervailing duty statute by the Uruguay Round Agreements Act of 1994 ("URAA").  As explained by the Statement of Administrative Action ("SAA") to that Act, 19 U.S.C. § 1677(5A) (section 771(5A) of the Tariff Act of 1930) implements the

provisions of Article 2 of the WTO Subsidies Agreement dealing with specificity.  URAA Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4241 (hereinafter "SAA").  The SAA goes on to explain that "the *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of the subsidy is unnecessary."  Id. H.R. Doc. No. 103-316 at 930; 1994 U.S.C.C.A.N. at 4242.  The *de jure* prong of the specificity test also "does not attempt to provide a precise mathematical formula for determining when the number of enterprises or industries eligible for a subsidy is sufficiently small so as to properly be considered specific."  Id.

From this legislative history contained in the SAA, it is clear that 19 U.S.C. § 1677(5A) was never intended to require universal availability of a measure to "all industries" but rather only applies when the number of enterprises or industries eligible for a subsidy is sufficiently small.  In this investigation, Commerce improperly applied a mathematical formula that anything less than 100% availability meant *de jure* specificity.

The United States, itself, has argued at the WTO that the specificity provisions of Article 2 of the WTO Subsidies Agreement must be given a narrow interpretation.  In the dispute on measures affecting trade in large civil aircraft (DS353), the United States argued that grants by the U.S. Department of Commerce to Boeing to perform R&D under the Advanced Technology Program (ATP) were not *de jure* specific even though the grants were explicitly limited by regulation to only those U.S. companies that perform research into "high risk, high pay-off, emerging and enabling technologies."  United States – Measures Affecting Trade in Large Civil Aircraft (Second Complaint), Report of the Panel (WT/DS353/R), paras. 7.1231- 7.1246 (2011).[3]

---

[3] https://docs.wto.org/dol2fe/Pages/SS/directdoc.aspx?filename=Q:/WT/DS/353R-01.pdf

The United States stressed that to treat the ATP grants as specific would render the specificity requirements of the WTO Subsidies Agreement "meaningless." Id. at para. 7.1234.

Accordingly, Commerce's findings of *de jure* specificity with respect to each of the countervailed climate change measure are contrary to law and cannot be sustained.  Moreover, Commerce's specificity determination for all but three of the countervailed climate change measures are based solely on *de jure* specificity under 19 U.S.C. § 1677(5A)(D)(i), and Commerce has made no determination of *de facto* specificity for these seven measures.[4] Therefore, the specificity determinations for these seven measures must be found to be contrary to law and require no further review by this Court of *de facto* specificity.

### b.    *De Facto* Specificity

As explained above, Commerce's determinations of *de jure* specificity with respect to each of the ten countervailed climate change measures are contrary to law.  Because Commerce only made determinations of *de facto* specificity with respect to three small measures (*i.e.*, sections 9b & 10 of the Electricity Tax Act (StromStG) and section 55 of the Energy Tax Act (EnergieStG)),[5] the Court's review of *de facto* specificity is limited to these three measures.

As explained in BGH's initial brief, Commerce's conclusion that sections 9b and 10 of the Electricity Tax Act and section 55 of the Energy Tax Act are *de facto* specific lacks any legal

---

[4] These seven measures for which Commerce made no determination of *de facto* specificity are EU Emissions Trading System (ETS), Section 9a of the Electricity Tax Act, Section 51 of the Energy Tax Act, Special Equalization Scheme (EEG Surcharge), Special Equalization Scheme (KWKG Surcharge), Concession Fee Ordinance and European Emission Trading System – Compensation of Indirect $CO_2$ Costs.
[5] These three measures account for a total final countervailing duty rate of just 0.27%.

or factual support.[6]  The statute sets out four factors that Commerce must review in making a

determination of *de facto* specificity:

- The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
- An enterprise or industry is a predominant user of the subsidy.
- An enterprise or industry receives a disproportionately large amount of the subsidy.
- The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).

It is undisputed that the last three of these factors are not present in this case.  Rather,

Commerce's entire decision on the *de facto* specificity of sections 9b and 10 of the Electricity

Tax Act and section 55 of the Energy Tax Act is based solely upon the first factor.  The SAA

makes clear that the "Administration intends that Commerce seek and consider information

relevant to all of these factors" (*i.e.*, all four factors in section 1677(5A)(D)(iii)).  SAA, H.R.

Doc. No. 103-316, vol. 1, at 931; 1994 U.S.C.C.A.N. at 4243.  Only when the "number of

enterprises or industries using a subsidy is not large," can the first factor alone show *de facto*

specificity.  Id.  Otherwise, Commerce must give proper weight to the predominant use and

disproportionality factors.  Id.

There is simply nothing in the administrative record that shows that sections 9b and 10 of

the Electricity Tax Act and section 55 of the Energy Tax Act are in any way specific to the

producers of forged steel fluid end blocks or steel products in general.  Rather, these provisions

are broadly available to all companies in the manufacturing, mining, quarrying, oil and gas

---

[6] It should also be noted that the countervailing duty petition and notice of initiation did not even make any subsidy allegations concerning section 9b and 10 of the Electricity Tax Act.  Pl. Br. 43-44.

extraction, utilities and construction sectors, covering 225 industries, with 33,192 companies

using section 9b of the Electricity Tax Act, 9,409 companies using section 10 of the Electricity

Tax Act and 5,448 companies using section 55 of the Energy Tax Act.  Pl. Br. 14-20.

As detailed in BGH's case brief, the number of companies using these provisions is far

above those in other proceedings where Commerce has found the measures not to be specific.

For example, in *Steel Wire Rod from Germany*, Commerce found that the predecessor acts to the

Electricity and Energy Tax Acts did not meet the specificity criteria of section 1677(5A)(D)

where "2,500 companies received the additional tax reduction" and coverage applied only to

companies in the manufacturing, agricultural, and forestry sectors.  Steel Wire Rod from

Germany, 67 Fed. Reg. 5991, 5999 (Feb. 8, 2002).

In *Steel Wire Rod from Germany*, Commerce also compared the total number of steel

companies in Germany (*i.e.*, at that time 37) with the total number of users and the total size of

the tax reductions and concluded that the tax program was "not *de facto* specific to an industry or

enterprise, or to a specific group of industries or enterprises."  Id.  During this current

investigation, there were only 39 German steel producers (statistical no. 24.10) having 250 or

more employees.  Pl. Br. 19-20.  As in *Steel Wire Rod from Germany*, this is a very small

number in comparison to the large number of companies using sections 9b and 10 of the

Electricity Tax Act and section 55 of the Energy Tax Act, thereby supporting the same

determination that these provisions are "not *de facto* specific to an industry or enterprise, or to a

specific group of industries or enterprises."  *See* Steel Wire Rod from Germany, 67 Fed. Reg. at

5999.

In its response brief, the Government does not meaningfully distinguish this prior

precedent.  It only notes that in *Steel Wire Rod from Germany* a larger number of companies

"had used the basic level of the program."  *See* Gvt. Br. 20.

In their response brief, Defendant-Intervenors claim only that the predecessor act "was not specific because it was broadly available to and used by '{c}ompanies in the manufacturing, agriculture, and forestry sectors…if they pay more than DM 1,000 in excise taxes on electricity and mineral oils."  *See* Gvt. Br. 19 (quoting Steel Wire Rod from Germany, 67 Fed. Reg. at 5999).  Defendant-Intervenors make no effort to compare the facts of this investigation to those in *Steel Wire Rod from Germany*.  It is however undisputed that the laws reviewed in *Steel Wire Rod from Germany* were the predecessors to the current Electricity and Energy Tax Acts and had similar provisions and coverage.  *See* Steel Wire Rod from Germany, 67 Fed. Reg. at 5999 (stating that the 1999 ecological tax reform laws were meant to reduce energy consumption and environmental pollution by increasing the excise taxes on mineral oil and electricity and applied to industries in the manufacturing, agricultural, and forestry sectors).

It is a well-established principle of administrative law that "like cases will be treated alike."  Anderson v. U.S. Sec'y of Agric., 462 F. Supp. 2d 1333, 1339 (CIT 2006) (stating that a "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike'").  Moreover, an "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Similarly, in *Certain Hot-Rolled Flats from Thailand*, Commerce found that 351 recipients of a subsidy did not constitute a limited number on either an industry or enterprise basis.  Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 50410 (Oct. 3, 2001), accompanying Issues & Dec. Mem. at Cmt. 15.  In its response brief, the Government tries to distinguish *Certain Hot-Rolled*

*Flats from Thailand* by stating that "no one industry represented a disproportionate amount of the debt on the list {of 351 companies}; and companies were named to the list based on neutral and objective criteria." Gvt. Br. 21. But that is precisely the point. In *Certain Hot-Rolled Flats from Thailand*, Commerce considered all four factors of the *de facto* specificity test and concluded that specificity did not exist even though only 351 companies received the subsidy. By contrast, in this current investigation, Commerce refused to consider the last three factors of the *de facto* specificity test and simply determined that the number of companies using the relevant provisions was *per se* too small even though it ranged from 5,448 to 33,192 companies.

The Government's reliance on *Wilmar Trading* is also inapposite. *See* Gvt. Br. 19. *Wilmar Trading* involved a situation where the subsidy in question was "limited to fourteen Indonesian industries" using crude palm oil. Wilmar Trading PTE Ltd. v. United States, 466 F. Supp. 3d 1334, 1357 (CIT 2020). By contrast, in this investigation, sections 9b and 10 of the Electricity Tax Act and section 55 of the Energy Tax Act apply to companies using electricity, gas and other energy sources in the manufacturing, mining, quarrying, oil and gas extraction, utilities and construction sectors, which cover 225 industries.

Accordingly, Commerce's truncated analysis of *de facto* specificity is not supported by substantial evidence on the administrative record and is contrary to law.

### 2. No Financial Contribution

It is undisputed that the climate change measures countervailed by Commerce in this case are actually additional taxes, surcharges and fees established by the German government and the European Union in order to meet their international obligations under the Paris Agreement and Kyoto Protocol. These measures in no way provide a benefit or financial contribution to BGH. Quite to the contrary, BGH had additional costs of well over 1 million Euros during the period of investigation due to these environmental measures.

11

Nevertheless, Commerce tries to turn these additional costs into a financial contribution by claiming that, despite BGH paying over 1 million Euros in additional taxes, fees and surcharges, the government is "foregoing or not collecting revenue that is otherwise due." In each instance, however, Commerce fails to establish that any revenue is **otherwise due**.

### a.    Electricity Tax Act and Energy Tax Act

The Electricity Tax Act is one integrated law and all of its provisions are integrally linked together and have been since the inception of the Act. The same is true for the Energy Tax Act. BGH fully paid all taxes due under the Electricity Tax Act and the Energy Tax Act, and there is no revenue forgone by the German government that is otherwise due under these Acts. The fact that the Acts may provide for a digressive rate structure as the level of energy consumption increases does not mean that revenues that would otherwise be due are being forgone or not collected. Rather, these revenues are simply not due under the Acts. Large energy users such as BGH are paying far more electricity and energy taxes in absolute terms than smaller energy users, even if the rate per unit of consumption (*e.g.*, kilowatt-hour) may be less.

In its response brief, the Government does not meaningfully respond to this argument. Rather, the Government states only that, in making its determinations, "Commerce took into consideration the entire language of the <u>subsection</u>." Gvt. Br. 15 (emphasis added). Thus, in narrowly focusing on the "subsection," Commerce did not consider the relevant Acts as unitary wholes, which establish the electricity tax and energy tax throughout the German economy by properly considering differences in energy consumption and absolute burdens from the taxes.

The Defendant-Intervenors also try to carve up each Act into two separate enactments. *See* Def.-Int. Br. 9. The Defendant-Intervenors cite to the 1998 *CVD Final Rule* discussing the situation where a "government puts in place new environmental restrictions that require a firm to purchase new equipment to adapt its facilities" and then "the government provides the firm with

subsidies to purchase that new equipment." <u>Countervailing Duties Final Rule</u>, 63 Fed. Reg. 65348, 65361 (1998).  This is definitively not the situation in this case.  The Electricity Tax Act is one integrated law as is the Energy Tax Act.  These Acts establish the imposition of the electricity tax and energy tax throughout the German economy.  As in any tax law, the rates are tailored to allocate the burden of the taxes in a just manner recognizing differences in consumption and the absolute amount of the tax.  There is no revenue due under these Acts that the German government has not properly collected from BGH.  Accordingly, there is no financial contribution under section 1677(5)(D).

**b.**      **EEG and KWKG Surcharges**

It is undisputed that BGH received no transfer of funds under either the Renewable Energy Resources Act (EEG) or the Combined Heat and Power Act (KWKG).  Rather, the record evidence clearly shows that BGH paid net combined EEG and KWKG surcharges of over half a million Euros during the period of investigation.  Pl. Br. 22.  In fact, Commerce concedes that the record does not support a finding that the German government itself is providing a financial contribution pursuant to these measures.  *See* <u>Preliminary IDM</u>, 24; P.R. 220. Nevertheless, Commerce claims that the private network operators are providing a financial contribution in the form of revenue forgone and that the German government "entrusts or directs" the private network operators to provide this alleged financial contribution.

Commerce however has failed to cite any record evidence demonstrating that the private network operators are foregoing any revenue.  In its response brief, Defendant ignores the fact that the EEG and KWKG surcharges are calculated to reimburse the private network operators for the additional costs of using renewable and combined heat and power (CHP) energy.  The four private transmission system operators in Germany determine and publish the EEG and KWKG surcharges in October of each year for the following year on the basis of projected

13

revenues and expenditures taking into account the rate adjustment under the Special Equalization Scheme.  Pl. Br. 23.  Thus, the full amount of the additional costs of using renewable and CHP energy are collected each year by the private network operators and there is no evidence on the administrative record that the private network operators did not fully recoup these costs during the period of investigation.  There is therefore no revenue forgone by the private network operators that is otherwise due.

<strong>c.      EU Emissions Trading System ("ETS")</strong>

Defendant's claim that the allocation of free emission allowances represents "a financial contribution from the FRG to BGH in the form of revenue foregone" is based upon a complete misunderstanding of the ETS system.  *See* Gvt. Br. 33.  As explained in BGH's initial brief, the European Commission calculates annual caps constituting the maximum level of emissions that all installations subject to the ETS in the European Union have the right to emit within a calendar year.  Pl. Br. 31.  In order to ensure that these yearly caps are respected and to monitor the situation, the total number of allowances available in any given year corresponds to these caps. Id. at 32.  Part of the allowances (approximately 43% of the annual ETS cap) are allocated to individual operators by "free allocation of allowances," and the remaining allowances (approximately 57% of the annual ETS cap) are auctioned using the private trading platform European Energy Exchange AG (EEX).  Id.  The free allocation of allowances does not relieve companies of any costs, but simply establishes a threshold of emissions beyond which operators have to make pollution abatement investments or pay for the excess allowances.  Because free allowances decrease gradually but constantly, they are a transitional element in order to achieve the final environmental aim of climate neutrality by 2050.  Id. at 32-33.

As a factual matter, the two groups of allowances are totally separate.  The 43% of free allowances cannot be actioned by the European Union or its Member States and the 57%

auctioned allowances cannot be allocated for free.  Pl. Br. 33.  By law, neither the European

Union nor any Member State may collect revenues on the 43% of free allowances and none of

the 57% auctioned allowances can be allocated for free.  In addition, the allocation of free

allowance to any particular company does not change the total amount of free allowances.  If the

allotted free allowances in a given year will exceed the 43% threshold, an across-the-board

reduction in the number of free allowances is made by way of a "cross-sectoral correction factor"

("CSCF").  Id. at 32.  Accordingly, the ETS never provides for the allocation of allowances

where a government is foregoing revenue that is otherwise due.

Defendant simply ignores these facts in its response brief.  Although Defendant-

Intervenors mention these facts in their response brief, they simply state, without explanation,

that these facts are "irrelevant."  See Def.-Int. Br. 28.  However, for purposes of determining

whether there is a foregoing of revenue that is otherwise due, the strict separation between free

allowances and auctioned allowances and the percentage limitations on each group are crucial.

The administrative record simply does not support Commerce's determination that the allocation

of free allowances constitutes a financial contribution in the form of revenue forgone that is

otherwise due.

### d.  Remaining Measures

With respect to the Concession Fee Ordinance, Commerce again concedes that BGH

received no transfer of funds from the German government but claims that the private network

operators are providing a financial contribution in the form of revenue forgone and that the

German government "entrusts or directs" the private network operators to provide this alleged

financial contribution.  See Final IDM, 38-39; P.R. 293.  The record is however clear that neither

the private network operators nor the German government are foregoing any revenue that is

otherwise due.  The Concession Fee Ordinance clearly sets out that counties/municipalities may

not charge private network operators concession fees on electricity supplied to special contract customers with below Marginal Price electricity prices.  Pl. Br. 41.  There is therefore simply no concession fee otherwise due by private network operators in these situations and no fee to be passed on to the final customer.

The ETS Compensation of Indirect $CO_2$ Costs is simply a corollary to the EU Emissions Trading System ("ETS") discussed above.  Because electricity production is not entitled to the allocation of any free allowances under the ETS system, electricity companies must purchase emission allowances for 100% of their emissions and these costs are passed on in full to electricity customers, even customers in industries that would otherwise be entitled to free emission allowances.  To remedy this problem, the ETS system sets out clear and objective criteria for offsetting a portion of the emission allowance costs indirectly paid by customers in industries having a significant risk of carbon leakage.  Pl. Br. 39.[7]

### 3.   No Benefit

It is undisputed that the climate change measures countervailed by Commerce in this case are actually additional taxes, surcharges and fees established by the German government and the European Union in order to meet their international obligations under the Paris Agreement and Kyoto Protocol.  These measures in no way provided a benefit to BGH but rather increased BGH's energy costs by well over 1 million Euros during the period of investigation.  In its initial brief, BGH explained how no previous administration has found such climate change measures to confer a countervailable benefit and that, in 2002, the Bush Administration examined the predecessors to the Electricity Tax Act and Energy Tax Act and found them not to be countervailable.  Pl. Br. 12 (citing Steel Wire Rod from Germany, 67 Fed. Reg. 5991, 5999).

---

[7] In any event, these two remaining measures account for a total final countervailing duty rate of only 0.17%.

In arguing that the determination in this present investigation is not an unprecedented action by the Trump Administration, Defendant-Intervenors state:

> Rather, Commerce's findings were entirely consistent with well-established U.S. law, which has long made clear that the United States will not allow foreign governments to harm U.S. industry by subsidizing domestic manufacturers under the guise of environmental objectives regardless of how sincerely held the belief is to address environmental degradation.  Commerce's rationale makes sense because otherwise a foreign government could subsidize its industry to cost competitiveness and be immune from the WTO obligations by calling the measure "environmental."

Def.-Int. Br. 10.  There is however no evidence on the administrative record as to any of these claims.  The environmental taxes, surcharges and fees established by the German government and the European Union in no way improve the cost competitiveness of German producers.  German electricity rates are already some of the highest in the world and these additional environmental taxes, surcharges and fees simply increase those costs.  At the same time, the U.S. industry is not subject to comparable taxes, surcharges or fees.  Indeed, neither the petitioners nor Commerce have made any allegation that BGH received electricity or any other energy source for less than adequate renumeration.

Defendant-Intervenors reliance upon *Saarstahl* for the proposition that the conferral of a "competitive advantage on foreign producers vis-à-vis U.S. industry" is "immaterial" is also misplaced.  *See* Def.-Int. Br. 6 (citing Saarstahl AG v. United States, 78 F.3d 1539, 1543 (Fed. Cir. 1996)).  In *Delverde*, the U.S. Court of Appeals for the Federal Circuit explicitly stated that *Saarstahl* was based on the Tariff Act before it was amended by the Uruguay Round Agreements Act (URAA).  Delverde, SrL v. United States, 202 F.3d 1360, 1368 (Fed. Cir. 2000).  Under the amended Tariff Act, the "statute clearly states that Commerce must determine that a person received both a financial contribution and a benefit, either directly or indirectly, through one of the acts enumerated." Id. (emphasis added).

Any common sense consideration of the climate change measures reviewed in this investigation would certainly conclude that BGH is receiving no benefit under these measures but is rather paying additional taxes, surcharges and fees, significantly increasing its energy costs.  The obligation to pay additional taxes, surcharges and fees on energy, additional costs that are not paid by U.S. producers, can in no way be seen as a benefit to BGH.

Moreover, as explained in BGH's initial brief, Commerce has miscalculated the benefit under the various measures because it simply applies the base rate under the applicable measure to BGH's full energy usage and disregards the fact that BGH is already paying taxes and surcharges on an absolute basis that were far higher than the vast majority of other energy customers due to its large energy consumption.  *See* Pl. Br. 20-21, 29-30 & 38.  Any calculation of a countervailable benefit received during the period of investigation must consider the absolute amount of taxes/surcharges paid in comparison to other customers.  *See* Appellate Body Report, United States – Tax Treatment for "Foreign Sales Corporations," Recourse to Article 21.5 of the DSU by the European Communities, para. 98, WTO Doc. WT/DS108/AB/RW (Jan. 14, 2002) (stating that "whether revenue foregone is otherwise due must allow a comparison of the fiscal treatment of comparable income, in the hands of taxpayers in similar situations").

While Defendant-Intervenors try to dismiss the persuasive effect of this Appellate Body Report, the concept that the benefit analysis rests on an analysis of similarly situated parties is imbedded into U.S. law.  *See*, Def.-Int. Br. 14.  Indeed, all the examples of a benefit being conferred listed in 19 U.S.C. § 1677(5)(E) require a comparison between the alleged subsidy and other comparable transactions.  For example, in the case of an equity infusion, a comparison with "the usual investment practice of private investors"; in the case of a loan, a comparison with "a comparable commercial loan that the recipient could actually obtain on the market"; in the case

of the provision of goods or services, a comparison with the "prevailing market conditions for the good or service being provided." *See* 19 U.S.C. § 1677(5)(E).

By blindly applying the base rate to BGH's total energy consumption without considering the absolute amount paid and the relative consumption compared to other energy consumers, Commerce comes out with absurdly high benefit amounts. For example, according to Commerce's benefit calculations, BGH should have paid a combined EEG and KWKG surcharge that is 115% more than the actual costs of the electricity itself. Pl. Br. 29. It is also important to understand that the surcharge rate reduction only applied to the amount of electricity consumption exceeding one million kilowatt-hours (kWh) per year (*i.e.*, 1 gigawatt-hour (GWh)). Id. at 27, n.7.

Commerce also failed to consider the costs associated with complying with the provisions of the various climate change measures in its benefit calculations. Pl. Br. 20-21 & 30. In response to these arguments, Defendant states that "BGH cites no regulation, statute, or other authority for why Commerce should take these factors into account when calculating the subsidy." Gvt. Br. 29. However, such costs are clearly to be taken into consideration when calculating the net countervailable subsidy according to 19 U.S.C. § 1677(6)(A). Contrary to Defendant-Intervenors' contentions, the investment requirements to qualify for these climate change measures (*e.g.*, operation of an energy management system that corresponds to the requirements of DIN EN ISO 50001) were specifically reported to Commerce during the investigation and Commerce did not make any subsequent information request concerning the specific costs. *See* Def.-Int. Br. 20; Pl. Br. 20-21 & 30.

In its initial brief, BGH also detailed various errors made by Commerce in its benefit calculations. *See, e.g.*, Pl. Br. 20-21, 29-30 & 38. With respect to BGH's argument that

Commerce used the wrong amount of free allowances in its benefit calculations (Pl. Br. 38),

Defendant contends that BGH failed to exhaust its administrative remedies.  *See* Gvt. Br. 34-35.

The problem is however that BGH was not granted adequate administrative remedies.

The post-preliminary determination for BGH was not issued until October 22, 2020 even

though the original preliminary determination was issued on May 19, 2020.  *See* BGH Extension

Request for Case Brief, 1 (Oct. 30, 2020); P.R. 279.  Commerce's very late issuance of a post-

preliminary determination and its sudden decision just one day later to cancel verification and set

a one-week briefing period gave BGH no meaningful time to review the changes made in

Commerce's preliminary determination or the revised calculations.  The insufficiency of this

extremely short time period was compounded by the fact that Commerce also suddenly issued a

questionnaire in lieu of performing on-site verification in the related antidumping duty

investigation on October 20, 2020, setting a one-week response deadline, and then refused to

extend the deadline for this antidumping question by more than one day.  Id.  Thus, up until

submission of the response to the questionnaire in lieu of performing on-site verification on

Wednesday, October 28, 2020, BGH and its counsel were fully occupied with meeting the

response deadline set by Commerce in the related antidumping duty investigation.  BGH Case

Brief, 2; P.R. 283.  Nevertheless, Commerce denied BGH's request for extension of the deadline

for filing case briefs and refused to make any changes in the briefing schedule.  Denial of

Extension of Time to Submit Case Briefs (Oct. 27, 2020); P.R. 280.

Application of the doctrine of exhaustion is discretionary and the courts have recognized

many exceptions to its application.  *See* Corus Staal BV v. United States, 502 F.3d 1370, 1378-

81 (Fed. Cir. 2007).  After taking five months subsequent to the original preliminary

determination to issue its post-preliminary determination, Commerce cannot properly foreclose a

party's rights to judicial review by providing such a short time to comment on the post-preliminary determination and revised subsidy calculations.

**B.      Improper Initiation and Expansion of Countervailing Duty Investigation**

In its initial brief, BGH has substantiated the major deficiencies in the countervailing duty petition.  Pl. Br. 43-44.  Commerce should not have initiated the countervailing duty investigation based upon this deficient petition; nor should it have expanded the investigation to include measures that could have been alleged in the petition.  Defendant claims that "Commerce is obliged to investigate programs it discovers during the course of an investigation."  Gvt. Br. 44.  This obligation however only applies when "the Secretary concludes that sufficient time remains before the scheduled date for the final determination."  19 C.F.R. § 351.311(b).

There simply was not sufficient time to expand the investigation as Commerce did in this case.  Despite the deficient nature of the questionnaire, Commerce initiated the investigation and then included a broad question seeking information on "any other forms of assistance to your company."  Countervailing Duty Questionnaire, 31 (Feb. 4, 2020); P.R. 55.  Commerce then issued multiple rounds of supplemental questionnaires to the German government and the foreign producers seeking to obtain information on programs far outside of the scope of the petition.  This, in turn, led to Commerce taking the unprecedented step of issuing a post-preliminary determination, countervailing additional programs, some five months after the date of the preliminary determination and then requiring case briefs to be submitted just 11 days after issuance of the post-preliminary determination.  See BGH Case Brief, 1-2; P.R. 283.  This severely affected BGH's procedural and due process rights by giving it no meaningful time to review the changes made in Commerce's preliminary determination and prepare its case brief.

### C.    *Ex Parte* Communications

It is undisputed that Commerce had an *ex parte* meeting in the related antidumping duty investigation with Representative Mike Kelly and that this meeting included Commerce officials responsible for decision-making in this current countervailing duty investigation. *See* Pl. Br. 45-46.  The letter from Representative Kelly to the Commerce Secretary also indicates that other *ex parte* discussions with Dr. Peter Navarro, Director of the Office of Trade and Manufacturing Policy (OTMP), also took place.  Id. at 45.  This evidence establishes a reasonable basis for the existence of *ex parte* communications and therefore fully complies with the judicial authorities cited by this Court in *Soc Trang Seafood*. *See* Soc Trang Seafood Joint Stock Co. v. United States, 321 F. Supp. 3d 1329, 1343 (CIT 2018); *see also* Nippon Steel Corp. v. United States, 118 F. Supp. 2d 1366 (CIT 2000) (taking judicial notice of press reports indicating that there were *ex parte* meetings absent from the record).

Defendant-Intervenors citations to *Butler* and *Bernklau* that a presumption of regularity supports official acts is not applicable to the current situation.  Both of these cases involved actions by the Veterans Administration and the U.S. Court of Appeals for Veterans Claims, and this current situation involves not an official act but a claim of inaction.  *See* Butler v. Principi, 244 F.3d 1337 (Fed. Cir. 2001); Bernklau v. Principi, 291 F.3d 795 (Fed. Cir. 2002).

## II.    Conclusion and Prayer for Relief

For the reasons stated above and in BGH's Rule 56.2 memorandum in support of motion for judgment upon the agency record (ECF No. 22 & 23), we respectfully request that the Court find that Commerce's Final Determination is not supported by substantial evidence on the administrative record and not in accordance with the law and remand this case to Commerce for redetermination.

Respectfully submitted,


/s/ Marc E. Montalbine
Marc E. Montalbine*
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman**
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de

Date: April 20, 2022                       *Counsel to BGH Edelstahl Siegen GmbH*

_____

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

\** Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **6,999** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

 

       /s/ Marc E. Montalbine
       Marc E. Montalbine*
       **DEKIEFFER & HORGAN, PLLC**
       1090 Vermont Ave., N.W.
       Suite 410
       Washington, DC 20005
       Tel: (202) 783-6900
       Fax: (202) 783-6909
       email:  montalbine@dhlaw.de
Date: April 20, 2022       *Counsel to BGH Edelstahl Siegen GmbH*

————————

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).