C-428-848<br>
Remand<br>
Slip Op. 22-117<br>
POI: 01/01/2018 – 12/31/2018<br>
<strong>Public Document</strong><br>
E&C/OVIII: SS

*BGH Edelstahl Siegen GmbH v. United States*,
Consol. Court No. 21-00080; Slip. Op. 22-117 (CIT October 12, 2022)
**Forged Steel Fluid End Blocks from the Federal Republic of Germany**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.   SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in *BGH Edelstahl Siegen GmbH v. United States*, Consol. Court No. 21-00080, Slip Op. 22-117 (CIT October 12, 2022) (*Remand Order*). These final results of redetermination concern the final determination in the countervailing duty (CVD) investigation on forged steel fluid end blocks from the Federal Republic of Germany (Germany).[1] In its *Remand Order*, the CIT directed Commerce to: (1) consider in the first instance whether to account for the compliance costs in its calculation of the CVD rates for subsidy programs under the Electricity Tax Act and Energy Tax Act; and (2) explain or reconsider its determination that the Konzessionsabgaben-verordnung (KAV) Program is a specific subsidy.[2]

---

[1] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Forged Steel Fluid End Blocks from the People's Republic of China, the Federal Republic of Germany, India, and Italy: Countervailing Duty Orders, and Amended Final Affirmative Countervailing Duty Determination for the People's Republic of China*, 86 FR 7535 (January 29, 2021) (*CVD Order*).
[2] *See Remand Order* at 50.

On December 12, 2022, Commerce released its Draft Results of Redetermination on the two issues identified above.³ On December 19, 2022, BGH Edelstahl Siegen GmbH (BGH) submitted timely comments on the Draft Results of Redetermination.⁴ No other interested party submitted comments on the Draft Results of Redetermination.

As set forth in detail below, pursuant to the CIT's *Remand Order*, we have explained our determination not to account for compliance costs in our calculation of the CVD rates for programs under the Electricity Tax Act and Energy Tax Act, and we have further explained our determination that the KAV Program is specific. For these final results of redetermination on remand, we have made no changes to the final subsidy rates calculated during the investigation.⁵ Further, in the "Interested Party Comments" section below, we have addressed BGH's comments on the Draft Results of Redetermination.

## II. BACKGROUND

### A. Electricity Tax Act and Energy Tax Act Programs

In the *Final Determination*, Commerce determined that respondents BGH and Schmiedewerke Gröditz GmbH received countervailable subsidies under provisions in Germany's Electricity Tax Act and Energy Tax Act.⁶ Pursuant to section 771(5)(E) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.509(a)(1), Commerce determined that these subsidies provided a benefit to the recipients in the amount of tax savings.⁷

---

³ *See* Draft Results of Redetermination, *BGH Edelstahl Siegen GMBH v. United States*, Consol. Court No. 21-00080, Slip Op. 22-117 (CIT October 12, 2022), dated December 12, 2022 (Draft Results of Redetermination).
⁴ *See* BGH's Letter, "Comments on Draft Results of Redetermination," dated December 19, 2022 (BGH's Draft Remand Comments).
⁵ *See Final Determination*, 85 FR at 80012, unchanged in *CVD Order*, 86 FR at 7536.
⁶ *See Final Determination* IDM at 6-7 and Comment 9. The Electricity Tax Act and Energy Tax Act are also known as the Stromsteuergesetz (StromStG) and Energiesteuergesetz (EnergieStG), respectively. *Id.* at 2.
⁷ *See Forged Steel Fluid End Blocks from the Federal Republic of Germany: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 31454 (May 26, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision

2

In the *Remand Order*, the CIT held that Commerce did not address BGH's argument regarding the effect of compliance costs on the subsidy rate calculations for these programs. Specifically, the CIT stated, "BGH raised the cost of compliance, stating, 'Commerce also failed to properly account for all the costs related to complying with the various climate change measures,' providing as an example 'an energy management system' under section 10 of the Electricity Tax Act."[8] The CIT remanded this issue for Commerce to consider in the first instance the effect of compliance costs on the subsidy rate calculations for the Electricity Tax Act and Energy Tax Act programs.[9] Further, the CIT stated that Commerce "may consider whether it wishes to reopen the record to permit the parties to submit evidence on BGH's costs of compliance."[10]

### B. Specificity of KAV Program

In the *Final Determination*, Commerce determined that the KAV Program was *de jure* specific pursuant to section 771(5A)(D)(i) of the Act, which provides that a subsidy is *de jure* specific if the governing authority "expressly limits access to the subsidy."[11] Commerce determined that the Government of Germany (FRG) "expressly limited access to the subsidy by providing relief to only those companies whose average price per kilowatt-hour {(kWh)} in the

---

Memorandum (PDM) at 20-22, unchanged in *Final Determination* IDM at 6-7; *see also* Memorandum, "Post-Preliminary Analysis of Countervailing Duty Investigation: Forged Steel Fluid End Blocks from the Federal Republic of Germany," dated October 21, 2020 (Post-Preliminary Analysis), at 7-9, unchanged in *Final Determination* IDM at 6-7.
[8] *See Remand Order* at 25.
[9] *Id.* at 26 and 50.
[10] *Id.* at 26.
[11] *See Final Determination* IDM at Comment 8 (citing section 771(5A)(D)(i) of the Act).

calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."[12]

In the *Remand Order*, the CIT stated that Commerce did not explain how this program favors certain industries over others or otherwise explicitly limits usage as to who may apply.[13] As the CIT noted, "{l}imiting the availability of a program may not be *de jure* specific if the criteria are neutral, *i.e.*, do not favor some industries over others."[14] The CIT held that "Commerce did not address whether criteria based on energy usage is economic in nature and horizontal in application, such that the program may not be specific as a matter of law" pursuant to section 771(5A)(D)(ii) of the Act.[15] On this basis, the CIT remanded the issue for Commerce to explain or reconsider its determination that the KAV Program is *de jure* specific.[16]

### III. ANALYSIS

#### A. Electricity Tax Act and Energy Tax Act Programs

We acknowledge, as the CIT held, that our final decision memorandum did not address BGH's argument regarding the effects of compliance costs on the subsidy rate calculations.[17] However, as discussed in detail below, the Act, our regulations, the *1998 Final Preamble*,[18] and Commerce's case precedent establish that Commerce will not incorporate offsets for compliance costs into its subsidy rate calculations. Specifically, we have explained why Commerce's subsidy rate calculations do not incorporate offsets for costs to comply with government laws and regulations such as climate change measures, including costs incurred to participate in

---

[12] *Id.*
[13] *See Remand Order* at 49.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 50.
[17] *Id.* at 25-26 (citing *Final Determination* IDM at 1-2 and 39-45; and BGH's Letter, "Case Brief," dated November 2, 2020, at 8-9).
[18] *See Countervailing Duties; Final Rule*, 63 FR 65348 (November 25, 1998) (*1998 Final Preamble*).

4

government programs under the measures. Based on this determination, we have made no changes to the subsidy rates calculated during the investigation.[19]

Section 771(6) of the Act is explicit and only permits three specific types of offsets to a "net countervailable subsidy:" (1) the deduction of application fees, deposits, and similar payments necessary to qualify for or receive a subsidy; (2) accounting for losses due to deferred receipt of the subsidy; and (3) the subtraction of export taxes, duties, or other charges intended to offset the countervailable subsidy.[20] Congress and the courts have affirmed that the statute permits only these specific types of offsets.[21] Further, Commerce has recognized the limited scope of the offset provision in its past cases.[22] Offsets for costs that a firm incurs to comply with a government's climate change measures or to participate in government programs under the measures do not fall within these three categories in the Act. Further, when analyzing whether a countervailable subsidy exists, Commerce does not consider the effects of the subsidy. Unless specified under section 771(6) of the Act, Commerce need not consider any other burdens or costs imposed on a firm that are related to the granting of the subsidy, such as those pertaining to compliance with certain environmental protection obligations.[23]

As explained in the *1998 Final Preamble*, Commerce looks at each subsidy program independently from other parts of a law, regulation, *etc.*, to evaluate whether the program confers

---

[19] *See Final Determination*, 85 FR at 80012, unchanged in *CVD Order*, 86 FR at 7536.
[20] *See* section 771(6)(A)-(C) of the Act.
[21] *See Trade Agreements Act of 1979*, U.S. Senate Report No. 96-249 (1979) (*TAA 1979*), at 86 ("{t}he list is narrowly drawn and is all inclusive."); *see also Kajaria Iron Castings v. United States*, 156 F.3d 1163, 1174 (Fed. Cir. 1998) (*Kajaria Iron Castings*) ("we agree that {section 771(6) of the Act} provides the exclusive list of permissible offsets …."); and *Geneva Steel v. United States*, 914 F. Supp. 563, 609 (CIT 1996) (*Geneva Steel*) (explaining that section 771(6) of the Act contains "an exclusive list of offsets that may be deducted from the amount of a gross subsidy").
[22] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Recission of Countervailing Duty Administrative Review; 2019*, 87 FR 6842 (February 7, 2022), and accompanying IDM at Comment 3; and *Large Residential Washers from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 75975 (December 26, 2012) (*Washers from Korea*), and accompanying IDM at Comment 10.
[23] *See 1998 Final Preamble*, 63 FR at 65361; *see also* 19 CFR 351.503(c).

5

a countervailable benefit.[24]  The *1998 Final Preamble* directly addresses BGH's argument, stating that "{a} subsidy that reduces a firm's cost of compliance remains a subsidy … even though the overall effect of the two government actions, taken together, may leave the firm with higher costs."[25]  The effect of the subsidy program and any related laws or regulations affecting the recipient's behavior, such as complying with the energy management system requirements under section 10 of the Electricity Tax Act, is not material to Commerce's determination as to whether the program confers a countervailable benefit and the amount of that benefit.

Section 771(5)(C) of the Act makes this principle explicit, stating that Commerce "is not required to consider the effect of the subsidy in determining whether a subsidy exists."[26]  In addition, 19 CFR 351.503(c) further elaborates on Commerce's practice of not considering the effects of a subsidy in our determination as to whether a program confers a countervailable benefit.  This section of the regulations states, "{i}n determining whether a benefit is conferred, the Secretary is not required to consider the effect of the government action on the firm's performance, including its prices or output, or how the firm's behavior otherwise is altered."[27]  For BGH to receive tax savings under the Electricity Tax Act and Energy Tax Act programs, it had to comply with certain environmental protection obligations.  In this instance, the firm's behavior was otherwise altered because of government action (*i.e.*, requirements laid out by the FRG in the provisions of the Electricity Tax Act and Energy Tax Act to receive the tax savings).  As a result, Commerce need not consider BGH's costs of complying with the climate change measures when analyzing whether these programs are countervailable subsidies, including whether they confer a countervailable benefit and the amount of that benefit.

---

[24] *See 1998 Final Preamble*, 63 FR at 65361.
[25] *Id.*
[26] *Id.*; *see also* section 771(5)(C) of the Act.
[27] *See* 19 CFR 351.503(c).

Further, the *1998 Final Preamble* describes a relevant example in which a government implements new environmental restrictions that require a firm to purchase new equipment.[28] The government then provides the firm with subsidies to purchase the new equipment, but this assistance does not fully offset the cost of the equipment.[29] Thus, the environmental regulations impose an overall net burden on the firm. The *1998 Final Preamble* proceeds to explain that, in this instance, Commerce would treat the new environmental requirements and the subsidization of compliance with those requirements as two separate actions.[30] In analyzing the subsidization separately from the environmental requirements, Commerce would not consider the cost of the new requirements as an offset to the government's assistance.[31]

Therefore, based on the Act's explicit limitation on the types of allowable offsets to subsidies, regulations detailing our practice of not considering the effects of a subsidy, and the guidance in the *1998 Final Preamble*, we find no basis to depart from our longstanding approach of evaluating subsidies without regard to any alleged burden, such as compliance costs.[32] Accordingly, for these final results of redetermination on remand, we have made no changes to the final calculated subsidy rates based on BGH's arguments. Further, we also do not find it

---

[28] *See 1998 Final Preamble*, 63 FR at 65361.
[29] *Id*.
[30] *Id.*
[31] *Id*.
[32] *See, e.g.*, *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 87 FR 27570 (May 9, 2022) (*Certain Hot-Rolled Steel Flat Products from Korea*), and accompanying IDM at Comment 1; *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 73252 (December 27, 2021) (*CTL Plate from Korea*), and accompanying IDM at Comment 3; *Washers from Korea* IDM at Comment 10; *Certain Softwood Lumber Products from Canada: Final Results of Countervailing Duty Expedited Review*, 84 FR 32121 (July 5, 2019) (*Certain Softwood Lumber Products from Canada 2015*), and accompanying IDM at Comment 7; *Certain Softwood Lumber Products from Canada: Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 FR 48455 (August 9, 2022) (*Certain Softwood Lumber Products from Canada 2020*), and accompanying IDM at Comment 62; and *Certain Uncoated Groundwood Paper from Canada: Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018) (*Certain Uncoated Groundwood Paper from Canada*), and accompanying IDM at Comment 68.

necessary to reopen the record to permit parties to submit evidence on BGH's costs of compliance.[33]

### B. Specificity of KAV Program

Commerce made its determination pursuant to section 771(5A)(D)(i) of the Act, which provides that a subsidy *is* specific as a matter of law when a governing authority expressly limits access to the subsidy. However, the CIT's analysis focuses on section 771(5A)(D)(ii) of the Act, which provides that a subsidy *is not* specific as a matter of law when three different conditions are all met.[34] Commerce continues to find that the KAV Program is specific pursuant to 771(5A)(D)(i) of the Act and, pursuant to the *Remand Order*, explains below how the KAV Program does not meet the conditions under section 771(5A)(D)(ii) of the Act, because the objective criteria or conditions of the KAV Program are not neutral.

The definition of "objective criteria or conditions" in section 771(5A)(D)(ii) of the Act states, "{f}or purposes of this clause, the term 'objective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another."[35] As we explained in the Post-Preliminary Analysis, utility companies and municipalities in Germany may agree to a Marginal Price that exceeds the average revenue per kWh from the supply of electricity to all special contract customers in the penultimate calendar year.[36] Conversely, they may also agree to a lower Marginal Price.[37] As stipulated by German law, the relevant Marginal

---

[33] *See Remand Order* at 26.
[34] *See* section 771(5A)(D)(ii) of the Act. Pursuant to this section, a subsidy is not *de jure* specific if the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, where: (I) eligibility is automatic; (II) the criteria or conditions for eligibility are strictly followed; and (III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification. The term "objective criteria or conditions" in this section of the Act means criteria or conditions that are neutral and that do not favor one enterprise or industry over another. *Id.*
[35] *See* section 771(5A)(D)(ii) of the Act.
[36] *See* Post-Preliminary Analysis at 13.
[37] *Id.*

8

Price (and, therefore, the requirement to pay concession fees for electricity supplied to the final consumer) is calculated separately for each electricity supplier and each operating site or point of delivery.[38] If the applicant for an exemption from the concession fee is: (1) a special contract customer; and (2) provides data to demonstrate that its average electricity price per kWh during the calendar year is lower than the Marginal Price agreed upon by the network operator (NO) and the municipality, the NO will not be required to pay concession fees for the electricity supplied to the applicant.[39] Therefore, the NO will not pass on a concession fee to the applicant.[40]

Based on this record evidence, we find that the FRG favors certain enterprises over others through the KAV Program. First, only special contract customers are eligible for the program.[41] Additionally, the KAV Program favors a specific subset of special contract customers: those applicants with electricity prices that are lower than the Marginal Price agreed upon by the NO and the municipality.[42] For this subset of special contract customers, the NO will not pass on a concession fee.[43] The KAV Program favors special contract customers in this group, as they are the only companies eligible to receive the fee exemption.[44] On this basis, we find that the eligibility criteria and conditions under the KAV Program are not neutral and favor certain special contract customers over other enterprises. Hence, the KAV Program is not

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.* As the CIT noted, "special contract customers" are those whose measured power exceeds 30 kilowatts in at least two months of the billing year and whose annual consumption is more than 30,000 kWh, as defined in section 2(7) of the KAV. *See Remand Order* at 49 (citing FRG's Letter, "First Supplemental Questionnaire Response," dated June 5, 2020, at Exhibit KAV03, p. 2 (containing section 2(7) of the KAV); and FRG's Letter, "Supplemental Questionnaire Response," dated September 22, 2020, at 7–8).
[42] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8 (stating that "the FRG also reports that the NOs receive exemptions in the concession fees they pay to the municipality associated with *certain special contract customers* which qualify for the concession fee relief.") (Emphasis added).
[43] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8 (stating that "{t}hrough the requirement that concession fees not be charged to *qualifying special contract customers*, the FRG is entrusting and directing the NOs to forgo collecting or paying revenue which would otherwise be due to the municipal governments.") (Emphasis added).
[44] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8.

consistent with the standards for "objective criteria or conditions" in section 771(5A)(D)(ii) of the Act.

In addition, given that the FRG favors a specific subset of special contract customers based on their electricity prices, we find that the criteria are not economic in nature and horizontal in application.[45] The SAA identifies "number of employees or the size of the enterprise" as examples of criteria that are economic in nature and horizontal in application.[46] As discussed above, the FRG effectively favors certain enterprises with lower electricity prices over those with higher electricity prices through this program. We do not find that criteria based on electricity prices for a specific group (*i.e.*, special contract customers with electricity prices that are lower than the Marginal Price agreed upon by the NO and the municipality) are economic in nature and horizontal in application. The FRG's eligibility criteria are not based on electricity usage or factors such as enterprise size or number of employees, as identified in the SAA.[47]

## IV. INTERESTED PARTY COMMENTS

### A. Electricity Tax Act and Energy Tax Act Programs

*BGH's Comments*

- Commerce did not reopen the record or reasonably explain its failure to consider BGH's costs related to applying for measures under the Electricity and Energy Tax Acts.[48]
- Costs incurred to operate an energy management system are one example of costs paid to qualify for benefits under section 10 of the Electricity Tax Act and section 55 of the Energy Tax Act.[49]
- Pursuant to section 771(6)(A) of the Act, Commerce subtracts from a gross countervailable subsidy the amount of "any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy." The

---

[45] *See Remand Order* at 49.
[46] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 930.
[47] *Id.*
[48] *See* BGH's Draft Remand Comments at 2.
[49] *Id.* at 2-3.

- amount incurred by BGH to operate an energy management system qualifies as a "similar payment paid in order to qualify for the benefit."[50]
- The statute makes clear that both explicit "application fees" and similar payments that serve as a prerequisite for qualifying for a subsidy fall under section 771(6)(A) of the Act.[51]
- The costs of an energy management system are not costs that a firm incurs to comply with a government's climate change measures. Instead, they are costs specifically incurred to qualify for measures under the Electricity and Energy Tax Acts.[52]
- No general obligation to operate an energy management system exists under German law, so benefits under the Electricity and Energy Tax Acts do not constitute subsidies to comply with new environmental requirements.[53]

**Commerce's Position:**

We disagree with BGH. As explained above, section 771(6) of the Act only permits three specific types of offsets to subsidies: (1) the deduction of application fees, deposits, and similar payments necessary to qualify for or receive a subsidy; (2) accounting for losses due to deferred receipt of the subsidy; and (3) the subtraction of export taxes, duties, or other charges intended to offset the countervailable subsidy.[54] Congress and the courts have both found that Commerce is limited in making offsets to subsidies under the statute.[55] Accordingly, Commerce has not applied subsidy offsets that are beyond the narrow scope of the language in section 771(6) of the Act.

Commerce has rejected arguments to apply the same types of subsidy offsets that BGH is requesting. In *Certain Softwood Lumber Products from Canada 2015*, for example, a party claimed that a provincial logging tax effectively functioned as an application fee or deposit

---

[50] *Id.* at 3.
[51] *Id.* at 3-4.
[52] *Id.* at 4.
[53] *Id.* at 5.
[54] *See* section 771(6)(A)-(C) of the Act.
[55] *See TAA 1979* at 86 (stating that "{t}he list is narrowly drawn and is all inclusive."); *see also Kajaria Iron Castings*, 156 F.3d at 1174 (stating that "we agree that {section 771(6) of the Act} provides the exclusive list of permissible offsets.…"); and *Geneva Steel*, 914 F. Supp. at 609 (explaining that section 771(6) of the Act "provides an exclusive list of offsets that may be deducted from the amount of a gross subsidy …").

necessary to qualify for a separate federal tax credit.[56] On this basis, the party argued that subtracting the provincial tax amount from the federal tax credit resulted in a net benefit of zero under the federal tax credit program.[57] Commerce rejected this argument, finding that "there are two government actions: (1) the {province} imposes an additional tax on loggers; and (2) the {federal government} and {province} provide a tax credit for the provincial tax on logging income."[58] Commerce determined that the federal program was fully countervailable because it reduced the respondent's taxes that were otherwise due.[59] In the instant case, treating the FRG's climate change measures and its subsidies related to those measures as separate actions is consistent with the *1998 Final Preamble* and Commerce's determinations in past cases, such as *Certain Softwood Lumber Products from Canada*.[60] BGH's costs to comply with the FRG's climate change measures are separate from the tax benefits BGH received under the Electricity Tax Act and Energy Tax Act. Thus, these costs do not constitute a "similar payment paid in order to qualify for the benefit," as BGH asserts.[61]

Additionally, in *Certain Uncoated Groundwood Paper from Canada*, a party argued that Commerce should have modified the benefit calculation for a program that required it "to curtail its power usage and consequently incur costs."[62] On this basis, the party argued that "Commerce must account for the entirety of the transactions involved" by calculating the program benefit "as the payment in excess of the value of {respondent}'s obligations and costs from participation in the program."[63] Citing *TAA 1979*, *Kajaria Iron Castings*, and *Geneva Steel*, Commerce rejected

---

[56] *See Certain Softwood Lumber Products from Canada 2015* IDM at Comment 7.
[57] *Id.*
[58] *Id.* (citing *1998 Final Preamble*, 63 FR at 65361).
[59] *Id.*
[60] *See 1998 Final Preamble*, 63 FR at 65361; *see also Certain Softwood Lumber Products from Canada 2015* IDM at Comment 7; *Certain Softwood Lumber Products from Canada 2020* IDM at Comment 62.
[61] *See* BGH's Draft Remand Comments at 3.
[62] *See Certain Uncoated Groundwood Paper from Canada* IDM at Comment 68.
[63] *Id.*

the party's request to modify the benefit calculations.[64]  Specifically, Commerce disagreed with the respondent's request to calculate a countervailable subsidy "which is net of {the respondent}'s costs under section 771(5)(E) {of the Act} and 19 CFR 351.503."[65]  Consistent with *Certain Uncoated Groundwood Paper from Canada*, we do not find that offsets to account for BGH's "obligations and costs from participation in the program{s}"[66] are permissible under section 771(6) of the Act.  The FRG provides tax benefits to relieve BGH of a financial burden that it would otherwise incur.[67]  An offset to the subsidy rate consisting of BGH's costs to participate in the program would otherwise result in a subsidy rate that does not accurately reflect the tax benefits BGH received.  Accordingly, the Electricity Tax Act and Energy Tax Act programs provide a benefit in the amount of taxes exempted.[68]

BGH argues that its costs to operate an energy management system qualify as a "similar payment paid in order to qualify for the benefit{s}" under the Electricity Tax Act and Energy Tax Act programs.[69]  However, costs to operate an energy management system are not a payment that is similar to a payment such as an application fee or deposit.  The FRG's climate change measures and subsidies related to those measures are two separate government actions.  On this basis, BGH's costs to operate an energy management system are not "application fees, deposits, and similar payments necessary to qualify for or receive a subsidy."[70]  By way of example, following a trade fair, a firm receives a government grant to support its participation in

---

[64] *Id.* (citing *TAA 1979* at 472; *Kajaria Iron Castings*; and *Geneva Steel*).
[65] *Id.*
[66] *Id.*
[67] *See, e.g.*, Post-Preliminary Analysis at 9 (stating that "{t}he actual tax relief is then calculated based on the savings on pension contributions"); *see also* FRG's Letter, "Forged Steel Fluid End Blocks from the Federal Republic of Germany: Section II Response," dated April 6, 2020, at Exhibit ETA(55)-1.
[68] *See Preliminary Determination* PDM at 20-22, unchanged in *Final Determination* IDM at 6-7; *see also* Post-Preliminary Analysis at 7-9, unchanged in *Final Determination* IDM at 6-7.
[69] *See* BGH's Draft Remand Comments at 3 (citing section 771(6)(A) of the Act).
[70] *See* section 771(6)(A) of the Act.

the fair. Under BGH's argument, the firm's expenses incurred to participate in the trade fair, such as for marketing materials, travel, and employee wages, would qualify as subsidy offsets because they are "costs specifically incurred to qualify for the measures."[71] Under this interpretation, any cost that a firm incurs would potentially constitute a "similar payment{} necessary to qualify for or receive a subsidy."[72] To make the offset here as argued by BGH, Commerce would be acting contrary to the Act's explicit limitation on allowable subsidy offsets. Thus, BGH's argument is inconsistent with Congress's and the courts' interpretation that Commerce is limited in making offsets to subsidies under the statute.[73]

Therefore, based on the Act's limitation on allowable subsidy offsets, regulations detailing our practice of not considering the effects of a subsidy, the guidance in the *1998 Final Preamble*, Congress's statement in the *TAA 1979*, court precedent, and Commerce's established practice, we do not find that BGH's costs to operate an energy management system constitute a "similar payment paid in order to qualify for the benefit" under the Electricity Tax Act and Energy Tax Act programs.[74] The FRG's tax benefits under the Electricity Tax Act and Energy Tax Act programs and its climate change measures constitute two separate government actions. Therefore, adjustments for costs that BGH incurs to comply with the FRG's climate change measures, including costs that BGH incurs to participate in the measures, are not permissible

---

[71] *See* BGH's Draft Remand Comments at 4. BGH argues that *Certain Hot-Rolled Steel Flat Products from Korea* and *CTL Plate from Korea*, which we cited in the Draft Results of Redetermination, are inapplicable because they "did not involve any payments paid in order to qualify for the benefit." *Id.* As explained in this section, however, we do not find that BGH's costs to participate in the FRG's climate change measures or to comply with those measures fall within the three categories of offsets in section 771(6)(A)-(C) of the Act. Accordingly, we continue to find that these cases demonstrate Commerce's practice of evaluating subsidies without regard to any alleged burden such as compliance costs. *See Certain Hot-Rolled Steel Flat Products from Korea* IDM at Comment 1; *see also CTL Plate from Korea* IDM at Comment 3.
[72] *See* section 771(6)(A) of the Act.
[73] *See TAA 1979* at 86 (stating that "{t}he list is narrowly drawn and is all inclusive."). *See also Kajaria Iron Castings*, 156 F.3d at 1174 (stating that "we agree that {section 771(6) of the Act} provides the exclusive list of permissible offsets.…"); and *Geneva Steel*, 914 F. Supp. at 609 (explaining that section 771(6) of the Act "provides an exclusive list of offsets that may be deducted from the amount of a gross subsidy …").
[74] *See* BGH's Draft Remand Comments at 3.

14

offsets under section 771(6) of the Act. Given that these offsets are not permissible under section 771(6) of the Act, we also do not find it necessary to reopen the record to permit parties to submit evidence on BGH's costs of compliance.[75] Accordingly, we have made no changes to the Draft Results of Redetermination based on BGH's arguments.

### B. Specificity of KAV Program

*BGH's Comments*

- The CIT directed Commerce to address whether criteria based on energy usage are economic in nature and horizontal in application, such that the KAV Program may be considered not specific as a matter of law pursuant to section 771(5A)(D)(ii) of the Act. However, in the Draft Results of Redetermination, Commerce failed to explain its specificity determination.[76]
- Eligibility for the KAV Program is automatic. Moreover, the criteria and conditions for eligibility are strictly followed, clearly set forth in the KAV statute, and verifiable.[77]
- No record evidence shows that the concession fee rate limit is narrowly focused on discrete segments of the German economy. Rather, any commercial/industrial enterprise can qualify for the program.[78]
- The FRG bases eligibility on energy usage as a neutral criterion (*i.e.*, a criterion economic in nature and horizontal in application). Average energy consumption is economic in nature and applied horizontally, as it is not restricted to certain enterprises or industries.[79]
- No record evidence shows that the Marginal Price comparison favors any industries or groups of industries. In fact, section 2(4) of the KAV states that special contract customers qualify for the program if their average unit price in that calendar year is lower than the average unit revenue from the supply of electricity to all special contract customers for the previous year.[80]
- No record evidence demonstrates that the criterion limits availability of the KAV Program to specific industries, sectors, or companies.[81]

---

[75] *See Remand Order* at 26.
[76] *See* BGH's Draft Remand Comments at 7.
[77] *Id.*
[78] *Id.* at 8.
[79] *Id.* at 8-9.
[80] *Id.* at 9.
[81] *Id.* at 10.

15

**Commerce's Position:**

We disagree with BGH. In its comments on the Draft Remand Redetermination, BGH states, "{a}s the court noted in its decision, the crucial point to determine specificity in the present case is therefore whether the criteria limiting the availability of the program are neutral."[82] As explained above, we find that the eligibility criteria and conditions under the KAV Program are not neutral and favor certain special contract customers over other enterprises. First, only special contract customers are eligible for the program.[83] Additionally, the KAV Program favors a specific subset of special contract customers: those applicants with electricity prices that are lower than the Marginal Price agreed upon by the NO and the municipality.[84] For this subset of special contract customers, the NO will not pass on a concession fee.[85] The KAV Program favors special contract customers in this group, as they are the only companies eligible to receive the fee exemption.[86] Thus, record evidence demonstrates that the objective criteria or conditions of the program are not neutral. Pursuant to the CIT's *Remand Order*, we have cited this evidence to demonstrate that the KAV Program does not meet the conditions specified in section 771(5A)(D)(ii) of the Act.

Further, BGH argues that "there is no evidence on the administrative record showing that the concession fee rate limit is in any way narrowly focused on discrete segments of the German economy."[87] BGH does not explain, however, why this type of evidence on the concession fee

---

[82] *Id.* at 7-8.
[83] *See* Post-Preliminary Analysis at 13.
[84] *Id.*; *see also Final Determination* IDM at Comment 8 (stating that "the FRG also reports that the NOs receive exemptions in the concession fees they pay to the municipality associated with *certain special contract customers* which qualify for the concession fee relief.") (Emphasis added).
[85] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8 (stating that "{t}hrough the requirement that concession fees not be charged to *qualifying special contract customers*, the FRG is entrusting and directing the NOs to forgo collecting or paying revenue which would otherwise be due to the municipal governments.") (Emphasis added).
[86] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8.
[87] *See* BGH's Draft Remand Comments at 8.

rate limit was necessary for a determination that the program is specific pursuant to section 771(5A)(D)(i) of the Act or how it relates to the instructions in the CIT's *Remand Order*. We determined that the program is specific pursuant to section 771(5A)(D)(i) of the Act because the FRG "expressly limited access to the subsidy by providing relief *to only those companies* whose average price per kilowatt-hour {(kWh)} in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."[88] Hence, the program is specific pursuant to section 771(5A)(D)(i) of the Act because the FRG expressly limits access to a "group" of enterprises, *i.e.*, a subset of special contract customers.[89] Sections 771(5A)(D)(i) and (ii) of the Act do not require Commerce to determine that any such "group" of enterprises is "narrowly focused on discrete segments" of a country's economy, as BGH has argued.[90]

Finally, BGH argues that "the Marginal Price comparison is also a neutral criterion not favoring specific industries or companies over others," and that "{p}rices are by nature an economic criterion."[91] As discussed above, the FRG favors a subset of special contract customers (*i.e.*, special contract customers with electricity prices that are lower than the Marginal Price agreed upon by the NO and the municipality) through this program.[92] Given that the FRG favors a specific subset of special contract customers based on their electricity prices, we find that the criteria are not economic in nature and horizontal in application. The SAA identifies "number of employees or the size of the enterprise" as examples of criteria that are economic in nature and horizontal in application.[93] The SAA does not identify prices of goods or services as

---

[88] *See Final Determination* IDM at Comment 8 (citing section 771(5A)(D)(i) of the Act) (Emphasis added).
[89] *See* section 771(5A)(D) of the Act (stating, "For purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.").
[90] *See* BGH's Draft Remand Comments at 8.
[91] *Id.* at 9.
[92] *See* Post-Preliminary Analysis at 13; *see also Final Determination* IDM at Comment 8.
[93] *See* SAA at 930.

a criterion that is economic in nature and horizontal in application, particularly when the prices in question apply to a specific group (*i.e.*, those special contract customers with electricity prices that are lower than the Marginal Price agreed upon by the NO and the municipality). As such, BGH's claim that "there is no evidence on the record that the criterion limits in any way the availability of the KAV Program to specific industries, sectors or even companies"[94] is inconsistent with record evidence on the eligibility criteria for the program. Accordingly, we do not find that eligibility for the KAV Program is consistent with the standards for "objective criteria or conditions" in section 771(5A)(D)(ii) of the Act, and we have made no changes to the Draft Results of Redetermination based on BGH's argument.

V.     **FINAL RESULTS OF REDETERMINATION**

Pursuant to the CIT's *Remand Order*, and in consideration of the record evidence, we have explained our determination not to account for compliance costs in our calculation of the CVD rates for programs under the Electricity Tax Act and Energy Tax Act, and we have further explained our determination that the KAV Program is specific. For these final results of redetermination on remand, we have made no changes to the final subsidy rates calculated during the investigation.[95]

1/9/2023

X _____

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[94] *See* BGH's Draft Remand Comments at 10.
[95] *See Final Determination*, 85 FR at 80012, unchanged in *CVD Order*, 86 FR at 7536.

18