C-428-848
Remand
Slip Op. 24-60
POI: 01/01/2018 – 12/31/2018
**Public Document**
E&C/OVIII: SS/RP

*BGH Edelstahl Siegen GmbH v. United States*,
**704 F. Supp. 3d 1372 (CIT 2024)**
**Forged Steel Fluid End Blocks from the Federal Republic of Germany**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO FOURTH COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of
redetermination pursuant to the fourth remand opinion and order of the U.S. Court of
International Trade (CIT) in *BGH Edelstahl Siegen GmbH v. United States*, 704 F. Supp. 3d
1372 (CIT 2024) (*Fourth Remand Order*).  These final results of redetermination concern the
final determination of the countervailing duty (CVD) investigation on forged steel fluid end
blocks from the Federal Republic of Germany (Germany) and Commerce's *Third Remand
Results*.[1]  In the *Third Remand Results*, we found, under respectful protest,[2] that the
Konzessionsabgabenverordung (KAV) Program was not *de jure* specific pursuant to section
771(5A)(D)(i) of the Tariff Act of 1930, as amended (the Act).[3]  Additionally, because we found
no basis to reconsider our decision in the *Final Determination* that the KAV Program "is *de jure*

---

[1] *See Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Forged Steel Fluid End Blocks from the People's Republic of China, the Federal Republic of Germany, India, and Italy:  Countervailing Duty Orders, and Amended Final Affirmative Countervailing Duty Determination for the People's Republic of China*, 86 FR 7535 (January 29, 2021) (*Order*); and *Final Results of Redetermination Pursuant to Court Remand, BGH Edelstahl Siegen GmbH v. United States*, Consol. Court No. 21-00080; Slip. Op. 23-159 (CIT November 14, 2023), dated February 12, 2024 (*Third Remand Results*).
[2] *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (*Viraj*).
[3] *See Third Remand Results* at 2 and 6.

specific rather than *de facto* specific," we determined that this program did not constitute a countervailable subsidy.[4]  Consequently, we revised the subsidy rates for BGH Edelstahl Siegen GmbH (BGH Siegen), Schmiedewerke Gröditz GmbH (SWG), voestalpine Bohler Group (voestalpine Bohler), and all other producers/exporters not subject to individual examination from the rates in the *Final Determination*.[5]

On May 22, 2024, the CIT remanded for Commerce to further explain or reconsider its determination in the *Third Remand Results*.[6]  Specifically, the CIT held that Commerce "failed to conduct *a de facto* specificity analysis despite there being reasons to believe the KAV Program is specific as a matter of fact."[7]

On August 23, 2024, Commerce released its Draft Remand Redetermination on this issue.[8]  On August 29, 2024, BGH Siegen and the petitioner[9] submitted timely comments on the Draft Remand Results.[10]  No other interested party submitted comments on the Draft Remand Results.

Consistent with the *Fourth Remand Order*, we have further explained our determination that the KAV Program does not constitute a countervailable subsidy because it is neither *de jure* nor *de facto* specific.  Consequently, no change to the subsidy rates calculated in the *Third Remand Results* is warranted.[11]

---

[4] *Id.*; s*ee also Final Determination* IDM at Comment 8.
[5] *See Third Remand Results* at 9-10; *see also Final Determination*, 85 FR at 80012 (unchanged in *Order*, 86 FR at 7536).
[6] *See Fourth Remand Order*, 704 F. Supp. 3d at 1380.
[7] *Id.*
[8] *See* Draft Remand Redetermination, *BGH Edelstahl Siegen GmbH v. United States*, Court No. 21-00080, Slip. Op. 24-60 (CIT May 22, 2024), dated August 23, 2024 (Draft Remand Results).
[9] The petitioner is the FEB Fair Trade Coalition (the petitioner) comprised of the Forging Industry Association, Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons.
[10] *See* BGH Siegen's Letter, "Comments on Draft Results of Redetermination," dated August 29, 2024 (BGH Siegen's Comments) and Petitioner's Letter, "Petitioner's Comments on Commerce's Draft Fourth Remand Redetermination," dated August 29, 2024 (Petitioner's Draft Comments).
[11] *See Third Remand Results* at 9-10.

II.    **SPECIFICITY OF KAV PROGRAM**

A.    **Background**

In the *Final Determination*, we determined that the KAV Program was *de jure* specific pursuant to section 771(5A)(D)(i) of the Act because the Government of Germany (GOG), via legislation, "expressly limited access to the subsidy by providing relief to only those companies whose average price per kilowatt-hour {(kWh)} in the calendar year is lower than the average revenue per kWh from the supply of electricity to all special contract customers."[12]  In its *First Remand Order*, the CIT explained that Commerce's *Final Determination* did not address how the KAV Program favored certain industries over others or otherwise explicitly limited usage as to who may apply, stating that "{l}imiting the availability of a program may not be *de jure* specific if the criteria are neutral, *i.e.*, do not favor some industries over others."[13]  The CIT held that "Commerce did not address whether criteria based on energy usage is economic in nature and horizontal in application, such that the program may not be specific as a matter of law" pursuant to section 771(5A)(D)(ii) of the Act.[14]  On this basis, the CIT remanded for Commerce to further explain or reconsider its determination.[15]

In the *First Remand Results*, we continued to find the KAV Program to be *de jure* specific pursuant to section 771(5A)(D)(i) of the Act.[16]  We also found that the KAV Program did not meet the standards set forth in section 771(5A)(D)(ii) of the Act because the objective criteria or conditions of the program were not neutral.[17]  Specifically, we found that the GOG

---

[12] *See Final Determination* IDM at Comment 8 (citing section 771(5A)(D)(i) of the Act).
[13] *See BGH Edelstahl Siegen GMBH v. United States*, 600 F. Supp. 3d 1241, 1269 (CIT 2022) (*First Remand Order*).
[14] *Id.*
[15] *Id.*
[16] *See Final Results of Redetermination Pursuant to Court Remand, BGH Edelstahl Siegen GmbH v. United States*, Consol. Court No. 21-00080, Slip. Op. 22-117 (CIT October 12, 2022), dated January 9, 2023 (*First Remand Results*), at 8, available at https://access.trade.gov/resources/remands/22-117.pdf.
[17] *Id.* at 9.

3

favored certain enterprises over others through the KAV Program because: (1) only "special contract customers" were eligible for the program; and (2) the program favored a specific subset of special contract customers — those applicants with electricity prices that were lower than the Marginal Price agreed upon by the network operator and the municipality.[18]  In addition, we explained that the SAA identifies "number of employees or the size of the enterprise" as examples of criteria that are economic in nature and horizontal in application.[19]  Thus, we found that criteria based on electricity prices for a specific group (*i.e.*, special contract customers with electricity prices that were lower than the Marginal Price agreed upon by the network operator and the municipality) were not "economic in nature and horizontal in application" in accordance with the description in the SAA.[20]

        In its *Second Remand Order*, the CIT held that Commerce's *First Remand Results* failed to explain: (1) how the amount of electricity consumed or the electricity prices paid by companies are not economic in nature; and (2) how criteria based solely on electricity consumption and pricing are not horizontal in application.[21]  Regarding the latter, the CIT explained that for the KAV Program's criteria to be vertical in application, the criteria would need to expressly limit the program's application to specifically named enterprises or industries or a group of enterprises or industries.[22]  The CIT elaborated that the GOG's eligibility criteria for the KAV Program did not expressly limit the program's application to specific enterprises or

---

[18] *Id.*
[19] *Id.* at 10 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 930).
[20] *Id.*
[21] *See BGH Edelstahl Siegen GmbH v. United States*, 639 F. Supp. 3d 1237, 1243-44 (CIT 2023) (*Second Remand Order*).
[22] *Id.* at 1244 (citing section 771(5A)(D)(i) the Act).

industries or groups of enterprises or industries.[23]  Accordingly, the CIT, again, remanded for Commerce to further explain or reconsider its determination.[24]

In the *Second Remand Results*, we found that the GOG's eligibility criteria for the KAV Program were not horizontal in application, and thus not neutral, pursuant to section 771(5A)(D)(ii) of the Act.[25]  We explained that "where an authority, by law, limits eligibility to a group of enterprises or industries (*e.g.*, those that operate specific types of 'stationary equipment'), it *cannot* do so uniformly."[26]  Further, we explained that "by expressly limiting eligibility to certain groups that the authority, itself, defines, the authority has, in effect, established criteria that are vertical in nature."[27]  Applying this analysis to the KAV Program, we found that "only special contract customers with lower average prices per kWh in the calendar year than the average revenue per kWh from the supply of electricity to all special contract customers are in the tier of eligibility (*i.e.*, the top tier) for the program.  All firms that did not pay these prices were in the tier of ineligible firms (*i.e.*, the bottom tier)."[28]  On this basis, we found the eligibility criteria for the KAV Program to be vertical in application.[29]

In its *Third Remand Order*, the CIT held that Commerce's position that a subsidy is *de jure* specific where "implementing legislation expressly limit{s} access to the 'group' that the legislation itself created" to be contrary to law.[30]  The CIT elaborated that "{t}he statute allows a

---

[23] *Id.*

[24] *Id.*

[25] *See Final Results of Redetermination Pursuant to Court Remand, BGH Edelstahl Siegen GmbH v. United States*, Consol. Court No. 21-00080; Slip. Op. 23-71 (CIT May 9, 2023), dated August 7, 2023 (*Second Remand Results*), at 11, available at https://access.trade.gov/resources/remands/23-71.pdf.

[26] *Id.* (citing *Certain Softwood Lumber Products from Canada:  Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review, 2020*, 87 FR 48455 (August 9, 2022), and accompanying IDM at Comment 103).

[27] *Id.*

[28] *Id.* (citing *Final Determination* IDM at Comment 8; GOG's Letter, "First Supplemental Questionnaire:  Response to Certain Questions," dated June 5, 2020, at Exhibits KAV-02 and KAV-03).

[29] *Id.*

[30] *See BGH Edelstahl Siegen GmbH v. United States*, 663 F. Supp. 3d 1378, 1384 (CIT 2023) (*Third Remand Order*).

subsidy to be limited to fewer than all enterprises or industries in an economy, so long as that criteria creating that legislation is objective."[31]  On this basis, the CIT remanded for Commerce to further explain or reconsider its determination that the KAV Program is *de jure* specific.[32]

In the *Third Remand Results*, under respectful protest,[33] we found that the KAV Program is not *de jure* specific pursuant to section 771(5A)(D)(i) of the Act.[34]  Additionally, because we found no basis to reconsider our decision in the *Final Determination* that the KAV Program "is *de jure* specific rather than *de facto* specific," we determined that this program does not constitute a countervailable subsidy.[35]  Consequently, we revised the subsidy rates for BGH Siegen, SWG, voestalpine Bohler, and all other producers/exporters not subject to individual examination from the rates in the *Final Determination*.[36]

On May 22, 2024, the CIT remanded for Commerce to further explain or reconsider its determination.[37]  Specifically, the CIT held that Commerce "failed to conduct *a de facto* specificity analysis despite there being reasons to believe the KAV Program is specific as a matter of fact."[38]

On July 11, 2024, we issued a supplemental questionnaire requesting additional information from the GOG with respect to whether the KAV Program is *de facto* specific pursuant to section 771(5A)(D)(iii) of the Act.[39]  Specifically, we asked that the GOG:

- Explain in detail what steps it took to obtain data from network operators (NOs) regarding concession fees paid by final consumers;
- Explain whether the relevant GOG authorities collect any statistical information or data, including aggregate data, regarding the implementation of

---

[31] *Id.* (citing SAA at 4242).
[32] *Id.*
[33] *See Viraj*, 343 F.3d at 1376.
[34] *See Third Remand Results* at 2 and 6.
[35] *Id.*; *see also Final Determination* IDM at Comment 8.
[36] *See Third Remand Results* at 6.
[37] *See Fourth Remand Order*, 704 F. Supp. 3d  at 1380.
[38] *Id.*
[39] *See* Commerce's Letter, "Supplemental Questionnaire," dated July 11, 2024 (GOG Supplemental Questionnaire).

the reduced concession fees under the Energy Industry Act and section 2(4) of
the KAV, *e.g.*, with respect to the number and types of entities claiming
reduced concession fees;

- Clarify whether NOs are required to provide any statistical data or
  information, including aggregated data, to the relevant GOG authorities
  regarding the collection and/or implementation of the concession fees; and
- Provide any available alternative information and/or data concerning the
  program's use that could inform our *de facto* analysis, including from GOG or
  third-party studies.[40]

The GOG timely responded on July 26, 2024,[41] explaining that no government authority

is involved in the process of granting concession fee relief under Section 2(4) of the KAV.[42] The

GOG elaborated that it does not have data on the concession fees paid by specific companies

because no government authority is involved in administering the process towards the final

consumer.[43] Consequently, the GOG stated that it did not attempt to obtain this information

from the NOs because the NOs are unable to provide this information;[44] according to the GOG, it

lacks the legal authority to acquire information on concession fees paid by companies because

NOs are prohibited from disclosing such information to the GOG pursuant to Germany's Trade

Secrets Protection Act (TSPA).[45] With respect to aggregated data on the collection of

concession fees, the GOG provided an excerpt of the "2018 Monitoring Report" that shows the

aggregate concession fees paid by industrial customers during the period of investigation

(POI).[46] The GOG also provided statistical data on "electricity sales and revenues of electricity

supply companies by customer groups," published by the GOG's Federal Statistical Office.[47]

This source provides annual totals for electricity usage in gigawatt hours (gWh) and the annual

---

[40] *Id.* at 3-4.
[41] *See* GOG's Letter, "Response to Supplemental Questionnaire," dated July 26, 2024 (GOG's SQR).
[42] *Id.* at 2.
[43] *Id.*
[44] *Id.*
[45] *Id.* at 3-4.
[46] *Id.* at 6 and Exhibit Remand-04.
[47] *Id.* at 6 and Exhibit Remand-05.

average price in cents per kWh for two customer types: (1) special contract customers (Sondervertragskunden), and (2) regular contract customers (Tarifkunden).[48]

On August 2, 2024, the petitioner submitted factual information to rebut, clarify, or correct information contained in the GOG's SQR.[49]  The petitioner provided a copy of a report titled "Environmentally Harmful Subsidies in Germany: Update 2021," published by the Umweltbundesamt (Federal Environmental Agency) of the GOG.[50]  Based on this report, the petitioner claims that the GOG's Statistisches Bundesamt (Federal Statistical Office) calculates the annual threshold price used to determine which enterprises are provided a complete exemption of the concession fee under paragraph 2(4) of the KAV.  Additionally, the petitioner argues that information on the aggregate number and types of entities that the GOG provides reduced concession fees is not a trade or business secret.[51]  The petitioner also contends that there is no reason the GOG could not have requested such data in actual or aggregate form from the NOs, which are the private entities that the GOG designated to administer the GOG's legally mandated subsidy.[52]

### B.    Analysis

On remand, we have further explained our determination that the KAV Program does not constitute a countervailable subsidy because it is neither *de jure* nor *de facto* specific. Specifically, we have analyzed whether record evidence supports a determination that the KAV Program is *de facto* specific pursuant to section 771(5A)(D)(iii) of the Act.

---

[48] *Id.*
[49] *See* Petitioner's Letter, "Petitioners' RFI and Comments on GOG SQR," dated August 2, 2024 (Petitioner's RFI Submission).
[50] *Id.* at 2 and Attachment.
[51] *Id.* at 3-4.
[52] *Id.*

Pursuant to section 771(5A)(D)(iii) of the Act, where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number;
(II)    An enterprise or industry is a predominant user of the subsidy;
(III)   An enterprise or industry receives a disproportionately large amount of the subsidy; and
(IV)    The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In reviewing the record, we find no evidentiary basis to determine the KAV Program meets any of the criteria listed above in section 771(5A)(D)(iii) of the Act. For example, in response to the GOG Supplemental Questionnaire, the GOG provided the "Electricity sales and revenues of electricity supply companies by customer groups" report from its Federal Statistical Office, which covers the 2018 POI.[53] This report shows that special contract customers in Germany consumed 294,737 gWh of electricity in 2018, compared to total consumption of 445,188 gWh by all final consumers.[54] Thus, special contract customers (*i.e.*, the enterprises that are eligible for the KAV concession fee exemption) accounted for over half of Germany's electricity consumption during the POI. However, the report does not categorize special contract customers on an enterprise or industry basis, nor does the information provide the number of enterprises or industries which are considered special contract customers. Therefore, we cannot determine, on the basis of record evidence, whether any subset of recipients is a predominant user or receives a disproportionally large amount of the subsidy pursuant to sections 771(5A)(D)(iii)(II) and (III) of the Act.[55]

---

[53] *See* GOG's SQR at Exhibit Remand-5.
[54] *Id.*
[55] *See*, *generally*, section 771(5A)(D)(iii) of the Act.

As explained above, the GOG stated that it was unable to provide actual usage information on reduced concession fees under the program because it does not maintain or collect the information because of Germany's trade secrets laws.[56]  Specifically, the GOG reports that TSPA stipulates that "all business and trade secrets must be protected and may not be acquired by unauthorized access or any other behavior that does not comply with the principle of good faith…."[57]  Further, the GOG reports that none of the exceptions permitted by the TSPA apply to this situation.[58]  Before the TPSA, the German Civil code contained the same principals.[59]  Accordingly, the GOG reports that network operators must protect the trade secrets of the final consumer and are prohibited from disclosing such information to the GOG.[60]

Because the GOG *does not* and *is not allowed to* maintain or collect such information, the record is devoid of information (*e.g.*, evidence that special contract customers were limited in number) evincing whether the program is *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act.  Further, because the GOG is not involved in administering the program, the GOG also could not provide evidence demonstrating whether it exercised discretion by favoring an enterprise or industry over others in the decision to grant the subsidy pursuant to section 771(5A)(D)(iii)(IV) of the Act.

Based on a review of the record, including the GOG's submissions, we find that necessary information is not available on the record, consistent with section 776(a)(1) of the Act. The gap in the record, however, did not result from the actions of an "interested party or any other person" as envisioned by section 776(a)(2) of the Act.  We determined in the investigation

---

[56] *See* GOG's SQR at 3-4, Exhibits Remand-02 and 03.
[57] *Id.* at 3 and Exhibit Remand-01.
[58] *Id.*
[59] *Id.* at 4, Exhibits Remand-02 and 03.
[60] *Id.*

that the GOG entrusted or directed NOs to provide a financial contribution to special contract customers in the form of revenue forgone by requiring NOs to exempt certain customers from paying the concession fee and exempting the NOs from paying a portion of the fee due to municipalities.[61]    Although we found that the GOG entrusted or directed NOs to provide a financial contribution, we did not find that the NOs themselves were government "authorities" within the meaning of section 771(5)(B) of the Act.[62]    In this proceeding, parties have not cited evidence that the GOG controls the NOs.[63]    The GOG also explained that it lacks the legal authority to acquire information on concession fees paid by companies because NOs are prohibited from disclosing such information to the GOG pursuant to the TSPA, and it provided a copy of this act.[64]    Section 776(a)(2)(A) of the Act does not apply here.    While information to conduct a *de facto* analysis is missing from the record, given the confidentiality law and the absence of evidence of control by the GOG over the NOs, we find no reasonable basis to conclude that the GOG withheld information that has been requested by Commerce.[65]    Section 776(a)(2)(B) of the Act does not apply, because there was no information available to the GOG

---

[61] *See Final Determination* IDM at Comment 8; *see also* sections 771(5)(B)(iii) and (D)(ii) of the Act.
[62] *See Final Determination* IDM at Comment 8.  ("Specifically, section 771(5)(B)(iii) of the Act provides that a subsidy is bestowed when an authority entrusts or directs a private entity to make a financial contribution, if providing the financial contribution would normally be vested in the government and the practice does not differ in substance from the practices normally followed by governments…. Through the requirement that concession fees not be charged to qualifying special contract customers, the {GOG} is entrusting and directing the NOs to forgo collecting or paying revenue which would otherwise be due to the municipal governments.").
[63] In analyzing whether an entity is a government "authority" within the meaning of section 771(5)(B) of the Act, Commerce has considered evidence that a government controls another entity.  *See, e.g.*, *Barium Chloride from India:  Final Affirmative Countervailing Duty Determination*, 88 FR 1044 (January 6, 2023), and accompanying IDM at Comment 1; *Certain Fabricated Structural Steel from Canada:  Final Negative Countervailing Duty Determination*, 85 FR 5387 (January 30, 2020), and accompanying IDM at Comment 13; and *Certain Oil Country Tubular Goods from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 79 FR 41964 (July 18, 2014), and accompanying IDM at 20-22 (finding, *e.g.*, that the government had to approve "decisions regarding the closure, limitation upon restriction, or capacity curtailing of any of the integrated steel production plants" of a company determined to be an authority pursuant to section 771(5)(B) of the Act).
[64] *See* GOG's SQR at 3 and Exhibit Remand-01.
[65] *See* section 776(a)(2)(A) of the Act.

that it failed to provide.[66]  Section 776(a)(2)(C) of the Act does not apply, because, as explained

above, the GOG stated that it *cannot* provide the information and that it is indeed legally

prohibited from collecting the needed data and information (statements for which the GOG

provided evidentiary support), and thus we have no basis to conclude from the record that the

GOG significantly impeded this proceeding.[67]  Finally, section 776(a)(2)(D) of the Act does not

apply, because, as stated above, the information missing from the record is not a result of the

submission of unverifiable information, but a result of the GOG being legally prohibited from

collecting the necessary information that would be required to conduct a *de facto* specificity

analysis.[68]  For these reasons, none of the provisions set forth in section 776(a)(2) of the Act

apply, and the gap on the record is not linked to the actions of "an interested party or any other

person."  Instead, based on an analysis of the record, Commerce determines that it is appropriate

to rely on facts otherwise available under section 776(a)(1) of the Act.

Section 776(b) of the Act states that "{i}f the administering authority... *finds that an*

*interested party has failed to cooperate* by not acting to the best of its ability to comply with a

request for information," Commerce may rely on an adverse inference in selecting from facts

otherwise available.[69]  Here, we have determined that the gap on the record did not result from

the actions of the GOG, and cannot be attributed to the actions of any interested party under

776(a)(2).  As explained above, the GOG is legally prohibited from gathering the necessary

information and that data is missing from the record.  Without an affirmative finding that

Commerce must rely on facts otherwise available based on the subsections presented in

776(a)(2), the application of an adverse inference in selecting from facts otherwise available is

---

[66] *See* section 776(a)(2)(B) of the Act.
[67] *See* section 776(a)(2)(C) of the Act.
[68] *See* section 776(a)(2)(D) of the Act.
[69] *See* section 776(b)(2) of the Act (emphasis added).

not appropriate. Thus, we have no basis to conclude that the GOG failed to cooperate by not acting to the best of its ability, which would warrant the application of adverse facts available (AFA) pursuant to section 776(b) of the Act.[70] Because the application of AFA is not appropriate here, we find no basis to determine that the program is *de facto* specific on the basis of AFA pursuant to section 776(b) of the Act, as requested by the petitioner.[71]

For the reasons detailed, above, on remand, and consistent with the *Third Remand Results*,[72] we continue to find, based on facts otherwise available in accordance with 776(a)(1) of the Act, that the KAV Program does not constitute a countervailable subsidy.

## III.  INTERESTED PARTY COMMENTS

*Petitioner's Comments*

The following is a verbatim summary of argument submitted by the petitioner. For further details, *see* Petitioner's Draft Remand Comments at 2-8.

> In its {Draft Remand Results}, Commerce found that the factual record did not allow it to determine whether the KAV program was *de facto* specific under any of the four prongs of section 771(5A)(D)(iii) of the Act.[73] Commerce noted that the {GOG} had not provided this information. However, it declined to apply any adverse inference, citing (1) the {TPSA} and (2) that the GOG does not control the German Network Operators (NOs). Commerce misunderstood the factual record and otherwise construed an incomplete factual record against an injured domestic industry without any additional investigation. Commerce should reconsider its {Draft Remand Results} and find the KAV program *de facto* specific.
>
> *First*, Commerce was incorrect in relying on the German TPSA to conclude that the GOG was prohibited from providing the information necessary to conduct an analysis under each of the statutory *de facto* prongs. In particular, the only information necessary to conduct an analysis under the first *de facto* specificity prong (*i.e.*{,} section 771(5A)(D)(iii)(I) of the Act) is aggregate information on the number and types of entities eligible for reduced concession fees. Such aggregate information is not a trade secret protected by TPSA. This is evident in the GOG's supplemental questionnaire response. Specifically, while the GOG indicated that the TPSA prevented it from collecting data on the concession fee amounts paid by

---

[70] *See* section 776(b) of the Act.
[71] *See* Petitioner's NFI Submission at 4.
[72] *See Third Remand Results* at 2 and 6.
[73] *See* Petitioner's Draft Remand Comments at 2 (citing Draft Remand Results at 9-10).

individual final customers, it never stated that TPSA prevented it from collecting aggregate data on the number and types of entities eligible for reduced fees.[74] Indeed, quite to the contrary, the GOG stated that NOs routinely provide similar aggregate data to the GOG as part of the GOG's monitoring efforts.[75]

*Second*, with regard to the data that could have been obtained from the NOs, the GOG did not evidence any attempt to collect the requested aggregate information on the "number and types of entities claiming reduced concession fees" from the NOs, the private entities that the GOG entrusts or directs to administer the KAV Program.[76] The GOG also did not cite to any legal provisions that would prohibit it from collecting or disclosing such aggregate data.[77]

Rather than comply with Commerce's request, the GOG simply refused. Contrary to Commerce's {Draft Remand Results}, the information necessary to conduct an analysis under section 771(5A)(D)(iii)(I) of the Act is missing because the GOG refused to act to the best of its ability to provide it, warranting the use of {AFA} under sections 776(a)(2)(A) and 776(a)(2)(B) of the Act. Commerce should not reward a failure to provide information. At a minimum, Commerce should have investigated further to reach a reasonable conclusion based on a further developed factual record.

## BGH Siegen's Comments

The following is a verbatim summary of argument submitted by BGH Siegen. For further details, *see* BGH Siegen's Draft Remand Comments at 2-8.

Based upon its further investigation and the factual information provided by the {GOG}, Commerce reasonably concluded that the elements of *de facto* specificity under section 771(5A)(D)(iii) of the Act are not met in this situation. The factual information provided by the {GOG} is substantial evidence for this determination and there is no need to conduct a further analysis of facts available under section 776(a) of the Act.

In any event, Commerce was correct to conclude that the {GOG} did not fail to cooperate by not acting to the best of its ability to comply with the request for information and that an adverse inference under section 776(b) of the Act is not warranted.

---

[74] *Id.* at 3 (*Compare* GOG SQR at 1-4 (GOG claiming that that the individual company-specific information requested in questions 1 and 2 are trade secrets covered by TPSA) *with id.* at 4-6 (GOG failing to make any claim that the aggregate data requested in question 3 is a trade secret covered by TPSA)).

[75] *Id.* (citing GOG SQR at 5 ("Thus, through this {monitoring} process *the NOs have provided the GOG with aggregated data* that show an average of the concession fee paid by consumers with a consumption of 24 gigawatt-hours (GWh)/year, which is defined as a consumption category with an annual usage period of 6,000 hours (annual peak load of 4,000 kW; medium voltage supply of 10 or 20 kV).") (emphasis supplied)).

[76] *Id.* (citing GOG SQR at 4-5 (response to question 3)).

[77] *Id.*

Commerce should however revise the electricity consumption figures referenced in the draft redetermination to reflect the year 2018.

**Commerce's Position:**

We disagree with the petitioner that Commerce misunderstood the factual record or did not conduct any additional investigation.   The petitioner contends that the GOG did not affirmatively assert that the TPSA prevents disclosure of the aggregate data requested by Commerce because such data is not a trade secret under the TPSA as demonstrated by the GOG's routine requirement that the NOs provide aggregate data on concession fees as part of the GOG's monitoring efforts.[78]  However, the petitioner misconstrues the GOG's explanation. Commerce's determination that the GOG was not permitted to disclose information, that the application of AFA was not appropriate, and that the KAV Program is not countervailable, is supported by substantial evidence and in accordance with law.

As the GOG previously explained, the KAV program is administered by the NOs. Because no governmental authority is involved in administering the process towards the final consumer based on Section 2(4) of the KAV, the GOG reports that while it collects data regarding concession fees for its monitoring report, it does not have, and cannot collect, data on the concession fees paid by specific companies and, thus, it cannot share such data with other entities.[79]  The GOG further explains that, pursuant to the TPSA, all business and trade secrets must be protected and may not be acquired by unauthorized access or any other behavior that does not comply with the principle of good faith, and that a person may not obtain, use, or disclose a trade secret who has obtained the trade secret through another person.[80]  The TPSA

---

[78] *Id*. at 6-7.
[79] *See* GOG's SQR at 2 (citing GOG's Letter, "First Supplemental Questionnaire:  Response to Certain Questions," dated June 5, 2020, at Exhibit KAV-02 at KAV-3) and 3.
[80] *Id.* at 3 and Exhibit Remand-01.

states that a trade secret is information "which is neither generally known nor readily accessible, as a whole, nor in the precise arrangement and composition of its components, to the persons in the circles who normally deal with this type of information and is therefore of economic value."[81]  While the petitioner argues that the GOG did not claim that the TPSA prevents disclosure of aggregate data requested by Commerce,[82] the GOG explained that business and trade secrets are information that are not generally known or easily accessible to the public, thus such information between the individual NOs and their customers are trade secrets protected by the TPSA.[83]

The petitioner contends that the GOG cannot claim that it is unable to collect the number and types of entities claiming a reduced concession fee because the GOG routinely requires the NOs to provide aggregate data as part of the GOG's monitoring efforts.[84]  However, the GOG explains that provisions of the EnWG[85] and the GWB[86] require the Federal Network Agency and the Federal Cartel Office to collect certain data to create and prepare a report on the electricity and gas markets and that all companies have a legal obligation to take part in this market monitoring.[87]  Through this specific mandate, the GOG is permitted to use the data collected from over 850 NOs[88] to fulfill its requirements to publish the monitoring report.  Thus, data used by these monitoring agencies is controlled by German law and the TPSA clarifies that such data cannot be passed on to other users which have no legal need for access to the data.[89]  Therefore, even if the GOG collected such data for purposes of the monitor report, the TPSA does not

---

[81] *Id.* at Exhibit Remand-01.
[82] *See* Petitioner's Draft Remand Comments at 6-7.
[83] *See* GOG's SQR at 2.
[84] *See* Petitioner's Draft Remand Comments at 6-7.
[85] Energy Industry Act or Energiewirtschaftgesetz (EnWG).
[86] Act Against Unfair Competition or Gesetz gegen den unlauteren Wettbewerb (GWB).
[87] *See* GOG's SQR at 5.
[88] *Id.* at 6.
[89] *Id.* at Exhibit Remand-01.

permit the GOG to share such data beyond the purposes for which it was collected and the GOG is indeed *prohibited* from doing so.

The petitioner contends that the GOG can compel NOs, which are not "authorities," to provide Commerce's requested *de facto* information because the GOG already exercises its influence and authority by "entrust{ing} or direct{ing} a private entity to make a financial contribution."[90]  However, the petitioner fails to explain how the provisions of the KAV would compel NOs to disregard what they consider are trade secrets and, despite the provisions of the TPSA, provide such information to the GOG to be further distributed to third parties. Commerce interprets the "entrusts or directs" language to mean that, if a government affirmatively causes or gives responsibility to a private entity or group of private entities to carry out what might otherwise be a governmental subsidy function of the type listed in subparagraphs (i) to (iv) of section 771(5)(D), there would be a financial contribution.[91]  Thus, when the government executes a particular policy by operating through a private body or when a government affirmatively causes a private body to act, such that one or more of the type of functions referred to in subparagraphs (i) to (iv) is carried out, there is entrustment or direction by the government.[92]  Here, the particular policy is a reduction in a special contract customer's concession fee under Section 2(4) of the KAV if the average price per kilowatt hour in the calendar year were lower than the average revenue per kilowatt-hour from the supply of electricity to all special contract customers.[93]  Therefore, the "entrust or directs" language of the statute concerns government actions, pursuant to certain policies and directives to provide a

---

[90] *See* Petitioner's Draft Remand Comments at 8 (citing section 771(5)(B)(iii) of the Act).
[91] *See Final Affirmative Countervailing Duty Determination:  Dynamic Random Access Memory Semiconductors from the Republic of Korea,* 68 FR 37122 (June 23, 2003), and accompanying IDM at Comment 1.
[92] *Id.*
[93] *See Final Determination* IDM at Comment 8 and GOG's SQR at 1 and 2.

financial contribution through private entities.  Contrary to the petitioner's assertions, absent record evidence, the fact that a government was found to have entrusted or directed certain entities to provide a financial contribution is not *also* a basis to conclude that the same government has the means to entrust or direct those entities to act beyond the specific policy or directives governing the provision of a financial contribution and in a manner that would otherwise violate specific laws regarding the prohibition on the disclosure of information.

Additionally, the petitioner argues that Commerce should apply AFA to the GOG and find that the KAV program is *de facto* specific because the GOG refused to attempt to collect the requested information and that the GOG's intransience reflects the GOG's unwillingness to cooperate to the best of its ability.[94]  As explained above, Commerce determined that the gap on the record did not result from the actions of the GOG, and cannot be attributed to the actions of *any* interested party under 776(a)(2) of the Act.  Indeed, as detailed above,[95] the GOG is legally prohibited from gathering the necessary information and that data is missing from the record.  Absent an affirmative finding that Commerce must rely on facts otherwise available based on the subsections presented in 776(a)(2), the application of an adverse inference in selecting from those facts is not appropriate.  Consequently, we have *no basis* to conclude that the GOG failed to cooperate by not acting to the best of its ability, which would warrant the application of AFA pursuant to section 776(b) of the Act.[96]

Finally, we agree with BGH Siegen that we inadvertently referenced data from the incorrect year (1991).  For the final results of redetermination, we have corrected this date and used information from 2018 (POR) which indicates that special contract customers in Germany

---

[94] *See* Petitioner's Draft Remand Comments at 9.
[95] *See supra* at pages 10-12.
[96] *See* section 776(b) of the Act.

consumed 294,737 gWh of electricity in 2018, compared to total consumption of 445,188 gWh by all final consumers.[97]

## IV.     FINAL RESULTS OF REDETERMINATION

Consistent with the CIT's *Fourth Remand Order*, and in consideration of the record evidence, we have further explained our determination that the KAV Program does not constitute a countervailable subsidy.  For these final results of redetermination on remand, we made no changes to the final subsidy rates calculated in the *Third Remand Results*.[98]

9/16/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[97] *See* GOG's SQR at Exhibit Remand-5.
[98] *See Third Remand Results* at 9-10.